# EXHIBIT A



23490300

1   Jennie Lee Anderson (SBN 203586)
    **ANDRUS ANDERSON LLP**
2   155 Montgomery Street, Suite 900
    San Francisco, California  94104
3   Telephone:  415-986-1400
    Facsimile: 415-986-1474
4   jennie@andrusanderson.com

5   Adam J. Levitt (*pro hac vice forthcoming*)
6   **DICELLO LEVITT GUTZLER LLC**
    Ten North Dearborn Street, Sixth Floor
7   Chicago, Illinois 60602
    Telephone:  312-214-7900
8   Facsimile: 312-253-1443
9   alevitt@dicellolevitt.com

10  Timothy W. Burns (*pro hac vice forthcoming*)
    **BURNS BOWEN BAIR LLP**
11  One S. Pinckney Street, Suite 930
    Madison, Wisconsin 53703
12  Telephone: 608-286-2302
13  Facsimile: 608- 286-2037
    tburns@bbblawllp.com

Mark Lanier (*pro hac vice forthcoming*)
**THE LANIER LAW FIRM PC**
10940 W. Sam Houston Parkway N., Suite 100
Houston, Texas 77064
Telephone:  713-659-5200
Facsimile: 713-659-2204
WML@lanierlawfirm.com

Douglas Daniels (*pro hac vice forthcoming*)
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas 77057
Telephone: 713-917-0024
Facsimile: 713-917-0026
douglas.daniels@dtlawyers.com

FILED
ALAMEDA COUNTY
NOV 12 2020
CLERK OF THE SUPERIOR COURT
By _____
Deputy

17  *Attorneys for Plaintiffs and the Class*
    (Additional counsel listed on signature page)

18

19              SUPERIOR COURT FOR THE STATE OF CALIFORNIA
                    FOR THE COUNTY OF ALAMEDA

20  | **MENOMINEE INDIAN TRIBE OF** | ) | Case No.: RG20080933 |
21  | **WISCONSIN, MENOMINEE INDIAN** | ) | |
    | **GAMING AUTHORITY d/b/a** | ) | |
22  | **MENOMINEE CASINO RESORT,** and | ) | **CLASS ACTION** |
    | **WOLF RIVER DEVELOPMENT** | ) | **COMPLAINT FOR:** |
23  | **COMPANY**, individually and on behalf of | ) | |
    | all others similarly situated, | ) | (1) BREACH OF CONTRACT; and |
24  | | ) | (2) DECLARATORY JUDGMENT |
25  | Plaintiffs, | ) | |
    | | ) | |
26  | vs. | ) | **DEMAND FOR JURY TRIAL** |
    | | ) | |
27  | (1) **LEXINGTON INSURANCE** | ) | |
    | **COMPANY;** | ) | |
28  | | | |

---

CLASS ACTION COMPLAINT

(2) UNDERWRITERS AT LLOYD'S –
SYNDICATES: ASC 1414, XLC 2003,
TAL 1183, MSP 318, ATL1861, KLN
510, AGR 3268;
(3) UNDERWRITERS AT LLOYD'S -
SYNDICATE: CNP 4444;
(4) UNDERWRITERS AT LLOYD'S -
ASPEN SPECIALTY INSURANCE
COMPANY;
(5) UNDERWRITERS AT LLOYD'S -
SYNDICATES: KLN 0510, ATL 1861,
ASC 1414, QBE 1886, MSP 0318, APL
1969, CHN 2015, XLC 2003;
(6) UNDERWRITERS AT LLOYD'S –
SYNDICATE: BRT 2987;
UNDERWRITERS AT LLOYD'S -
(7) SYNDICATES: KLN 0510, TMK 1880,
BRT 2987, BRT 2988, CNP 4444, ATL
1861, NEON WORLDWIDE
PROPERTY CONSORTIUM, AUW
0609, TAL 1183, AUL 1274;
(8) HOMELAND INSURANCE
COMPANY OF NEW YORK;
(9) HALLMARK SPECIALTY
INSURANCE COMPANY;
ENDURANCE WORLDWIDE
(10) INSURANCE LTD T/AS SOMPO
INTERNATIONAL;
(11) ARCH SPECIALTY INSURANCE
COMPANY;
(12) EVANSTON INSURANCE
COMPANY;
(13) ALLIED WORLD NATIONAL
ASSURANCE COMPANY;
(14) LIBERTY MUTUAL FIRE
INSURANCE COMPANY;
(15) LANDMARK AMERICAN
INSURANCE COMPANY; and
(16) SRU DOE INSURERS 1-20;

     Defendants.

CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT

Plaintiffs Menominee Indian Tribe of Wisconsin ("Menominee Tribe"), Menominee Indian Gaming Authority d/b/a Menominee Casino Resort ("Menominee Casino" or MCR") and Wolf River Development Company ("Wolf River")) ("Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide class of insureds under the Tribal First Tribal Property Insurance Program (collectively, the "Class"), bring this limited-fund class action against Defendants Lexington Insurance Company, *et al.*[1] (collectively, "Defendants" or the "Insurers") and in support thereof state the following:

### I.    NATURE OF THE ACTION

1.    Plaintiff Menominee Tribe is a federally recognized Indian Tribal Entity located in Keshena, Wisconsin, composed of more than 9,000 enrolled members.  The reservation consists of approximately 235,000 acres of land held in trust by the United States government for the benefit of the Tribe, along with other land held in fee by both Tribal members and non-Indians. Within certain restrictions imposed by the United States government, the Tribe has jurisdiction over activities occurring on the reservation and has rights to economic and other benefits resulting from use of the reservation property and resources.

2.    The mission of the Menominee Tribe is to promote, protect, and preserve the rights, resources, and culture of the Tribe through responsible leadership and the judicious exercise of its sovereign powers.  The Menominee Tribe value their children, elders, and each other, and value preserving their language, tradition, history, and culture.

---

[1] Defendants are: (1) Lexington Insurance Company; (2) Underwriters at Lloyd's – Syndicates: ASC1414, XLC 2003, TAL 1183, MSP 318, ATL1861, KLN 510, AGR 3268; (3) Underwriters at Lloyd's - Syndicate: CNP 4444; (4) Underwriters at Lloyd's - Aspen Specialty Insurance Company; (5) Underwriters at Lloyd's - Syndicates: KLN 0510, ATL 1861, ASC 1414, QBE 1886, MSP 0318, APL 1969, CHN 2015, XLC 2003; (6) Underwriters at Lloyd's – Syndicate: BRT 2987; (7) Underwriters at Lloyd's - Syndicates: KLN 0510, TMK 1880, BRT 2987, BRT 2988, CNP 4444, ATL 1861, Neon Worldwide Property Consortium, AUW 0609, TAL 1183, AUL 1274; (8) Homeland Insurance Company of New York; (9) Hallmark Specialty Insurance Company; (10) Endurance Worldwide Insurance Ltd t/as Sompo International; (11) Arch Specialty Insurance Company; (12) Evanston Insurance Company; (13) Allied World National Assurance Company; (14) Liberty Mutual Fire Insurance Company; (15) Landmark American Insurance Company; and (16) SRU Doe Insurers 1-20.

3.     Under the Indian Gaming Act of 1988, federally recognized tribes are permitted to conduct Class III casino gaming operations on tribal land, subject to negotiation of a gaming compact with the affected state.  These gaming operations provide invaluable revenue for the maintenance and operation of tribal institutions and activities. The Menominee Tribe and the State of Wisconsin entered into the Gaming Compact of 1992 and later amended that compact on April 25, 2003, and on subsequent occasions.  The Gaming Compact has been approved by the United States Department of the Interior and has permitted the Menominee Tribe to operate Class III gaming operations on tribal land for more than thirty years.

4.     According to the Bureau of Indian Affairs, the Menominee Tribe is one of 574 federally recognized Indian Tribal Entities in the United States.[2]  The National Indian Gaming Commission found that Indian gaming revenue totaled $33.7 billion in fiscal year 2018, generated from 501 gaming operations run by 241 federally recognized tribes across 29 states.[3]  Like many other recognized tribes, the Menominee Tribe relies upon revenue from its gaming operations and other commercial enterprises in order to fulfill its mission and to provide services to members of the tribe.

5.     Plaintiffs own, operate, and receive both business revenue and tax revenue from the Menominee Casino Resort in Keshena, Wisconsin.  MCR includes: a casino with table games, slots and bingo; restaurant; café; lounge; live entertainment space; gift shop; RV park; hotel with fitness center and indoor pool; and a convention and event center with banquet operations.  In addition, the Five Clans Ballroom can host weddings for up to 500 guests.  MCR has been welcoming guests for 33 years and is a popular destination for tourists and gaming enthusiasts throughout Wisconsin.  Those properties, however, have suffered direct physical loss or damage from COVID-19 (a.k.a. the "coronavirus" or "SARS-CoV-2").

---

[2] https://www.govinfo.gov/content/pkg/FR-2020-01-30/pdf/2020-01707.pdf

[3] https://www.nigc.gov/news/detail/2018-indian-gaming-revenues-of-33.7-billion-show-a-4.1-increase

2

CLASS ACTION COMPLAINT

6.     Plaintiffs also own, operate, and receive both business revenue and tax revenue from the Thunderbird Complex, located nine miles north of MCR.  Thunderbird is a modern facility including a mini casino with slot machines, the Thunderbird restaurant, and a full bar, as well as a venue for seasonal outdoor entertainment. The Thunderbird's properties also have suffered direct physical loss or damage from COVID-19.

7.     The Menominee Tribe also owns, operates, and receives business revenues from the Menominee Tribal Clinic (the "Clinic"), which provides healthcare to the Menominee community.  The skilled and dedicated professionals at the Clinic provide a broad range of healthcare services, including medical, dental, behavior health, optometry, pharmacy and laboratory services, as well as physical therapy, fitness, diabetes prevention and wellness programs.  Due to COVID-19, the Clinic also has suffered direct physical loss or damage and, as a result, the Clinic's ability to provide services has been severely hampered, causing a significant drop in business and tax revenue.

8.     Menominee Tribe also owns, operates, and receives business and tax revenues from other businesses located within the Menominee Indian Reservation, many operated by Wolf River.  These businesses have also have suffered direct physical loss or damage due to COVID-19, causing a loss in business and tax revenue for Plaintiffs.

9.     For the policy period July 1, 2010, to July 1, 2020, Plaintiffs and the Class purchased insurance coverage in a Tribal Property Insurance Program ("TPIP," "Master Policy," or "Policy") prepared by Tribal First, which has its principal place of business in San Diego, California. Tribal First is a specialized program of Alliant Underwriting Services, Inc, a California corporation with its principal place of business in Newport Beach, California.

10.     The TPIP is comprised of insurance policies from more than a dozen insurance carriers, led by Defendant Lexington Insurance Company.  The TPIP Policy is comprised of various layers of coverage such that a particular insurer is responsible for losses that fall between specified amounts.  At least some of these layers of coverage have aggregate limits of coverage that may be exhausted by losses of any one or more of the Class members, such that if a loss of

1    one Class member is paid, it reduces the insurance available in that layer to pay losses for other

2    Class members. This situation creates a limited fund for which adjudication of one Class member's

3    rights may, as a practical matter, be dispositive of the interests of other Class members or would

4    substantially impair or impede their ability to protect their interests.

5         11.    Tribal First made this insurance program available to tribes and tribal entities

6    throughout the United States. Tribal First maintains a list of insureds under the program, including

7    Plaintiff, who are subject to the same overall aggregate policy limits for one or more particular

8    layers of coverage. "Notice of Loss" must be made in writing to Tribal First. The Master Policy

9    that Tribal First brokered and that Defendants sold to Plaintiffs is memorialized in the Tribal First

10   "Property Solutions" book, pages 1-113, which are attached hereto as Exhibit 1.

11        12.    Among other provisions, the Master Policy provides coverage for "loss resulting

12   directly from interruption of business, services, or rental value caused by direct physical loss or

13   damage, as covered by this Policy to real and/or personal property insured by this Policy, occurring

14   during the term of this Policy."

15        13.    Due to COVID-19, Plaintiffs have suffered "direct physical loss or damage" to

16   MCR, Thunderbird, the Clinic, and other businesses. COVID-19 made MCR, Thunderbird and

17   the Clinic unusable in the way that they had been used before COVID-19. Instead of being able to

18   fill MCR and Thunderbird with guests, gamblers, meeting attendees, and diners, MCR and

19   Thunderbird were required to drastically reduce operations, and even to close entirely. To do

20   anything else would have led to the emergence or reemergence of COVID-19 at MCR and

21   Thunderbird. Until COVID-19 was brought even slightly under control, even such limited use as

22   this was not possible.

23        14.    COVID-19 also limited access, reduced usable space, and required the installation

24   of physical barriers and increased cleaning and sanitizing at MCR, Thunderbird, and the Clinic.

25        15.    This loss is "direct" — Plaintiffs suffered loss of business income occasioned

26   directly by the presence of COVID-19 and the resulting inability or lessened ability to use MCR,

27   Thunderbird and the Clinic.

28

16.     This loss is physical. MCR, Thunderbird, and the Clinic are unable to use their interior spaces in the manner in which they had previously used those spaces. The probability of illness prevents the use of the space in the same way that a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable.[4]

17.     This loss constitutes a loss under the Policy. Plaintiffs experienced loss of functionality and diminishment of the usable physical space in the hotel, casino, dining and other areas in MCR, Thunderbird, and the Clinic, causing impairment of the business function and damage to MCR, Thunderbird and the Clinic.

18.     The loss or damage is capable of repair, and repairs have been made such as those listed in paragraph 14.

19.     Plaintiffs purchased "all risk" property coverage to protect themselves in the event that their hotel, casino, restaurant, healthcare or other businesses suddenly had to suspend operations for reasons outside of their control, or if they had to act in order to prevent further property damage.  Plaintiffs obtained this coverage through the Policy, which includes coverage described below for Property Damage, including insurance for Protection and Preservation of Property, as well as several so-called "Time-Element" coverages applying to disruption of business, including Business Interruption, Extra Expense, Ingress/Egress, Interruption by Civil Authority ("Civil Authority"), Contingent Time Element and Tax Revenue Interruption coverages.

20.     MCR, Thunderbird and the Clinic suffered a physical loss of property due to COVID-19 and the Closure Orders (defined below), were forced to suspend business activities due to COVID-19 and the Closure Orders, and incurred losses covered by Protection and Preservation

---

[4] Note, however, that Plaintiffs are not seeking recovery for their loss of use. Plaintiffs are seeking coverage for their loss of business income, rental value and tax revenue. As an example to illustrate the difference, some law firms have been unable to use their office space because of COVID-19, but the firms' business income has nevertheless increased, and they thus have faced no loss of business income. A claim by such a law firm for not being able to use its office space would be a "loss of use" claim. The law firm would have no loss of business income claim. Here, Plaintiffs' business has decreased because of the impairment of the hotel, casinos, restaurants and other facilities at MCR and Thunderbird, and Plaintiffs are seeking the loss of business income, rental value and tax revenue under the business interruption and other Time Element coverages of the Policy.

CLASS ACTION COMPLAINT

1    of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent

2    Time Element and Tax Revenue Interruption provisions due to COVID-19 and the Closure Orders.

3        21.     Upon information and belief, Lexington and the other Insurers have, on a uniform

4    basis, refused to pay claims for losses and costs due to COVID-19 and the resultant Closure Orders

5    covered by the insurance provisions identified in this Class Action Complaint to all Class members

6    under the Policy. Indeed, Lexington, through its affiliate at AIG Claims, Inc, has repudiated

7    coverage for Plaintiffs' claim under the Policy.

8                 **II.      JURISDICTION AND VENUE**

9        22.     This Court has subject matter jurisdiction over the matters alleged herein.

10        23.     This Court has personal jurisdiction over each of the defendants named in this

11    action. Each of the defendant insurance companies regularly issued policies in California, and did,

12    in fact issue policies in California to Plaintiffs and the Class as part of the TPIP developed and

13    coordinated by Tribal First. Tribal First organized the TPIP from its office in California, and

14    communications concerning the establishment and purchase of the TTPIP program from Class

15    members around the country, including Plaintiffs, were received in California. Premium payments

16    under the TPIP program were and continue to be mailed to Tribal First in California.

17        24.     Although the TPIP program is centered in California, none of the individual

18    defendants has its principal place of business in California. Instead, through the TPIP, each of the

19    Defendants has agreed to accept service of process for any suit based upon the Policy in San

20    Francisco, California, at the offices of Foley & Lardner.

21        25.     Venue is also proper in this Court pursuant to California Code of Civil Procedure

22    section 395(a) ("If none of the defendants reside in the state …, the action may be tried in the

23    superior court in any county that the plaintiff may designate in his or her complaint …").

24    ///

25    ///

26    ///

27                 **III.      THE PARTIES**

28

CLASS ACTION COMPLAINT

*Plaintiffs*

26.     Menominee Indian Tribe of Wisconsin is a federally recognized Indian Tribe located in Keshena, Wisconsin.

27.     The Menominee Indian Gaming Authority d/b/a Menominee Casino Resort holds a business Charter from the Tribal Government of the Menominee Tribe and was formed for the purpose of conducting the gaming and gaming related operations of the Menominee Tribe on the reservation.

28.     Wolf River holds a Charter from the Tribal Government of the Menominee Tribe as a tribal business and was formed for the purpose of conducting the nongaming commercial activity of the Menominee Tribe on the reservation.

*Defendants*

29.     Lexington Insurance Company ("Lexington") is an insurance company organized under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts.  Lexington is a wholly owned subsidiary of American International Group, Inc. ("AIG").  At all times material hereto, Lexington conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Lexington issued Policy Nos. 017471589/06, 38412453, 38412468 and 011660435/07 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

30.     Underwriters at Lloyd's – Syndicates ASC1414, XLC 2003, TAL 1183, MSP 318, ATL1861, KLN 510, and AGR 3268 are underwriters composed of separate syndicates, in turn comprised of entities known as "Names," which underwrite insurance in a market known as Lloyd's of London.  The "Names" and syndicates are organized under the laws of the United Kingdom and are located in and have their principal place of business in England.  At all times material hereto, these underwriters conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program

CLASS ACTION COMPLAINT

1 sold to Plaintiffs, the underwriters identified in this paragraph issued Policy No. PJ193647 to

2 Plaintiffs, effective July 1, 2019, to July 1, 2020.

3      31.    Underwriters at Lloyd's - Syndicate: CNP 4444 is an underwriting syndicate

4 comprised of "Names," which underwrites insurance in the Lloyd's of London market. The

5 "Names" and syndicate are organized under the laws of the United Kingdom and are located in

6 and have their principal place of business in England. At all times material hereto, these

7 underwriters conducted and transacted business through the selling and issuing of insurance

8 policies within California, including, but not limited to, selling and issuing property coverage to

9 Plaintiffs. As a component of the Tribal First Property Insurance Program sold to Plaintiffs, the

10 underwriters identified in this paragraph issued Policy No. PJ1900131 to Plaintiffs, effective July

11 1, 2019, to July 1, 2020.

12      32.    Underwriters at Lloyd's - Aspen Specialty Insurance Company ("Aspen") is an

13 underwriting syndicate formed by Aspen Specialty Insurance Company, which underwrites

14 insurance in the Lloyd's of London market. The syndicate is organized under the laws of the

15 United Kingdom and is located in and has its principal place of business in England. At all times

16 material hereto, Aspen conducted and transacted business through the selling and issuing of

17 insurance policies within California, including, but not limited to, selling and issuing property

18 coverage to Plaintiffs. As a component of the Tribal First Property Insurance Program sold to

19 Plaintiffs, Aspen issued Policy No. PX006CP19 to Plaintiffs, effective July 1, 2019, to July 1,

20 2020.

21      33.    Underwriters at Lloyd's - Syndicates: KLN 0510, ATL 1861, ASC 1414, QBE

22 1886, MSP 0318, APL 1969, CHN 2015, and XLC 2003 are underwriting syndicates comprised

23 of "Names," which underwrite insurance in the Lloyd's of London market. The "Names" and

24 syndicates are organized under the laws of the United Kingdom and are located in and have their

25 principal place of business in England. At all times material hereto, these underwriters conducted

26 and transacted business through the selling and issuing of insurance policies within California,

27 including, but not limited to, selling and issuing property coverage to Plaintiffs. As a component

28

CLASS ACTION COMPLAINT

1   of the Tribal First Property Insurance Program sold to Plaintiffs, the underwriters identified in this

2   paragraph issued Policy No. PJ1933021 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

3       34.    Underwriters at Lloyd's – Syndicate: BRT 2987 is an underwriting syndicate

4   comprised of "Names," which underwrites insurance in the Lloyd's of London market.  The

5   "Names" and syndicate are organized under the laws of the United Kingdom and are located in

6   and have their principal place of business in England.  At all times material hereto, these

7   underwriters conducted and transacted business through the selling and issuing of insurance

8   policies within California, including, but not limited to, selling and issuing property coverage to

9   Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, the

10  underwriters identified in this paragraph issued Policy No. PD-10363-05 to Plaintiffs, effective

11  July 1, 2019, to July 1, 2020.

12      35.    Underwriters at Lloyd's - Syndicates: KLN 0510, TMK 1880, BRT 2987, BRT

13  2988, CNP 4444, ATL 1861, Neon Worldwide Property Consortium, AUW 0609, TAL 1183,

14  AUL 1274 are underwriting syndicates comprised of "Names," which underwrite insurance in the

15  Lloyd's of London market.  The "Names" and syndicates are organized under the laws of the

16  United Kingdom and are located in and have their principal place of business in England.  At all

17  times material hereto, these underwriters conducted and transacted business through the selling

18  and issuing of insurance policies within California, including, but not limited to, selling and issuing

19  property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program

20  sold to Plaintiffs, the underwriters identified in this paragraph issued Policy No. PJ1900067 to

21  Plaintiffs, effective July 1, 2019, to July 1, 2020.

22      36.    Homeland Insurance Company of New York ("Homeland") is an insurance

23  company organized under the laws of the State of New York, with its principal place of business

24  in Plymouth, Minnesota.  Homeland is an underwriting company of OneBeacon Insurance Group,

25  Ltd., which is a subsidiary of Intact Financial Corporation.  At all times material hereto, Homeland

26  conducted and transacted business through the selling and issuing of insurance policies within

27  California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a

28

9

CLASS ACTION COMPLAINT

1  component of the Tribal First Property Insurance Program sold to Plaintiffs, Homeland issued

2  Policy No. 798000237 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

3       37.     Hallmark Specialty Insurance Company ("Hallmark") is an insurance company

4  organized under the laws of the State of Oklahoma, with its principal place of business in Dallas,

5  Texas.  At all times material hereto, Hallmark conducted and transacted business through the

6  selling and issuing of insurance policies within California, including, but not limited to, selling

7  and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance

8  Program sold to Plaintiffs, Hallmark issued Policy Nos. 73PRX19A1B7 and 73PRX19A1EF to

9  Plaintiffs, effective July 1, 2019, to July 1, 2020.

10      38.     Endurance Worldwide Insurance Ltd t/as Sompo International ("Endurance") is an

11  insurance company incorporated in England, with its principal place of business in London,

12  England.  At all times material hereto, Endurance conducted and transacted business through the

13  selling and issuing of insurance policies within California, including, but not limited to, selling

14  and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance

15  Program sold to Plaintiffs, Endurance issued Policy No. PJ1900134 to Plaintiffs, effective July 1,

16  2019, to July 1, 2020.

17      39.     Arch Specialty Insurance Company ("Arch") is an insurance company organized

18  under the laws of the State of Missouri, with its principal place of business in Jersey City, New

19  Jersey.  At all times material hereto, Arch conducted and transacted business through the selling

20  and issuing of insurance policies within California, including, but not limited to, selling and issuing

21  property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program

22  sold to Plaintiffs, Arch issued Policy No. ESP7303914-02 to Plaintiffs, effective July 1, 2019, to

23  July 1, 2020.

24      40.     Evanston Insurance Company ("Evanston") is an insurance company organized

25  under the laws of the State of Illinois, with its principal place of business in Rosemont, Illinois.

26  At all times material hereto, Evanston conducted and transacted business through the selling and

27  issuing of insurance policies within California, including, but not limited to, selling and issuing

28

1  property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program

2  sold to Plaintiffs, Evanston issued Policy No. MKLV14XP012536 to Plaintiffs, effective July 1,

3  2019, to July 1, 2020.

4      41.    Allied World National Assurance Company ("Allied") is an insurance company

5  organized under the laws of the State of New Hampshire, with its principal place of business in

6  New York, New York.  At all times material hereto, Allied conducted and transacted business

7  through the selling and issuing of insurance policies within California, including, but not limited

8  to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property

9  Insurance Program sold to Plaintiffs, Allied issued Policy No. 0310-8171-1N to Plaintiffs,

10  effective July 1, 2019, to July 1, 2020.

11      42.    Liberty Mutual Fire Insurance Company ("Liberty Mutual" or "LMFIC") is an

12  insurance company organized under the laws of the state of Massachusetts, with its principal place

13  of business in Boston, Massachusetts.  At all times material hereto, Liberty Mutual conducted and

14  transacted business through the selling and issuing of insurance policies within California,

15  including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component

16  of the Tribal First Property Insurance Program sold to Plaintiffs, Liberty Mutual issued a Policy to

17  Plaintiffs, effective July 1, 2019, to July 1, 2020.

18      43.    Landmark American Insurance Company ("Landmark") is an insurance company

19  organized under the laws of the State of New Hampshire, with its principal place of business in

20  Atlanta, Georgia.  At all times material hereto, Landmark conducted and transacted business

21  through the selling and issuing of insurance policies within California, including, but not limited

22  to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property

23  Insurance Program sold to Plaintiffs, Landmark issued Policy No. LHQ424636 to Plaintiffs,

24  effective July 1, 2019, to July 1, 2020.

25      44.    SRU Doe Insurers 1-20 are insurance companies who insure through Specialty Risk

26  Underwriters ("SRU").  At all times material hereto, SRU conducted and transacted business

27  through the selling and issuing of insurance policies within California, including, but not limited

28

1  to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property

2  Insurance Program sold to Plaintiffs, SRU issued Policy No. AQS-190984 to Plaintiffs, effective

3  July 1, 2019, to July 1, 2020.

4  ### IV.  FACTUAL BACKGROUND

5  *A.*    *The Master Policy*

6          45.     In return for the payment of a substantial premium, the Insurers issued to Plaintiffs

7  and other members of the Class the Master Policy contained in TPIP USA Form No. 15, including

8  each of the policies identified therein and described in Paragraphs 29 to 43of this Class Action

9  Complaint.  Plaintiffs have performed all of their obligations under the Master Policy, including

10  the payment of premiums, and on information and belief other Class Members have as well.  With

11  respect to Plaintiffs, covered property includes Menominee Tribal property, such as the casino,

12  hotel, restaurant, healthcare and other property at MCR, Thunderbird and the Clinic.

13          46.     The Policy "insures Real and Personal Property within the United States of

14  America" and covers damage to "all property of every description both real and personal."

15          47.     Coverage under the Policy extends to "Miscellaneous Unnamed Locations,"

16  including "property at locations (including buildings, or structures, owned, occupied or which the

17  Named Insured is obligated to maintain insurance)" within the United States.

18          48.     Under the Policy, Named Insureds are shown on the Declarations Page provided to

19  each Named Insured, and a schedule of all Named Insureds is maintained by Tribal First.

20  Menominee Indian Tribe of Wisconsin and Menominee Indian Economic Development Authority

21  are Named Insureds shown on the Declarations Page of the copy issued to them.

22          49.     Named Insureds or Insureds also include agencies, organizations, enterprises or

23  individuals "for whom the Named Insured is required or has agreed to provide coverage, or as so

24  named in the 'Named Insured Schedule' on file with Tribal First, … and which are owned,

25  financially controlled or actively managed by the herein named interest." Policy § 1.B.  MCR and

26  the Clinic are each an agency, organization or enterprise for whom Menominee Indian Tribe of

27

28

CLASS ACTION COMPLAINT

1  Wisconsin is required or has agreed to provide coverage, and are owned, financially controlled or

2  actively managed by Menominee Tribe.

3       50.    Insureds also include lessors and other parties of interest "in all property of every

4  description ... for their respective rights and interests," and mortgages "to whom certificates of

5  coverage have been issued."

6       51.    Under the Policy, "occurrence" is defined as "a loss, incident or series of losses or

7  incidents not otherwise excluded by [the] Policy and arising out of a single event or originating

8  cause and includes all resultant or concomitant insured losses."

9       52.    In many parts of the world, property insurance is sold on a specific peril basis. Such

10 policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake,

11 H1N1, etc.). Most property policies sold in the United States, however, including those sold by

12 Defendant, are all-risk property damage policies. These types of policies cover all risks of loss

13 except for risks that are expressly and specifically excluded.

14      53.    Under the heading, "Perils Covered," the Insurers promised that: "Subject to the

15 terms, conditions and exclusions stated elsewhere herein, this Policy provides insurance against

16 all risk of direct physical loss or damage occurring during the period of this Policy." Subject to

17 these terms and conditions, none of which relieve the Insurers of their obligations for the claims

18 made herein, the covered cause of loss under the Policy is therefore "all risk of direct physical loss

19 or damage."

20      54.    Unlike many policies that provide business interruption and related coverages, the

21 Policy sold by the Insurers does not include, and is not subject to, any exclusion for losses caused

22 by viruses or communicable diseases.

23      55.    The Insurers did not exclude or limit coverage for losses from the spread of virus

24 in the Protection and Preservation of Property, Business Interruption, Extra Expense,

25 Ingress/Egress, Civil Authority, Contingent Time Element, or Tax Revenue Interruption coverages

26 of the Policy, or any other coverages of the Policy.

27

28

56.     The policy expressly excludes "fungus, mold(s), mildew or yeast," as well as "spores or toxins" created or produced by such "fungus, mold(s), mildew or yeast," but the exclusion does not cover viruses, which are in a completely different biological category. Furthermore, the exclusion highlights that the Insurers can list excluded pathogens if they wish to exclude them.

57.     The policy also contains an exclusion for seepage, pollution, or contamination, but this exclusion likewise does not refer or apply to a virus or communicable disease, nor does the policy extend the undefined term "contamination" to viruses.

58.     Losses due to COVID-19 are therefore a covered cause of loss, and losses due to COVID-19 fall within the "Perils Covered" under the Policy.

59.     The Property Damage coverage in Section II of the Policy includes "Protection and Preservation of Property" coverage that pays the cost of actions taken by insureds due to "actual or imminent physical loss or damage" to covered property. Policy § II.B.16. The Insurers agreed to pay "the expenses incurred by the Named Insured in taking reasonable and necessary actions for the temporary protection and preservation" of covered property. In this same "Protection and Preservation of Property" provision, the Insurers required that insureds "shall endeavor to protect covered property from further damage" "[i]n the event of loss likely to be covered" by the Policy.

60.     The Time Element coverages in Section III of the Policy include Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption coverages, each of which applies here.

61.     In the Policy, the Insurers agreed to pay for actual "Business Interruption" "loss resulting directly from interruption of business, services or rental value caused by direct physical loss or damage" to covered property during the "period of restoration." Policy § III.A.1.

62.     Insured Business Interruption losses include loss of Gross Earnings, which are the sum of: (a) "total net sales," plus (b) "other earnings derived from the operation of the business," minus the cost of: (c) "merchandise sold including packaging," (d) "materials and supplies consumed directly in supplying" services, and (e) services "purchased from outside (not employees

1  of the Named Insured) for resale that does not continue under contract." "No other cost shall be

2  deducted in determining gross earnings."

3  63.  Rental value is comprised of several categories of loss, including "total anticipated

4  gross rental income from tenant occupancy." "In determining rental value, due consideration shall

5  be given to the experience before the date of loss or damage and the probable experience thereafter

6  had no loss occurred."

7  64.  The period of restoration during which Business Interruption losses accrue begins

8  "on the date direct physical loss occurs and interrupts normal business operations and ends on the

9  date that the damaged property should have been repaired, rebuilt or replaced with due diligence

10 and dispatch, but not limited by the expiration of this policy.". The coverage period is 12 months.

11 65.  As described below, Plaintiffs' and the other Class Members' hotels, casinos,

12 restaurants, healthcare facilities and other business properties, as well as their tax generating

13 properties, have suffered direct physical loss or damage. Due to COVID-19, these properties have

14 become unsafe for their intended purpose and thus have suffered physical loss or damage. The

15 business functions of their hotels, casinos, restaurants, healthcare facilities and other properties, as

16 well as their tax generating properties, have been impaired. If they were to conduct business as

17 usual, the disease and virus would appear, and guests, gamblers, meeting attendees, diners,

18 patients, and others would get sick. This is not a non-physical or remote loss such as one

19 occasioned by a breach of contract, loss of market, or the imposition of a governmental penalty.

20 It is a direct physical loss. In their current condition, Plaintiffs' and the other Class members'

21 hotels, casinos, restaurants, healthcare facilities and other properties, as well as their tax generating

22 properties, are not yet functional for their business purposes, but Plaintiffs and the other Class

23 members are conducting repairs to make the properties usable once again

24 66.  Moreover, the presence of virus or disease can constitute physical damage to

25 property, as the insurance industry has recognized since at least 2006. When preparing so-called

26 "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting

27

28

CLASS ACTION COMPLAINT

arm, The Insurance Services Office ("ISO"), circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance),or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

67.    The presence of virus or disease has resulted in physical damage to property in that manner in this case and in addition has infested the air or imminently threatens to infest the air in the properties.

68.    In the Policy, in additional to Business Interruption losses, the Insurers agreed to pay reasonable and necessary "Extra Expense" losses incurred to continue the normal operation of business "as nearly as practicable" following damage to covered property by a covered cause of loss during the "period of restoration." Policy § III.A.2.

69.    In the Policy, the Insurers also agreed to provide Ingress/Egress coverage, which applies to loss sustained for up to 30 days when "direct physical loss or damage … occurring at property located within a 10 mile radius of covered property" prevents ingress to or egress from covered property. Policy § III.B.1.

70.    The Insurers further agreed to provide "Civil Authority" coverage, which applies to loss sustained for up to 30 days when a civil authority issues an order that prohibits access to covered property due to property damage "at a property located within a 10-mile radius of covered property." Policy § III.B.2.

71.    COVID-19 caused damage to property within a 10-mile radius of the covered property of Plaintiffs and the other Class members in the same manner that it did with Plaintiffs' covered property, as described in this Class Action Complaint.

CLASS ACTION COMPLAINT

72.     In the Policy, the Insurers also agreed to "Contingent Time Element" coverage, which applies to losses caused by property damage at the properties of the business partners of Plaintiffs or Class members.  Under these Contingent Time Element coverages, the Insurers agreed to pay losses for Business Interruption, rental income, or Extra Expenses due to property damage "at direct supplier or direct customer locations" that (a) prevents suppliers from supplying goods or services to insureds, or (b) prevents customers from accepting goods or services from insureds.  Policy § III.B.4.

73.     In the Policy, the Insurers further agreed to pay "Tax Revenue Interruption" losses "resulting directly from necessary interruption of sales, property or other tax revenue ... collected by or due" insureds caused by damage to property which is not operated by insureds, "and which wholly or partially prevents the generation of revenue for the account of" insureds.  Tax revenue covered by this provision includes "Tribal Incremental Municipal Services Payments," as well as other sales tax, property tax, and other tax revenue.  Policy § III.B.5.

74.     The time period for "Tax Revenue Interruption" coverage begins "with the date of damage to the contributing property" and continues "for only the length of time as would be required with exercise of due diligence and dispatch to rebuild, replace or repair the contributing property," but is "not limited by the expiration date" of the Policy.

75.     COVID-19 caused damage to such "contributing property" in the same manner that it did with Plaintiffs' other covered property, resulting in the interruption of Tribal Incremental Municipal Services Payments, sales tax, property tax, and other tax revenue.

76.     Losses caused by COVID-19 and the related Closure Orders issued by local, state and Tribal authorities therefore triggered the Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element, and Tax Revenue Interruption coverage provisions of the Policy.

**B.      *The Covered Cause of Loss***

77.     The threat and presence of COVID-19 is direct physical loss or damage to property and has caused civil authorities across the United States to issue orders requiring the suspension

17

1   or restriction of business at a wide range of establishments.   Those authorities include Tribal

2   authorities with direct jurisdiction over MCR, Thunderbird, and the Clinic.   Indeed, many

3   governmental bodies specifically found that COVID-19 causes property damage when issuing stay

4   at home orders.   *See* N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)[5] (emphasizing

5   the virulence of COVID-19 and that it "physically is causing property loss and damage"); N.Y.C.

6   Emergency Exec. Order No. 103, at 1 (Mar. 25, 2020)[6] (actions taken to prevent spread of COVID-

7   19 "have led to property loss and damage"); Broward Cty. Fla. Administrator's Emergency Order

8   No. 20-01, at 2 (Mar. 22, 2020)[7] (noting that COVID-19 "constitutes a clear and present threat to

9   the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office

10  of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[8]

11  (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious

12  nature and transmission through "person-to-person contact, especially in group settings"); Napa

13  Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[9]

14  (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa

15  County "and the physical damage to property caused by the virus"); City of Key West Fla. State

16  of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[10] (COVID-19 is "causing property

17  damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Oakland

18  Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[11] (COVID-19 is

19  "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18,

20

21  [5] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf

22  [6] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf

23  [7] https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf

    [8]https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-
24  Order_Harris-County.pdf

25  [9] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-
    Order

26  [10] https://www.cityofkeywest-fl.gov/egov/documents/1584822002_20507.pdf

27  [11] https://oaklandparkfl.gov/DocumentCenter/View/8408/Local-Public-Emergency-Action-
28  Directive-19-March-2020-PDF

CLASS ACTION COMPLAINT

1  2020)[12] (stating that the resolution is necessary because of COVID-19's propensity to spread

2  person to person and because the "virus physically is causing property damage"); Exec. Order of

3  the Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)[13] (in addition to COVID-

4  19's creation of a "dangerous physical condition," it also creates "property or business income loss

5  and damage in certain circumstances"); Colorado Dep't of Pub. Health & Env't, Updated Public

6  Health Order No. 20-24, at 1 (Mar. 26, 2020)[14] (emphasizing the danger of "property loss,

7  contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged

8  periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of

9  a Local Emergency, 26 (Mar. 27, 2020)[15] ("This order and the previous orders issued during this

10  emergency have all been issued … also because the virus physically is causing property loss or

11  damage due to its proclivity to attach to surfaces for prolonged periods of time"); and City of

12  Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26,

13  2020)[16] (prohibiting entities that provide food services from allowing food to be eaten at the site

14  where it is provided "due to the virus's propensity to physically impact surfaces and personal

15  property").

16  **C.    The COVID-19 Pandemic**

17      78.    According to the CDC, "COVID-19 is caused by a coronavirus called SARS-CoV-

18  2. Coronaviruses are a large family of viruses that are common in people and [many] different

19  species of animals, including camels, cattle, cats, and bats. Rarely, animal coronaviruses can infect

20  people and then spread between people."[17] "The virus that causes COVID-19 is thought to spread

21  mainly from person to person, mainly through respiratory droplets produced when an infected

---

22  [12] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604

23  [13] https://www.hillsboroughcounty.org/library/hillsborough/media-
24  center/documents/administrator/epg/saferathomeorder.pdf

25  [14] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620
     [15] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf

26  [16] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-
27  Second-Amdmt-3-25-20_FINAL

28  [17] https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics.

1    person coughs or sneezes.  These droplets can land in the mouths or noses of people who are nearby

2    or possibly be inhaled into the lungs.  Spread is more likely when people are in close contact with

3    one another (within about 6 feet)."[18]

4         79.      "It may be possible that a person can get COVID-19 by touching a surface or object

5    that has the virus on it and then touching their own mouth, nose, or possibly their eyes."[19]  A

6    scientific study investigating the stability of COVID-19 in different environmental conditions

7    found that, following COVID-19 contamination, the virus could be detected hours later for tissues

8    and paper, days later for wood, cloth and glass, or even a week later for stainless steel and plastic.[20]

9         80.      The CDC advised travelers:

10              CDC recommends you stay home as much as possible and avoid close
                contact, especially if you are at higher risk of severe illness. Staying in
11              temporary accommodations (hotels, motels, and rental properties) may
                expose you to the virus through person-to-person contact and possibly
12              through contact with contaminated surfaces and objects.[21]

13   The CDC advised businesses to "[u]se videoconferencing or teleconferencing when possible for

14   work-related meetings and gatherings," and to "[c]ancel, adjust, or postpone large work-related

15   meetings or gatherings that can only occur in-person in accordance with state and local regulations

16   and guidance."[22]

17        81.      There is sustained transmission of COVID-19 on six continents. The United States

18   has reported the most cases and deaths, with cases in all 50 states.

19

20

21

22   _____

      [18] Id.

      [19] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

23   [20] See Alex W.H. Chin, et al., "Stability of SARS-CoV-2 in different environmental conditions,"
24   The Lancet Microbe (April 2, 2020), available at https://doi.org/10.1016/S2666-5247(20)30003-
     3.

25   [21] Coronavirus Disease 2019, Considerations for Travelers – Coronavirus in the US,
26   https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html.

     [22] Coronavirus Disease 2019, Interim Guidance for Businesses and Employers Responding to
27   Coronavirus Disease 2019 (COVID-19), (May 2020),
28   https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

CLASS ACTION COMPLAINT

1  82.    The threat and presence of COVID-19 has caused civil authorities throughout the

2  country to issue orders requiring the suspension of business at a wide range of establishments (the

3  "Closure Orders").

4  **D.    The Wisconsin Closure Orders**

5  83.    Authorities in Wisconsin have issued several Closure Orders with a variety of

6  restrictions impacting business activities of Plaintiffs, including the following:

7  84.    On March 12, 2020, Wisconsin Governor Tony Evers issued Executive Order 72,

8  "Declaring a Health Emergency in Response to the COVID-19 Coronavirus."

9  85.    At the direction of Governor Evers, Wisconsin then issued Emergency Order 4,

10  Effective March 17, 2020, ordering "a statewide moratorium on mass gatherings of 50 people or

11  more to mitigate the spread of COVID-19." Restaurants and bars were limited to "50 percent of

12  seating capacity or 50 total people, whichever is less," and were required to maintain "distancing

13  of 6 feet between tables, booths, bar stools, and ordering counters."

14  86.    On March 17, 2020, Wisconsin issued Emergency Order 5, effective at 5:00 pm on

15  March 17, 2020, prohibiting gatherings of "10 or more people in a single room or single confined

16  space at the same time." Restaurants were allowed to "remain open for take-out or delivery service

17  only," and were required to "preserve social distancing of six feet between customers during pick

18  up."

19  87.    On March 20, 2020, Wisconsin issued Emergency Order 8, "Updated Mass

20  Gathering Ban," further detailing the limit on bars and restaurants to take-out and delivery (with

21  no delivery of alcoholic beverages to retail customers unless they paid in person).

22  88.    On March 24, 2020, Wisconsin issued Emergency Order 12, a "Safer At Home

23  Order." The Order stated: "Despite prior emergency orders banning mass gatherings, the rates of

24  infection continue to drastically increase, necessitating additional measures to slow the rate of

25  infection and save lives." The Order closed all Non-Essential Businesses and Operations and

26  required Essential Businesses and Operations to comply with Social Distancing Guidelines. All

27  individuals present within the state were ordered "to stay at home or their place of residence," with

28

21

CLASS ACTION COMPLAINT

1  certain exceptions. Bars and restaurants remained limited to take-out and delivery (with no

2  delivery of alcoholic beverages to retail customers).

3       89.    Many of the restrictions in Emergency Order 12 were renewed through May 26,

4  2020, in Emergency Order 28. Although the new order exempted tribal members acting within

5  their own reservation, it emphasized that tribal authorities could issue their own orders providing

6  similar restrictions or otherwise affecting those tribal members. Specifically, the order stated that

7  "Activities by Tribal members within the boundaries of their Tribal reservations … are exempt

8  from the restrictions in this Order but may be subject to restrictions by tribal authorities." As

9  described below, the Menominee Tribe had already issued restrictions that applied to tribal

10  members and that remained in force.

11       90.    Furthermore, Emergency Order 28 continued to apply to non-tribal members who

12  may have wished to travel to a reservation in order to visit a casino, to eat at a restaurant, to stay

13  in a hotel, or participate in other recreational or business opportunities available on the reservation.

14  Emergency Order 28 expressly stated: "Non-tribal members should be respectful of and avoid

15  nonessential travel to Tribal territory."

16       91.    Emergency Orders 12 and 28 provide that violations are punishable by up to 30

17  days in jail and/or a fine not to exceed $250.00.

18  **E.**    ***Menominee Closure Orders***

19       92.    On March 12, 2020, the Menominee Tribal Legislature issued a Declaration of State

20  of Emergency due to COVID-19.

21       93.    On March 19, 2020, the Menominee Tribal Legislature approved a motion to

22  "automatically adopt state guidelines including all emergency orders by the State of Wisconsin

23  relating to COVID-19 as they are released." By amended motion, the Tribal Legislature

24  established that the Wisconsin guidelines would be the minimal guidelines for the Tribe, though

25  guidelines would need to respect the sovereignty of the Tribe. Adoption of the guidelines set forth

26  by Wisconsin began no later than Wisconsin Emergency Order 5 and continued through

27  subsequent Orders.

28

CLASS ACTION COMPLAINT

94.    On June 3, 2020, the Tribal Legislature approved a "Moving Safer Forward Plan" for restarting businesses, which set forth criteria for reopening but also maintained significant restrictions on commercial activity for businesses that chose to reopen.

95.    In response to the continuing incidence of COVID-19 in the State of Wisconsin, the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 1, effective July 29, 2020, through August 31, 2020, imposing an overnight curfew from 10:00 p.m. until 6:00 a.m.

96.    Shortly thereafter, the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 2, Effective July 31, 2020, closing "casino gaming operations, bars and restaurants, and farmers markets," including gaming operations at MCR and Thunderbird. All bars were closed, and restaurants within the gaming establishments were closed except for takeout. In an August 6, 2020, Order of Extension, these closures were extended until 7:00 a.m. on August 17, 2020.

97.    Effective July 31, 2020, the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 3, which required six-feet social distancing in all businesses.

98.    Effective September 16, 2020, through September 28, 2020, the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 4, which closed MCR and Thunderbird, except for restaurant takeout, the gift shop, convenience store and gas station. The Order also closed all bars, and imposed an overnight curfew from 10:00 p.m. until 6:00 a.m. The closure was subsequently extended to October 5, and then to October 12.

F.    *Closure Orders Throughout the United States*

99.    Closure Orders were also issued by local, state and Tribal governments throughout the United States. The list includes Alaska, Oklahoma, New Mexico, Montana, Washington, Wisconsin and 37 other states, plus the District of Columbia. In addition, six other states issued Closure Orders with social distancing, limits on the size of gatherings, and closure of certain non-essential businesses, even if they did not expressly order that residents must Stay Home. This list includes, for example, South Dakota.

CLASS ACTION COMPLAINT

100.   Many Indian Tribes, Nations or Bands also issued Closure Orders, including Cherokee, Chippewa, Choctaw, Colorado River, Crow, Menominee, Mission, Muscogee (Creek), Navajo, Northern Cheyenne, Seminole, Southern Ute, Suquamish, and Tulalip.

101.   All of the Closure Orders described in this Class Action Complaint were issued in response to the rapid spread of COVID-19.

**G.      The Impact of COVID-19 and the Closure Orders**

102.   The threat and presence of COVID-19 caused direct physical loss or damage to the covered property under the Policy, by impairing the function of and damaging the covered property, and by causing the "interruption of business, services or rental value" during a "period of restoration."

103.   The Closure Orders, including the issuance of the Wisconsin and Menominee Closure Orders, prohibited access to MCR and Thunderbird and to the covered property of other Class Members, and the 10-mile radius surrounding all of that covered property, in response to dangerous physical conditions described above resulting from a covered cause of loss (*i.e.*, resulting from a cause within "Perils Covered").

104.   The Closure Orders, including the issuance of the Wisconsin and Menominee Closure Orders, restricted the use of the Clinic and the healthcare facilities of other Class Members. These restrictions reduced elective patient flow and revenue and required increased spending for physical barriers, cleaning and sanitizing and other measures.

105.   As a consequence of COVID-19 and the Closure Orders, MCR closed on March 19, 2020, and only partially reopened with restricted capacity on May 27, 2020.  (The affiliated gift shop opened slighter earlier, on May 1, 2020).  MCR closed again on July 31, 2020, and only partially reopened with restricted capacity on August 17, 2020.  MCR, except for the gift shop, closed again on September 16, 2020, and only partially reopened later that month.  Similarly, the Thunderbird Restaurant closed for on-site dining (with operations restricted to carry out only). The Closure Orders also forced the mini casino to close and, later, to open at reduced capacity. The Clinic was also required to reduce its capacity to see patients.

1      106.   As a result of the presence of COVID-19 and the Closure Orders, Plaintiff and the

2 other Class members suffered losses covered by Protection and Preservation of Property, Business

3 Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax

4 Revenue Interruption protections.

5      107.   Plaintiffs submitted a claim for loss to the Insurers under the Policy due to the

6 presence of COVID-19 and the Closure Orders, and the Insurers denied that claim.

7           **V.**    **CLASS ACTION ALLEGATIONS**

8      108.   **Class Definition**.  Plaintiffs bring this action pursuant to California Code of Civil

9 Procedure section 382, individually and on behalf of all others similarly situated. There are

10 questions of common or general interest, and it is impracticable to bring all of the numerous parties

11 before the Court.

12      109.   Plaintiffs seek to represent a nationwide Class defined as all persons and entities

13 insured under the Policy with claims due to COVID-19 and/or closure orders from the relevant

14 authorities, including persons and entities that:

15        (a)   Incurred reasonable and necessary expense to temporarily
16             protect or preserve covered property due to "actual or
            imminent physical loss or damage" to covered property; or

17        (b)   suffered an interruption of business and sustained loss of Gross
18             Earnings; or

19        (c)   suffered an interruption of business and sustained loss of rental
20             value; or

21        (d)   incurred reasonable and necessary Extra Expense to continue
            the normal operation of business "as nearly as practicable"
22             following damage to covered property by a covered cause of
23             loss, during a "period of restoration"; or

24        (e)   suffered an actual loss due to "direct physical loss or damage
            … occurring at property located within a 10-mile radius of
25             covered property," thereby preventing ingress to or egress
            from covered property; or

26        (f)   suffered an actual loss when a civil authority issued an order
27             that specifically prohibited access to covered property, due to

28

property damage "at a location within a 10-mile radius of covered property; or

(g)  suffered Business Interruption, rental income or Extra Expense losses due to property damage at direct supplier and direct customer locations, preventing supply of goods or services from suppliers to insureds or from insureds to customers; or

(h)  incurred Tax Revenue Interruption losses due to damage to contributing property not operated by insureds.

110.   Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members.  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

111.   **Numerous and Ascertainable Class Members.**  The members of the defined Class are so numerous that individual joinder of all Class Members is impracticable.  While Plaintiffs are informed and believe that there are dozens of Class Members, the precise number of Class Members is unknown to Plaintiffs but may be ascertained from the books and records of Tribal First or the Defendants.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

112.   **Commonality and Predominance.**  This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

(a)  The Insurers issued the all-risk Policy in exchange for payment of premiums by or for Plaintiffs and other Class Members;

(b)  whether the Class suffered a covered loss based on the Policy;

(c)  whether the Insurers wrongfully denied all claims based on COVID-19 and the Closure Orders;

CLASS ACTION COMPLAINT

1        (d)    whether the Policy's Protection and Preservation of Property coverage applies

2               to reasonable and necessary expenses caused by COVID-19 and the Closure

3               Orders;

4        (e)    whether the Policy's Business Interruption coverage applies to an interruption

5               caused by COVID-19 and the Closure Orders;

6        (f)    whether the Policy's Extra Expense coverage applies to a business loss caused

7               by COVID-19 and the Closure Orders;

8        (g)    whether the Policy's Ingress/Egress coverage applies to a business loss

9               caused by COVID-19 and the Closure Orders;

10       (h)    whether the Policy's Civil Authority coverage applies to an interruption due

11              to the Closure Orders;

12       (i)    whether the Policy's Contingent Time Element coverage applies to an

13              interruption caused by COVID-19 and the Closure Orders;

14       (j)    whether the Policy's Tax Revenue Interruption coverage applies to an

15              interruption due to COVID-19 and the Closure Orders;

16       (k)    whether the Insurers have breached their contract of insurance through a

17              blanket denial of all claims based on business interruption, business losses,

18              costs or closures related to COVID-19 and the Closure Orders; and

19       (l)    whether Plaintiffs and the other Class Members are entitled to an award of

20              reasonable attorney fees, interest and costs.

21      113.    **Typicality.**  Plaintiffs' claims are typical of the other Class Members' claims

22 because Plaintiffs and the other Class Members are all similarly affected by Defendants' refusal

23 to pay under its Protection and Preservation of Property, Business Interruption, Extra Expense,

24 Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption

25 coverages.  Plaintiffs' claims are based upon the same legal theories as those of the other Class

26 Members.  Plaintiffs and the other Class Members sustained damages as a direct and proximate

27 result of the same wrongful practices in which Defendants engaged.

28

CLASS ACTION COMPLAINT

114. **Adequacy of Representation.** Plaintiffs are adequate Class representative because their interests do not conflict with the interests of the other Class Members who they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiffs intend to prosecute this action vigorously. The interests of the above-defined Classes will be fairly and adequately protected by Plaintiffs and their counsel.

115. **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests.** Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Defendants' Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption coverages. The prosecution of separate actions by individual Class Members would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants. Moreover, the adjudications sought by Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class Members, who are not parties to this action, to protect their interests.

116. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

117. **Declaratory and Injunctive Relief.** Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members.

///

## VI.   CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT – PROPERTY DAMAGE, PROTECTION AND PRESERVATION OF PROPERTY COVERAGE

118.   Plaintiffs repeat and reallege Paragraphs 1-117 as if fully set forth herein.

119.   Plaintiffs bring this Count individually and on behalf of the Class.

120.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

121.   In the Policy, the Insureds agreed to pay for Plaintiffs' and the other Class Members' expenses for "reasonable and necessary actions for the temporary protection and preservation" of covered property, including expenses for actions taken due to "actual or imminent physical loss or damage" to covered property, and for actions taken to "protect covered property from further damage."

122.   Plaintiffs and the other Class Members incurred reasonable and necessary expenses "for the temporary protection and preservation" of covered property as a result of "actual or imminent physical loss or damage" to covered property caused by COVID-19.

123.   Plaintiffs and the other Class Members incurred reasonable and necessary expenses to "protect covered property from further damage" caused by COVID-19.

124.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

125.   By denying coverage for any Protection and Preservation of Property losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

126.   As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

## COUNT II
## BREACH OF CONTRACT -- BUSINESS INTERRUPTION COVERAGE

127.    Plaintiffs repeat and reallege Paragraphs 1-126 as if fully set forth herein.

128.    Plaintiffs bring this Count individually and on behalf of the Class.

129.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

130.    In the Policy, the Insurers agreed to pay for Plaintiffs' and the other Class Members' actual "loss resulting directly from interruption of business, services or rental value caused by direct physical loss or damage" to covered property during the "period of restoration." These losses include lost Gross Earnings and lost rental value.

131.    The "period of restoration begins "on the date direct physical loss occurs and interrupts normal business operations and ends on the date that the damaged property should have been repaired, rebuilt or replaced with due diligence and dispatch." The "period of restoration" is "not limited by the expiration" of the Policy, and the coverage period is 12 months.

132.    COVID-19 caused direct physical loss and damage to the covered property of Class Members, requiring interruption of business activities at their covered property. Losses caused by COVID-19 thus triggered the Business Interruption provision of the Policy.

133.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

134.    By denying coverage for any Business Interruption losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

135.    As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

CLASS ACTION COMPLAINT

**COUNT III**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**

136.    Plaintiffs repeat and reallege Paragraphs 1-135 as if fully set forth herein.

137.    Plaintiffs bring this Count individually and on behalf of the Class.

138.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

139.    In the Policy, the Insurers agreed to pay reasonable and necessary Extra Expense incurred by Plaintiffs and other Class Members to continue the normal operation of business "as nearly as practicable" following damage to covered property by a covered cause of loss, during the "period of restoration."

140.    Due to COVID-19 and the Closure Orders, Class Members incurred Extra Expense at covered property.

141.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

142.    By denying coverage for any Extra Expense losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

143.    As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT IV**
**BREACH OF CONTRACT – INGRESS/EGRESS COVERAGE**

144.    Plaintiffs repeat and reallege Paragraphs 1-143 as if fully set forth herein.

145.    Plaintiffs bring this Count individually and on behalf of the Class.

146.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

CLASS ACTION COMPLAINT

147.    In the Policy, the Insurers agreed to pay for the actual loss sustained by Plaintiffs and other Class Members for up to 30 days when "direct physical loss or damage ... occurring at property located within a 10-mile radius of covered property" prevents ingress to or egress from covered property.

148.    COVID-19 triggered the Ingress/Egress provision of the Policy.  COVID-19 caused direct physical loss or damage to property within a ten-mile radius of covered property in the same manner that it caused direct physical loss or damage to covered property described herein.

149.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

150.    By denying coverage for any Ingress/Egress losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

151.    As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT V**
**BREACH OF CONTRACT – INTERRUPTON BY CIVIL AUTHORITY COVERAGE**

152.    Plaintiffs repeat and reallege Paragraphs 1-151 as if fully set forth herein.

153.    Plaintiffs bring this Count individually and on behalf of the Class.

154.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

155.    In the Policy, the Insurers agreed to pay for the actual loss sustained by Plaintiffs and other Class Members for up to 30 days when a civil authority issues an order that specifically prohibits access to covered property, due to property damage "at a property located within a 10-mile radius of covered property."

CLASS ACTION COMPLAINT

1    156.    The Closure Orders triggered the Civil Authority provision of the Policy. COVID-

2  19 caused direct physical loss or damage to property within a ten-mile radius of covered property

3  in the same manner described herein that it caused direct physical loss or damage to covered

4  property. The Closure Orders were actions taken in response to the dangerous physical conditions

5  resulting from the direct physical loss or damage to such properties, and the Closure Orders

6  prohibited access within a ten-mile radius area that included covered property.

7    157.    Class Members have complied with all applicable provisions of the Policy and/or

8  those provisions have been waived by the Insurers or the Insurers are estopped from asserting

9  them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the

10  Policy's clear and unambiguous terms.

11    158.    By denying coverage for any Civil Authority losses incurred by the Class in

12  connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations

13  under the Policy.

14    159.    As a result of the Insurers' breach of the Policy, the Class has sustained substantial

15  damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT VI**
16
**BREACH OF CONTRACT – CONTINGENT TIME ELEMENT COVERAGE**

17    160.    Plaintiffs repeat and reallege Paragraphs 1-159 as if fully set forth herein.

18    161.    Plaintiffs bring this Count individually and on behalf of the Class.

19    162.    The Policy is a contract under which Plaintiffs and the other Class Members paid

20  premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the

21  Policy.

22    163.    In the Policy, the Insurers agreed to pay Plaintiffs' and the other Class Members'

23  "Contingent Time Element" Business Interruption, rental income, and Extra Expense losses due

24  to property damage "at direct supplier or direct customer locations" that (a) prevents suppliers

25  from supplying goods or services to insureds, or (b) prevents customers from accepting goods or

26  services from insureds.

27

28

CLASS ACTION COMPLAINT

164.   COVID-19 triggered the Contingent Time Element provision of the Policy. COVID-19 caused direct physical loss or damage to direct supplier or direct customer property in the same manner that it caused direct physical loss or damage to covered property, as described herein.

165.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

166.   By denying coverage for any Contingent Time Element losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

167.   As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

## COUNT VII
## BREACH OF CONTRACT – TAX REVENUE INTERRUPTION COVERAGE

168.   Plaintiffs repeat and reallege Paragraphs 1-167 as if fully set forth herein.

169.   Plaintiffs bring this Count individually and on behalf of the Class.

170.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

171.   In the Policy, the Insurers agreed to pay Plaintiffs' and the other Class Members' actual Tax Revenue Interruption losses "resulting directly from necessary interruption of" Tribal Incremental Municipal Services Payments, sales tax, property tax, and other tax revenue collected by or due Class Members, caused by damage to property which is not operated by Class Members, "and which wholly or partially prevents the generation of revenue for the account of" Class Members.

172.   The Insurers agreed to pay these Tax Revenue Interruption losses beginning "with the date of damage to the contributing property" and continuing "for only the length of time as

34

1  would be required with exercise of due diligence and dispatch to rebuild, replace or repair the

2  contributing property."

3      173.    COVID-19 caused damage to contributing property in the same manner that it did

4  with Plaintiffs' covered property, as described herein, resulting in interruption of Tribal

5  Incremental Municipal Services Payments, sales tax, property tax, and other tax revenue.

6      174.    Class Members have complied with all applicable provisions of the Policy and/or

7  those provisions have been waived by the Insurers or the Insurers are estopped from asserting

8  them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the

9  Policy's clear and unambiguous terms.

10      175.    By denying coverage for any Tax Revenue Interruption losses incurred by the Class

11  in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations

12  under the Policy.

13      176.    As a result of the Insurers' breach of the Policy, the Class has sustained substantial

14  damages for which the Insurers are liable, in an amount to be established at trial.

15                              **COUNT VIII**
16  **DECLARATORY JUDGMENT – PROPERTY DAMAGE, PROTECTION AND
    PRESERVATION OF PROPERTY COVERAGE**

17      177.    Plaintiffs repeat and reallege Paragraphs 1-176 as if fully set forth herein.

18      178.    Plaintiffs bring this Count individually and on behalf of the Class.

19      179.    The Policy is a contract under which Plaintiffs and the other Class Members paid

20  premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the

21  Policy.

22      180.    Class Members have complied with all applicable provisions of the Policy and/or

23  those provisions have been waived by the Insurers, or the Insurers are estopped from asserting

24  them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the

25  Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide

26  coverage to which Class Members are entitled.

27

28

181.   The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

182.   An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of reasonable and necessary costs incurred by the Class "for the temporary protection and preservation" of covered property: (a) as a result of "actual or imminent physical loss or damage" to covered property caused by COVID-19, and (b) "to protect covered property from further damage" caused by COVID-19.

183.   Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.   Class Members' Property Damage, Protection and Preservation of Property losses incurred in connection with the COVID-19 pandemic are insured losses under the Policy; and

    ii.   The Insurers are obligated to pay the Class for the full amount of the Property Damage, Protection and Preservation of Property losses incurred by their businesses stemming from the COVID-19 pandemic.

## COUNT IX
## DECLARATORY JUDGMENT – BUSINESS INTERRUPTON COVERAGE

184.   Plaintiffs repeat and reallege Paragraphs 1-183 as if fully set forth herein.

185.   Plaintiffs bring this Count individually and on behalf of the Class.

186.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

187.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

CLASS ACTION COMPLAINT

188.   The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

189.   An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Business Interruption losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

190.   Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

i.   Class Members' Business Interruption losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

ii.   The Insurers are obligated to pay the Class for the full amount of the Business Interruption losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT X
### DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE

191.   Plaintiffs repeat and reallege Paragraphs 1-190 as if fully set forth herein.

192.   Plaintiffs bring this Count individually and on behalf of the Class.

193.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

194.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

CLASS ACTION COMPLAINT

195.    The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

196.    An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Extra Expense losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

197.    Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

   i.    Class Members' Extra Expense losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

   ii.   The Insurers are obligated to pay the Class for the full amount of the Extra Expense losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XI
### DECLARATORY JUDGMENT – INGRESS/EGRESS COVERAGE

198.    Plaintiffs repeat and reallege Paragraphs 1-197 as if fully set forth herein.

199.    Plaintiffs bring this Count individually and on behalf of the Class.

200.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

201.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

202.    The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

203.    An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Ingress/Egress losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

204.    Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Ingress/Egress losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Ingress/Egress losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XII
## DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE

205.    Plaintiffs repeat and reallege Paragraphs 1-204 as if fully set forth herein.

206.    Plaintiffs bring this Count individually and on behalf of the Class.

207.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

208.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

39

CLASS ACTION COMPLAINT

209.    The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

210.    An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Civil Authority losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

211.    Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Civil Authority losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Civil Authority losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XIII
## DECLARATORY JUDGMENT – CONTINGENT TIME ELEMENT COVERAGE

212.    Plaintiffs repeat and reallege Paragraphs 1-211 as if fully set forth herein.

213.    Plaintiffs bring this Count individually and on behalf of the Class.

214.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

215.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

216.    The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

217.    An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Contingent Time Element losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

218.    Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Contingent Time Element losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Contingent Time Element losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XIV
## DECLARATORY JUDGMENT – TAX REVENUE INTERRUPTON COVERAGE

219.    Plaintiffs repeat and reallege Paragraphs 1-218 as if fully set forth herein.

220.    Plaintiffs bring this Count individually and on behalf of the Class.

221.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

222.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the

1  Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide

2  coverage to which Class Members are entitled.

3       223.    The Insurers have denied coverage related to COVID-19 on a uniform and class

4  wide basis, without individual bases or investigations, such that the Court can render declaratory

5  judgment irrespective of whether members of the Class have filed a claim.

6       224.    An actual case or controversy exists regarding Class Members' rights and the

7  Insurers' obligations under the Policy to reimburse the full amount of Tax Revenue Interruption

8  losses incurred by the Class in connection with interruption of their businesses stemming from the

9  COVID-19 pandemic.

10      225.    Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek

11  a declaratory judgment from this Court declaring the following:

12      i.    Class Members' Tax Revenue Interruption losses incurred in connection with the

13            Closure Orders and the interruption of their businesses stemming from the COVID-

14            19 pandemic are insured losses under the Policy; and

15      ii.   The Insurers are obligated to pay the Class for the full amount of the Tax Revenue

16            Interruption losses incurred in connection with the Closure Orders during the period

17            of restoration and the interruption of their businesses stemming from the COVID-

18            19 pandemic.

19              **VII.    REQUEST FOR RELIEF**

20      WHEREFORE, Plaintiffs, individually and on behalf of all Class Members, respectfully

21  requests that the Court enter judgment in their favor and against Defendants as follows:

22      a.    Entering an order certifying the proposed nationwide Class, as requested herein,

23  designating Plaintiffs as Class representatives, and appointing Plaintiffs' undersigned attorneys as

24  Counsel for the Class;

25      b.    Entering an interim order attaching any layer of coverage that is subject to an

26  aggregate limit that is shared among the Class members under the TPIP, such that one or more of

27  Defendants may not pay the loss of one Class member to the detriment of other Class members;

28

CLASS ACTION COMPLAINT

1       c.      Entering judgment on Counts I-VII in favor of the Class and awarding damages for

2 breach of contract in an amount to be determined at trial;

3       d.      Entering declaratory judgments on Counts VIII-XIV in favor of the Class, as

4 follows;

5          i.     Class Members' Protection and Preservation of Property, Business Interruption,

6                Extra Expense, Ingress/Egress, Interruption by Civil Authority, Contingent Time

7                Element and Tax Revenue Interruption losses incurred in connection with the

8                Closure Orders and the interruption of their businesses stemming from the COVID-

9                19 pandemic are insured losses under the Policy; and

10        ii.    Defendants are obligated to pay for the foregoing losses incurred and to be incurred

11               by the Class related to COVID-19, the Closure Orders and the interruption of their

12               businesses stemming from the COVID-19 pandemic;

13       e.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts

14 awarded;

15       f.       Ordering Defendants to pay attorneys' fees and costs of suit;

16       g.      Ordering Defendants to pay multiple damages where required under state law; and

17       h.      Ordering such other and further relief as may be just and proper.

18                     **VIII.   JURY DEMAND**

19     Plaintiff hereby demands a trial by jury on all claims so triable.

20 Dated: November 11, 2020                 Respectfully submitted,

21

22                                   Jennie Lee Anderson (SBN 203586)

23                               **ANDRUS ANDERSON LLP**

                                  155 Montgomery Street, Suite 900

24                               San Francisco, California  94104

25                               Telephone:  415-986-1400

                                  jennie@andrusanderson.com

26                               Adam J. Levitt (*pro hac vice forthcoming*)

                                  Mark S. Hamill (*pro hac vice forthcoming*)

27                               **DiCELLO LEVITT GUTZLER LLC**

                                  Ten North Dearborn Street, Sixth Floor

28

CLASS ACTION COMPLAINT

1

Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
mhamill@dicellolevitt.com

2

3

Mark A. DiCello (*pro hac vice forthcoming*)
Kenneth P. Abbarno (*pro hac vice forthcoming*)
Mark Abramowitz (*pro hac vice forthcoming*)
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio 44060
Telephone: 440-953-8888
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

4

5

6

7

8

9

Timothy W. Burns (*pro hac vice forthcoming*)
Jeff J. Bowen (*pro hac vice forthcoming*)
Jesse J. Bair (*pro hac vice forthcoming*)
Freya K. Bowen (*pro hac vice forthcoming*)
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

10

11

12

13

14

15

16

17

Mark Lanier (*pro hac vice forthcoming*)
Alex Brown (*pro hac vice forthcoming*)
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North, Suite 100
Houston, Texas 77064
Telephone: 713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com

18

19

20

21

22

Douglas Daniels (*pro hac vice forthcoming*)
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas 77057
Telephone: 713-917-0024
douglas.daniels@dtlawyers.com

23

24

25

26

*Counsel for Plaintiffs and the Proposed Class*

27

28

44

CLASS ACTION COMPLAINT

# EXHIBIT 1



**TRIBAL FIRST**

# PROPERTY SOLUTIONS

Recognizing the Past While Protecting the Future





**TRIBAL FIRST**
ALLIANT UNDERWRITING SOLUTIONS

## TRIBAL PROPERTY INSURANCE PROGRAM
## EVIDENCE OF COVERAGE

**NAMED INSURED:**     Menominee Indian Tribe of Wisconsin

**ADDRESS:**     P.O. Box 910
Keshena, WI 54135-0910

**POLICY PERIOD:**     July 1, 2019 to July 1, 2020

**DECLARATION:**     17-TPIP I

**INSURANCE
COMPANIES:**     Lexington Insurance Company and Additional A Rated and Non Admitted Carriers

**TPIP POLICY #:**     017471589/06 (Dec 17) 9131

| TOTAL INSURED VALUES: | | | |
|---|---|---|---|
| | $ | 157,040,328 | Real Property |
| | $ | 77,958,765 | Personal Property (includes TIV's reported for EDP and Software, Contractor's Equipment and Scheduled Fine Arts) |
| | $ | 25,000,000 | Business Interruption |
| | **$** | **259,999,093** | **Total Insured Values** |
| | | Not Covered | Ordinary Payroll |
| | | Not Covered | Ordinary Payroll Days |
| | | 12 | Months Business Income Reported |
| | $ | 259,999,093 | Earthquake TIV |
| | $ | 259,999,093 | Flood TIV |

**Values as of : July 1, 2019**

**ALL RISK
COVERAGES &
LIMITS:**     $     259,999,093     Per Occurrence: all Perils, Coverages (subject to policy exclusions) and all Named Insureds (as defined in the policy) combined, per Declaration, subject to the following per occurrence and/or aggregate sub-limits as noted below.

*2019-2020 Tribal Property Insurance Program Evidence of Coverage*
*Menominee Indian Tribe of Wisconsin*
**(Continued):**

| | | |
|---|---:|---|
| $ | 5,000,000 | Flood Limit - Per Occurrence & Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) excluding flood zones A & V (inclusive of all 100 year exposures) |
| | Not Covered | Per Occurrence and in the Annual Aggregate for scheduled locations in Flood Zones A & V (inclusive of all 100 year exposures). This Sub-limit does not increase the specific flood limit of liability for those Named Insured(s) that purchase this optional dedicated coverage. |
| $ | 5,000,000 | Earthquake Shock - Per Occurrence and in the Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) |
| $ | 31,250,000 | Combined Business Interruption and Rental Income. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $500,000 per Named Insured subject to maximum of $2,500,000 Per Occurrence, Per Declaration for Business Interruption and Rental Income combined. Business Interruption coverage for Power Generating Plants is excluded, unless otherwise specified. |
| $ | 35,000,000 | Extra Expense |
| $ | 40,000,000 | Automatic Acquisition for new locations for existing Named Insureds for 120 days, excluding Earthquake Shock in the states of Alaska and California. If Flood coverage is purchased for all scheduled locations, this extension will extend to include Flood coverage for any location not situated in Flood Zones A or V. (If values are not reported within the stated reporting provision, a maximum sub-limit of $25,000,000 for any one occurrence will apply). Additionally a sub-limit of $2,500,000 applies for Tier 1 Wind Counties, Parishes and Independent Cities for 60 days for the states of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas and/or situated anywhere within the states of Florida and Hawaii. |
| $ | 40,000,000 | Miscellaneous Unnamed Locations excluding Earthquake Shock for locations in the states of Alaska and California, and if Flood Coverage is purchased for scheduled locations, Flood is covered subject to Named Insured's Flood Limits, however, Flood Zones A&V are excluded. This coverage extension does not apply to locations situated in Tier I or Tier II Counties. |

*2019-2020 Tribal Property Insurance Program Evidence of Coverage*
*Menominee Indian Tribe of Wisconsin*
**(Continued):**

| | |
|---|---|
| $ 1,000,000 | Unscheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item for existing Named Insureds excluding Earthquake coverage for locations in Alaska and California. If flood coverage is purchased for scheduled locations, this extension includes Flood coverage for any location not situated in Flood Zones A or V. |
| $ 5,000,000 or 110% of the scheduled values, whichever is greater, for | Scheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item |
| $ 35,000,000 | Errors & Omissions (errors/omissions in the description, location of property, or valuation of property). This extension does not increase any more specific limit stated elsewhere in this policy. |
| $ 25,000,000 | Course of Construction and Additions (including new) for projects with project values not exceeding the sub-limit shown. This sub-limit may be increased to $100,000,000 for non-combustible construction, subject to Underwriting review and approval. |
| $ 250,000 | Prize Giveaways |
| $ 2,500,000 | Money and Securities as respects perils of Fire, Wind, Hail, Explosion, Smoke, Lightning, Riot, Civil Commotion, Impact by Aircraft or Objects falling there from, Impact by vehicles, Water Damage and Theft (other than by an employee(s) of the Insured(s)) |
| $ 2,500,000 | Unscheduled Fine Arts |
| $ 25,000 | Per Occurrence and in the Annual Aggregate as respects Accidental Contamination for Owned Land, Land Values and Water owned by the Insured(s) |
| $ 750,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| $ 150,000,000 | Increased Cost of Construction due to the enforcement of building codes/ordinance or law (includes All Risk and Boiler & Machinery). Demolition, Compliance with Law and BI are restricted to $35,000,000 |

*2019-2020 Tribal Property Insurance Program Evidence of Coverage*
*Menominee Indian Tribe of Wisconsin*
  **(Continued):**

| | | |
|---|---:|---|
| $ | 25,000,000 | Transit |
| $ | 2,500,000 | Unscheduled Animals;  subject to maximum of $50,000 per Animal,  Per Occurrence |
| $ | 2,500,000 | Watercraft under 50 feet (watercraft over 50 feet must be scheduled subject to underwriting review and approval) |
| $ | 25,000,000 | Off Premises Services Interruption including Extra Expense resulting from a covered peril at non-owned/operated location(s) |
| $ | 3,000,000 | Separately as respects Contingent Business Interruption, Contingent Rental Value, and Contingent Extra Expense |
| $ | 3,000,000 | Tax Revenue Interruption – Per Policy Provisions. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $100,000 Per Occurrence – Per Policy Provisions. |
| $ | 500,000 | Separately as respects Furs, Jewelry, Precious Metals and Precious Stones |
| $ | 1,000,000 | Claims Preparation Expenses |
| $ | 25,000,000 | Expediting Expenses |
| $ | 1,000,000 | Personal Property Outside the USA |
| | 180 Days | Extended Period of Indemnity |
| $ | 100,000 | Per Occurrence while in Storage and In Transit coverage subject to $10,000 Deductible for Unmanned Aircraft as more fully defined in the Policy.  Not Covered while in Flight. |
| $ | 100,000 | Per Occurrence with a $1,000,000 Annual Aggregate per Declaration for Mold/Fungus Resultant Damage as more fully defined in the policy. |
| **BOILER & MACHINERY COVERAGES & LIMITS:** $ | 100,000,000 | Boiler Explosion and Machinery Breakdown as respects Combined Property Damage and Business Interruption/Extra Expense (Including Bond Revenue Interest Payments where Values Reported and excluding Business Interruption for Power Generating Facilities unless otherwise specified).  Limit includes loss adjustment agreement and electronic computer or electronic data processing equipment with the following sub-limits: |

*2019-2020 Tribal Property Insurance Program Evidence of Coverage*
*Menominee Indian Tribe of Wisconsin*
**(Continued):**

| | | |
|---|---|---|
| $ | 10,000,000 | Utility Interruption |
| $ | 10,000,000 | Ammonia Contamination |
| $ | 10,000,000 | Water Damage |
| $ | 10,000,000 | Consequential Damage |
| $ | 2,000,000 | Media Coverage |
| $ | 1,000,000 | Hazardous Substance |
| $ | 25,000,000 | Ordinance or Law - Included in Demo & ICC Limit above |

**NEWLY ACQUIRED LOCATIONS:**    $ 25,000,000    Automatic Acquisition for Boiler & Machinery values at newly acquired locations. Values greater than $25,000,000 or Power Generating Facilities must be reported within 90 days and must have prior underwriting approval prior to binding

**VALUATION:**
- Repair or Replacement Cost
- Actual Loss Sustained for Time Element Coverages
- Contractor's/Scheduled Equipment either Replacement Cost or Actual Cash Value as elected by declaring values in the manner losses are to be adjusted. If not declared, valuation will default to Actual Cash Value (ACV)

**"ALL RISK" BASIC DEDUCTIBLE:**    $ 10,000    All Risk Deductible; Per occurrence each and every loss except as specified below:

**"ALL RISK" DEDUCTIBLES FOR SPECIFIC PERILS AND COVERAGES:**    $ 10,000    Residential Property(ies) less than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater

   $ 25,000    Residential Property(ies) greater than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater

   $ 100,000    All Flood Zones excluding Flood Zones A & V

   Not Covered    Flood Zones A & V (inclusive of all 100 year exposures)

   5% subject to a $100,000 minimum    Earthquake Shock Per Unit of Insurance Per Occurrence separately as respects Real Property, Personal Property, Property in the Open and Time Element except 10% with $100,000 minimum for buildings constructed prior to 1940 where Earthquake Coverage is purchased

*2019-2020 Tribal Property Insurance Program Evidence of Coverage*
*Menominee Indian Tribe of Wisconsin*
**(Continued):**

| | | |
|---|---|---|
| $ | 1,000 | Specially Trained Animals |
| $ | 500,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| | 2.5% | of Annual Tax Revenue Value per Location for Tax Interruption |
| | 24 Hour Waiting Period | Service Interruption as respects All Perils and Coverages (other than Boiler and Machinery Breakdown) |
| | 24 Hour | Equivalent Business Interruption Deductible at the time of loss (24 hours to be calculated by dividing the total Business Interruption loss by the number of days business was interrupted) as respects All Perils and Coverages solely for Casino(s) with Total Insurable Values in excess of $50,000,000 |
| $ | 10,000 | Boiler & Machinery Deductible, per occurrence each and every loss |

**SPECIAL TERMS 1:**  Add Mortgagee in relation to all BPP.: Associated Bank, N.A.
ISAOA
P.O. BOX 12768
Green Bay, WI 54307-2768

Not Applicable                    Special Terms Limit

Not Applicable                    Special Terms Deductible

The following stand-alone coverages are provided by the Tribal Property Insurance Program but are not covered in the Limit of Liability or the Sub-Limits of Liability above or attached to the Master Policy Form Wording. However, the coverage costs are included in the TPIP Total Costs noted below.

| | | |
|---|---|---|
| $ | 15,000,000 | Per Occurrence Primary Terrorism subject to $80,000,000 Annual Aggregate for all TPIP I Declarations 15, 16, 17, 31 and 37 combined |
| $ | 485,000,000 | Per Occurrence Terrorism Excess of $15,000,000 Primary Subject to $520,000,000 Annual Aggregate for TPIP 1 Declarations 15, 16, 17, 31 and 37 combined |

|   |   |   |
|---|---|---|
| Same as All-Risk Deductible | Primary Terrorism Deductible | |
| Included | Information Security & Privacy Insurance with Electronic Media Liability Coverage.  See attached Cyber Coverage Summary for applicable Limits. (Cyber Liability) | |
| Included | See Tribal Property Insurance Program (TPIP) Pollution Liability Insurance Document for applicable limits and deductibles | |
| Included | See Tribal Property Insurance Program (TPIP) Deadly Weapons Coverage Insurance Document for applicable limits and deductibles. | |

**COVERAGE TERM:**     July 1, 2019 to July 1, 2020

**TOTAL ANNUAL COSTS:**     $ 472,575

*Total Annual Cost Includes:* All Risk Premiums, Boiler & Machinery Premiums, Underwriting Fees, Commissions, Loss Control Expenses, Program Administration charges, and Applicable Taxes (does not include Broker Fees, if applicable)

**TERMS & CONDITIONS:**

- 25% Minimum Earned Premium

- If this policy is canceled by the *First Named Insured* due to such *Credit Rating Downgrade*, then the *Company* shall return the unearned pro-rata proportion of the premium as of the effective date of cancellation and shall waive any minimum earned premium requirement specified herein.

**NOTIFICATION OF CLAIMS TO:**

**TRIBAL FIRST**
P.O. Box 609015
San Diego, CA 92160
858-541-1900

**NOTICE OF CANCELLATION:**     90 Days except 10 Days for non-payment of premium

**Alliant Specialty Insurance Services**

*[signature: R A Corbett]*

Ray Corbett
Senior Vice President

Dated: 09/20/2019

*Coverage outlined in this Evidence of Coverage is subject to the Terms and Conditions set forth in the policy.*

**Tribal First/Alliant Specialty Insurance Services provides underwriting, claims/risk management, and administrative services all as part of the insurance solution for your clients protection.**

## DISCLOSURES

This evidence of insurance is provided as a matter of convenience and information only.  All information included in this evidence, including but not limited to personal and real property values, locations, operations, products, data, automobile schedules, financial data and loss experience, is based on facts and representations supplied to Tribal First/Alliant Specialty Insurance Services, Inc./Alliant Insurance Services, Inc. by you.  This evidence does not reflect any independent study or investigation by Tribal First/Alliant Specialty Insurance Services, Inc./Alliant Insurance Services, Inc. or its agents and employees.

This evidence does not add to, extend, amend, change, or alter any coverage in any actual policy of insurance you may have.  All existing policy terms, conditions, exclusions, and limitations apply.  For specific information regarding your insurance coverage, please refer to the policy itself.  Tribal First/Alliant Specialty Insurance Services, Inc./Alliant Insurance Services, Inc. will not be liable for any claims arising from or related to information included in or omitted from this proposal of insurance.

Alliant embraces a policy of transparency with respect to its compensation from insurance transactions.  Details on our compensation policy, including the types of income that Alliant may earn on a placement, are available on our website at *www.alliant.com*.  For a copy of our policy or for any inquiries regarding compensation issued pertaining to your account you may also contact us at:  Alliant Insurance Services, Inc., Attention:  General Counsel, 701 B Street, 6th Floor, San Diego, CA 92101.

Analyzing insurers' over-all performance and financial strength is a task that requires specialized skills and in-depth technical understanding of all aspects of insurance company finances and operations. Insurance brokerages such as Alliant Insurance typically rely upon rating agencies for this type of market analysis. Both A.M. Best and Standard and Poor's have been industry leaders in this area for many decades, utilizing a combination of quantitative and qualitative analysis of the information available in formulating their ratings.

A.M. Best has an extensive database of nearly 6,000 Life/Health, Property Casualty and International companies. You can visit them at www.ambest.com. For additional information regarding insurer financial strength ratings visit Standard and Poor's website at www.standardandpoors.com.

Our goal is to procure insurance for you with underwriters possessing the financial strength to perform.  Alliant does not, however, guarantee the solvency of any underwriters with which insurance or reinsurance is placed and maintains no responsibility for any loss or damage arising from the financial failure or insolvency of any insurer.  We encourage you to review the publicly available information collected to enable you to make an informed decision to accept or reject a particular underwriter.  To learn more about companies doing business in your state, visit the Department of Insurance website for that state.

NY Regulation 194
Alliant Insurance Services, Inc. is an insurance producer licensed by the State of New York. Insurance producers are authorized by their license to confer with insurance purchasers about the benefits, terms and conditions of insurance contracts; to offer advice concerning the substantive benefits of particular insurance contracts; to sell insurance; and to obtain insurance for purchasers.  The role of the producer in any particular transaction typically involves one or more of these activities.

Compensation will be paid to the producer, based on the insurance contract the producer sells.  Depending on the insurer(s) and insurance contract(s) the purchaser selects, compensation will be paid by the insurer(s) selling the insurance contract or by another third party.  Such compensation may vary depending on a number of factors, including the insurance contract(s) and the insurer(s) the purchaser selects.  In some cases, other factors such as the volume of business a producer provides to an insurer or the profitability of insurance contracts a producer provides

to an insurer also may affect compensation.

The insurance purchaser may obtain information about compensation expected to be received by the producer based in whole or in part on the sale of insurance to the purchaser, and (if applicable) compensation expected to be received based in whole or in part on any alternative quotes presented to the purchaser by the producer, by requesting such information from the producer.


OTHER DISCLOSURES / DISCLAIMERS

FATCA:
The Foreign Account Tax Compliance Act (FATCA) requires the notification of certain financial accounts to the United States Internal Revenue Services.  Alliant does not provide tax advice so please contact your tax consultant for your obligation regarding FATCA.

Claims Reporting:
Your policy will come with specific claim reporting requirements.  Please make sure you understand these obligations.  Contact your Alliant Service Team with any questions.

NRRA:
(Applicable if the insurance company is non-admitted)
The Non-Admitted and Reinsurance Reform Act (NRRA) went into effect on July 21, 2011.  Accordingly, surplus lines tax rates and regulations are subject to change which could result in an increase or decrease of the total surplus lines taxes and/or fees owed on this placement.  If a change is required, we will promptly notify you.  Any additional taxes and/or fees must be promptly remitted to Alliant Insurance Services, Inc.



## TRIBAL PROPERTY INSURANCE PROGRAM
### 2019-2020 NAMED INSURED
#### AS OF 07/01/2019

Menominee Indian Tribe of Wisconsin
P.O. Box 910, W2908 Tribal Office Loop Road
Keshena, WI 54135-0910

**NAMED INSURED:**

Menominee Indian Tribe of Wisconsin

Menominee Indian Economic Development
    Authoirty (MIEDA)

# TRIBAL PROPERTY INSURANCE PROGRAM
## DECLARATION PAGE
### (Primary Layer)

1. **Insurer Name:**        **LEXINGTON INSURANCE COMPANY**
   **Administrative Offices: 99 High Street, Boston, MA 02110-2310**

2. **Policy Number:**        **017471589/06**

3. **Named Insured:**        **All Entities listed as Named Insureds on file with Alliant Insurance Services, Inc.**

4. **Mailing Address of Insured:**        **As on file with Alliant Insurance Services, Inc.**
   **c/o 325 E. Hillcrest Dr. Suite 250**
   **Thousand Oaks, CA 91360**

5. **Policy Period:**    From:     **July 1, 2019**
                   To:        **July 1, 2020**

   Both days at 12:01 a.m. Local Standard Time

6. **Limits of Liability:**

   55% of $2,500,000 Primary Layer     Per occurrence, per Declarations 15-17, 31 and 37 subject to an annual aggregate which is adjustable based on the actual premium on file with Alliant Specialty Insurance Services Inc. for the perils of All Risk including Earthquake, Flood, Boiler and Machinery Breakdown, excluding Terrorism.

7. **Sub-Limits of Liability:**

   The program sub-limits as outlined in Declarations 15-17, 31 and 37 are 100% per occurrence per declaration ground up sub-limits. Lexington shall not be liable for more than the Primary $2,500,000 of the program sub-limits which are part of and not in addition to the policy limit of liability. When a sub-limit of liability applies in the aggregate, the insurer's maximum amount payable for such sub-limited coverage will not exceed such sub-limit of liability during any policy year. To the extent there exists a difference between the Evidence of Coverage and program sub-limit the Evidence of Coverage sub-limit applies.

8. **Deductibles:**

   Program Deductibles as outlined in the corresponding Declarations below:

        Declarations 15-17, 31 and 37 exclusively

   To the extent there exists a difference between the Evidence of Coverage and program deductibles the Evidence of Coverage deductible applies.

9. **Terms and Conditions:**     25% Minimum Earned Premium and cancellations subject to 10% penalty

10. **Notification of Claims to:**    Tribal First
    P.O. Box 609015
    San Diego, CA 92160

This document does not amend, extend, or alter the coverage afforded by the policies indicated on the attached Schedule of Carriers and Participations.

Ray Corbett
Senior Vice President

_(signature)_ Dated: 08/13/2019
(Authorized Representative)

Alliant Specialty Insurance Services
Alliant Underwriting Services
325 E. Hillcrest Drive, Suite 250
Thousand Oaks, CA 91360

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY:** | Varies by Named Insured | Flood Limit - Per Occurrence & Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) excluding flood zones A & V (inclusive of all 100 year exposures) |
| | Varies by Named Insured | Per Occurrence and in the Annual Aggregate for scheduled locations in Flood Zones A & V (inclusive of all 100 year exposures). This Sub-limit does not increase the specific flood limit of liability for those Named Insured(s) that purchase this optional dedicated coverage. |
| | Varies by Named Insured | Earthquake Shock - Per Occurrence and in the Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) |
| | Varies by Named Insured | Combined Business Interruption and Rental Income. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $500,000 per Named Insured subject to maximum of $2,500,000 Per Occurrence, Per Declaration for Business Interruption and Rental Income combined. Business Interruption coverage for Power Generating Plants is excluded, unless otherwise specified. |
| | $ 35,000,000 | Extra Expense |
| | $ 40,000,000 | Automatic Acquisition for new locations for existing Named Insureds for 120 days, excluding Earthquake Shock in the states of Alaska and California. If Flood coverage is purchased for all scheduled locations, this extension will extend to include Flood coverage for any location not situated in Flood Zones A or V. (If values are not reported within the stated reporting provision, a maximum sub-limit of $25,000,000 for any one occurrence will apply). Additionally a sub-limit of $2,500,000 applies for Tier 1 Wind Counties, Parishes and Independent Cities for 60 days for the states of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas and/or situated anywhere within the states of Florida and Hawaii. |
| | $ 40,000,000 | Miscellaneous Unnamed Locations excluding Earthquake Shock for locations in the states of Alaska and California, and if Flood Coverage is purchased for scheduled locations, Flood is covered subject to Named Insured's Flood Limits, however, Flood Zones A&V are excluded. This coverage extension does not apply to locations situated in Tier I or Tier II Counties. |
| | $ 1,000,000 | Unscheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item for existing Named Insureds excluding Earthquake coverage for locations in Alaska and California. If flood coverage is purchased for scheduled locations, this extension includes Flood coverage for any location not situated in Flood Zones A or V. |
| | $ 5,000,000 or 110% of the scheduled values, whichever is greater, for | Scheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item |

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY CONT.** | $ 35,000,000 | Errors & Omissions (errors/omissions in the description, location of property, or valuation of property). This extension does not increase any more specific limit stated elsewhere in this policy. |
| | $ 25,000,000 | Course of Construction and Additions (including new) for projects with project values not exceeding the sub-limit shown. This sub-limit may be increased to $100,000,000 for non-combustible construction, subject to Underwriting review and approval. |
| | $ 250,000 | Prize Giveaways |
| | $ 2,500,000 | Money and Securities as respects perils of Fire, Wind, Hail, Explosion, Smoke, Lightning, Riot, Civil Commotion, Impact by Aircraft or Objects falling there from, Impact by vehicles, Water Damage and Theft (other than by an employee(s) of the Insured(s)) |
| | $ 2,500,000 | Unscheduled Fine Arts |
| | $ 25,000 | Per Occurrence and in the Annual Aggregate as respects Accidental Contamination for Owned Land, Land Values and Water owned by the insured(s) |
| | $ 750,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| | $ 150,000,000 | Except $50,000,000 for Named Insureds in Decarlations 31 and 37 for Increased Cost of Construction due to the enforcement of building codes/ordinance or law (includes All Risk and Boiler & Machinery). Demolition, Compliance with Law and BI are restricted to $35,000,000 |
| | $ 25,000,000 | Transit |
| | $ 2,500,000 | Unscheduled Animals; subject to maximum of $50,000 per Animal, Per Occurrence |
| | $ 2,500,000 | Watercraft under 50 feet (watercraft over 50 feet must be scheduled subject to underwriting review and approval) |
| | $ 25,000,000 | Off Premises Services Interruption including Extra Expense resulting from a covered peril at non-owned/operated location(s) |
| | $ 3,000,000 | Separately as respects Contingent Business Interruption, Contingent Rental Value, and Contingent Extra Expense |
| | $ 3,000,000 | Tax Revenue Interruption – Per Policy Provisions. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $100,000 Per Occurrence – Per Policy Provisions. |

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY CONT.** | $       500,000 | Separately as respects Furs, Jewelry, Precious Metals and Precious Stones |
| | $     1,000,000 | Claims Preparation Expenses |
| | $   25,000,000 | Expediting Expenses |
| | $     1,000,000 | Personal Property Outside the USA |
| | 180 Days | Extended Period of Indemnity |
| | $       100,000 | Per Occurrence while in Storage and In Transit coverage subject to $10,000 Deductible for Unmanned Aircraft as more fully defined in the Policy. Not Covered while in Flight. |
| | $       100,000 | Per Occurrence with a $1,000,000 Annual Aggregate per Declaration for Mold/Fungus Resultant Damage as more fully defined in the policy. |
| **BOILER & MACHINERY COVERAGES & LIMITS:** | $ 100,000,000 | Boiler Explosion and Machinery Breakdown as respects Combined Property Damage and Business Interruption/Extra Expense (Including Bond Revenue Interest Payments where Values Reported and excluding Business Interruption for Power Generating Facilities unless otherwise specified). Limit includes loss adjustment agreement and electronic computer or electronic data processing equipment with the following sub-limits: |
| | $   10,000,000 | Utility Interruption |
| | $   10,000,000 | Ammonia Contamination |
| | $   10,000,000 | Water Damage |
| | $   10,000,000 | Consequential Damage |
| | $     2,000,000 | Media Coverage |
| | $     1,000,000 | Hazardous Substance |
| | $   25,000,000 | Ordinance or Law - Included in Demo & ICC Limit above |
| **NEWLY ACQUIRED LOCATIONS:** | $   25,000,000 | Automatic Acquisition for Boiler & Machinery values at newly acquired locations. Values greater than $25,000,000 or Power Generating Facilities must be reported within 90 days and must have prior underwriting approval prior to binding |
| **"ALL RISK" BASIC DEDUCTIBLE:** | Varies by Named Insured | All Risk Deductible; Per occurrence each and every loss except as specified below: |

| "ALL RISK" DEDUCTIBLES FOR SPECIFIC PERILS & COVERAGES: | | |
|---|---|---|
| $ | 10,000 | Residential Property(ies) less than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater |
| $ | 25,000 | Residential Property(ies) greater than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater |
| Varies by Named Insured | | All Flood Zones excluding Flood Zones A & V |
| Varies by Named Insured | | Flood Zones A & V (inclusive of all 100 year exposures) |
| Varies by Named Insured | | Earthquake Shock Per Unit of Insurance Per Occurrence separately as respects Real Property, Personal Property, Property in the Open and Time Element except 10% with $100,000 minimum for buildings constructed prior to 1940 where Earthquake Coverage is purchased |
| $ | 1,000 | Specially Trained Animals |
| $ | 500,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| | 2.5% | of Annual Tax Revenue Value per Location for Tax Interruption |
| 24 Hour Waiting Period | | Service Interruption as respects All Perils and Coverages (other than Boiler and Machinery Breakdown) |
| | 24 Hour | Equivalent Business Interruption Deductible at the time of loss (24 hours to be calculated by dividing the total Business Interruption loss by the number of days business was interrupted) as respects All Perils and Coverages solely for Casino(s) with Total Insurable Values in excess of $50,000,000 |
| Varies by Named Insured | | Boiler & Machinery Deductible, per occurrence each and every loss |

| SPECIAL TERMS & CONDITIONS: | It is understood and agreed that not withstanding anything contained herein to the contrary the following shall apply to this Policy which vary by Named Insured. |
|---|---|

# TRIBAL PROPERTY INSURANCE PROGRAM
## DECLARATION PAGE
### (Primary Layer)

| | | |
|---|---|---|
| 1. **Insurer Name:** | : | **LEXINGTON INSURANCE COMPANY**<br>**Administrative Offices: 99 High Street, Boston, MA 02110-2310** |
| 2. **Policy Number:** | | **38412453** |
| 3. **Named Insured:** | | **All Entities listed as Named Insureds on file with Alliant Insurance Services, Inc.** |
| 4. **Mailing Address of Insured:** | | **As on file with Alliant Insurance Services, Inc.**<br>**c/o 325 E. Hillcrest Dr. Suite 250**<br>**Thousand Oaks, CA 91360** |

| | | | |
|---|---|---|---|
| 5. **Policy Period:** | From: | **July 1, 2019** | |
| | To: | **July 1, 2020** | |
| | | Both days at 12:01 a.m. Local Standard Time | |

6. **Limits of Liability:**

| | |
|---|---|
| 35% of $25,000,000<br>Primary Layer | Per occurrence, per Declarations 15-17, 31 and 37 subject to an annual aggregate which is adjustable based on the actual premium on file with Alliant Specialty Insurance Services Inc. for the perils of All Risk including Earthquake, Flood, Boiler and Machinery Breakdown, excluding Terrorism. |

7. **Sub-Limits of Liability:**

The program sub-limits as outlined in Declarations 15-17, 31 and 37) are 100% per occurrence per declaration ground up sub-limits. Lexington shall not be liable for more than the Primary $25,000,000 of the program sub-limits which are part of and not in addition to the policy limit of liability. When a sub-limit of liability applies in the aggregate, the insurer's maximum amount payable for such sub-limited coverage will not exceed such sub-limit of liability during any policy year. To the extent there exists a difference between the Evidence of Coverage and program sub-limit the Evidence of Coverage sub-limit applies.

8. **Deductibles:**

Program Deductibles as outlined in the corresponding Declarations below:

Declarations 15-17, 31 and 37 exclusively

To the extent there exists a difference between the Evidence of Coverage and program deductibles the Evidence of Coverage deductible applies.

| | |
|---|---|
| 9. **Terms and Conditions:** | 25% Minimum Earned Premium and cancellations subject to 10% penalty |
| 10. **Notification of Claims to:** | Tribal First<br>P.O. Box 609015<br>San Diego, CA 92160 |

This document does not amend, extend, or alter the coverage afforded by the policies indicated on the attached Schedule of Carriers and Participations.

Ray Corbett
Senior Vice President

*[signature]* Dated: 08/13/2019
(Authorized Representative)

Alliant Specialty Insurance Services
Alliant Underwriting Services
325 E. Hillcrest Drive, Suite 250
Thousand Oaks, CA 91360

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY:** | Varies by Named Insured | Flood Limit - Per Occurrence & Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) excluding flood zones A & V (inclusive of all 100 year exposures) |
| | Varies by Named Insured | Per Occurrence and in the Annual Aggregate for scheduled locations in Flood Zones A & V (inclusive of all 100 year exposures). This Sub-limit does not increase the specific flood limit of liability for those Named Insured(s) that purchase this optional dedicated coverage. |
| | Varies by Named Insured | Earthquake Shock - Per Occurrence and in the Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) |
| | Varies by Named Insured | Combined Business Interruption and Rental Income. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $500,000 per Named Insured subject to maximum of $2,500,000 Per Occurrence, Per Declaration for Business Interruption and Rental Income combined. Business Interruption coverage for Power Generating Plants is excluded, unless otherwise specified. |
| | $ 35,000,000 | Extra Expense |
| | $ 40,000,000 | Automatic Acquisition for new locations for existing Named Insureds for 120 days, excluding Earthquake Shock in the states of Alaska and California. If Flood coverage is purchased for all scheduled locations, this extension will extend to include Flood coverage for any location not situated in Flood Zones A or V. (If values are not reported within the stated reporting provision, a maximum sub-limit of $25,000,000 for any one occurrence will apply). Additionally a sub-limit of $2,500,000 applies for Tier 1 Wind Counties, Parishes and Independent Cities for 60 days for the states of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas and/or situated anywhere within the states of Florida and Hawaii. |
| | $ 40,000,000 | Miscellaneous Unnamed Locations excluding Earthquake Shock for locations in the states of Alaska and California, and if Flood Coverage is purchased for scheduled locations, Flood is covered subject to Named Insured's Flood Limits, however, Flood Zones A&V are excluded. This coverage extension does not apply to locations situated in Tier I or Tier II Counties. |
| | $ 1,000,000 | Unscheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item for existing Named Insureds excluding Earthquake coverage for locations in Alaska and California. If flood coverage is purchased for scheduled locations, this extension includes Flood coverage for any location not situated in Flood Zones A or V. |
| | $ 5,000,000 or 110% of the scheduled values, whichever is greater, for | Scheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item |

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY CONT.** | $ 35,000,000 | Errors & Omissions (errors/omissions in the description, location of property, or valuation of property). This extension does not increase any more specific limit stated elsewhere in this policy. |
| | $ 25,000,000 | Course of Construction and Additions (including new) for projects with project values not exceeding the sub-limit shown. This sub-limit may be increased to $100,000,000 for non-combustible construction, subject to Underwriting review and approval. |
| | $ 250,000 | Prize Giveaways |
| | $ 2,500,000 | Money and Securities as respects perils of Fire, Wind, Hail, Explosion, Smoke, Lightning, Riot, Civil Commotion, Impact by Aircraft or Objects falling there from, Impact by vehicles, Water Damage and Theft (other than by an employee(s) of the Insured(s)) |
| | $ 2,500,000 | Unscheduled Fine Arts |
| | $ 25,000 | Per Occurrence and in the Annual Aggregate as respects Accidental Contamination for Owned Land, Land Values and Water owned by the Insured(s) |
| | $ 750,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| | $ 150,000,000 | Except $50,000,000 for Named Insureds in Decarlations 31 and 37 for Increased Cost of Construction due to the enforcement of building codes/ordinance or law (includes All Risk and Boiler & Machinery). Demolition, Compliance with Law and BI are restricted to $35,000,000 |
| | $ 25,000,000 | Transit |
| | $ 2,500,000 | Unscheduled Animals; subject to maximum of $50,000 per Animal, Per Occurrence |
| | $ 2,500,000 | Watercraft under 50 feet (watercraft over 50 feet must be scheduled subject to underwriting review and approval) |
| | $ 25,000,000 | Off Premises Services Interruption including Extra Expense resulting from a covered peril at non-owned/operated location(s) |
| | $ 3,000,000 | Separately as respects Contingent Business Interruption, Contingent Rental Value, and Contingent Extra Expense |
| | $ 3,000,000 | Tax Revenue Interruption – Per Policy Provisions. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $100,000 Per Occurrence – Per Policy Provisions. |

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY CONT.** | $ 500,000 | Separately as respects Furs, Jewelry, Precious Metals and Precious Stones |
| | $ 1,000,000 | Claims Preparation Expenses |
| | $ 25,000,000 | Expediting Expenses |
| | $ 1,000,000 | Personal Property Outside the USA |
| | 180 Days | Extended Period of Indemnity |
| | $ 100,000 | Per Occurrence while in Storage and In Transit coverage subject to $10,000 Deductible for Unmanned Aircraft as more fully defined in the Policy.  Not Covered while in Flight. |
| | $ 100,000 | Per Occurrence with a $1,000,000 Annual Aggregate per Declaration for Mold/Fungus Resultant Damage as more fully defined in the policy. |
| **BOILER & MACHINERY COVERAGES & LIMITS:** | $ 100,000,000 | Boiler Explosion and Machinery Breakdown as respects Combined Property Damage and Business Interruption/Extra Expense (Including Bond Revenue Interest Payments where Values Reported and excluding Business Interruption for Power Generating Facilities unless otherwise specified).  Limit includes loss adjustment agreement and electronic computer or electronic data processing equipment with the following sub-limits: |
| | $ 10,000,000 | Utility Interruption |
| | $ 10,000,000 | Ammonia Contamination |
| | $ 10,000,000 | Water Damage |
| | $ 10,000,000 | Consequential Damage |
| | $ 2,000,000 | Media Coverage |
| | $ 1,000,000 | Hazardous Substance |
| | $ 25,000,000 | Ordinance or Law - Included in Demo & ICC Limit above |
| **NEWLY ACQUIRED LOCATIONS:** | $ 25,000,000 | Automatic Acquisition for Boiler & Machinery values at newly acquired locations. Values greater than $25,000,000 or Power Generating Facilities must be reported within 90 days and must have prior underwriting approval prior to binding |
| **"ALL RISK" BASIC DEDUCTIBLE:** | Varies by Named Insured | All Risk Deductible;  Per occurrence each and every loss except as specified below: |

| "ALL RISK" DEDUCTIBLES FOR SPECIFIC PERILS & COVERAGES: | $ | 10,000 | Residential Property(ies) less than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater |
|---|---|---|---|
| | $ | 25,000 | Residential Property(ies) greater than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater |
| | Varies by Named Insured | | All Flood Zones excluding Flood Zones A & V |
| | Varies by Named Insured | | Flood Zones A & V (inclusive of all 100 year exposures) |
| | Varies by Named Insured | | Earthquake Shock Per Unit of Insurance Per Occurrence separately as respects Real Property, Personal Property, Property in the Open and Time Element except 10% with $100,000 minimum for buildings constructed prior to 1940 where Earthquake Coverage is purchased |
| | $ | 1,000 | Specially Trained Animals |
| | $ | 500,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| | | 2.5% | of Annual Tax Revenue Value per Location for Tax Interruption |
| | 24 Hour Waiting Period | | Service Interruption as respects All Perils and Coverages (other than Boiler and Machinery Breakdown) |
| | 24 Hour | | Equivalent Business Interruption Deductible at the time of loss (24 hours to be calculated by dividing the total Business Interruption loss by the number of days business was interrupted) as respects All Perils and Coverages solely for Casino(s) with Total Insurable Values in excess of $50,000,000 |
| | Varies by Named Insured | | Boiler & Machinery Deductible, per occurrence each and every loss |

| SPECIAL TERMS & CONDITIONS: | It is understood and agreed that not withstanding anything contained herein to the contrary the following shall apply to this Policy which vary by Named Insured. |
|---|---|

## TRIBAL PROPERTY INSURANCE PROGRAM
## DECLARATION PAGE
### (Primary Layer)

| | | |
|---|---|---|
| 1. | **Insurer Name:** | **LEXINGTON INSURANCE COMPANY**<br>**Administrative Offices: 99 High Street, Boston, MA 02110-2310** |
| 2. | **Policy Number:** | **38412468** |
| 3. | **Named Insured:** | **All Entities listed as Named Insureds on file with Alliant Insurance Services, Inc.** |
| 4. | **Mailing Address of Insured:** | **As on file with Alliant Insurance Services, Inc.**<br>**c/o 325 E. Hillcrest Dr. Suite 250**<br>**Thousand Oaks, CA 91360** |

| | | | |
|---|---|---|---|
| 5. | **Policy Period:** | From: | **July 1, 2019** |
| | | To: | **July 1, 2020** |

Both days at 12:01 a.m. Local Standard Time

6. **Limits of Liability:**

10% of $25,000,000 Primary Layer — Per occurrence, per Declarations 15-17, 31 and 37 subject to an annual aggregate which is adjustable based on the actual premium on file with Alliant Specialty Insurance Services Inc. for the perils of All Risk including Earthquake, Flood, Boiler and Machinery Breakdown, excluding Terrorism.

7. **Sub-Limits of Liability:**

The program sub-limits as outlined in Declarations 15-17, 31 and 37 are 100% per occurrence per declaration ground up sub-limits. Lexington shall not be liable for more than the Primary $25,000,000 of the program sub-limits which are part of and not in addition to the policy limit of liability. When a sub-limit of liability applies in the aggregate, the insurer's maximum amount payable for such sub-limited coverage will not exceed such sub-limit of liability during any policy year. To the extent there exists a difference between the Evidence of Coverage and program sub-limit the Evidence of Coverage sub-limit applies.

8. **Deductibles:**

Program Deductibles as outlined in the corresponding Declarations below:

Declarations 15-17, 31 and 37 exclusively

To the extent there exists a difference between the Evidence of Coverage and program deductibles the Evidence of Coverage deductible applies.

9. **Terms and Conditions:**   25% Minimum Earned Premium and cancellations subject to 10% penalty

10. **Notification of Claims to:**   Tribal First
P.O. Box 609015
San Diego, CA 92160

This document does not amend, extend, or alter the coverage afforded by the policies indicated on the attached Schedule of Carriers and Participations.

Ray Corbett
Senior Vice President

_RA Corbett_ Dated: 08/13/2019
(Authorized Representative)

Alliant Specialty Insurance Services
Alliant Underwriting Services
325 E. Hillcrest Drive, Suite 250
Thousand Oaks, CA 91360

| **SUB-LIMITS OF LIABILITY:** | Varies by Named Insured | Flood Limit - Per Occurrence & Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) excluding flood zones A & V (inclusive of all 100 year exposures) |
|---|---|---|
| | Varies by Named Insured | Per Occurrence and in the Annual Aggregate for scheduled locations in Flood Zones A & V (inclusive of all 100 year exposures). This Sub-limit does not increase the specific flood limit of liability for those Named Insured(s) that purchase this optional dedicated coverage. |
| | Varies by Named Insured | Earthquake Shock - Per Occurrence and in the Annual Aggregate (for those Named Insured(s) that purchase this optional dedicated coverage) |
| | Varies by Named Insured | Combined Business Interruption and Rental Income. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $500,000 per Named Insured subject to maximum of $2,500,000 Per Occurrence, Per Declaration for Business Interruption and Rental Income combined. Business Interruption coverage for Power Generating Plants is excluded, unless otherwise specified. |
| | $   35,000,000 | Extra Expense |
| | $   40,000,000 | Automatic Acquisition for new locations for existing Named Insureds for 120 days, excluding Earthquake Shock in the states of Alaska and California. If Flood coverage is purchased for all scheduled locations, this extension will extend to include Flood coverage for any location not situated in Flood Zones A or V. (If values are not reported within the stated reporting provision, a maximum sub-limit of $25,000,000 for any one occurrence will apply). Additionally a sub-limit of $2,500,000 applies for Tier 1 Wind Counties, Parishes and Independent Cities for 60 days for the states of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas and/or situated anywhere within the states of Florida and Hawaii. |
| | $   40,000,000 | Miscellaneous Unnamed Locations excluding Earthquake Shock for locations in the states of Alaska and California, and if Flood Coverage is purchased for scheduled locations, Flood is covered subject to Named Insured's Flood Limits, however, Flood Zones A&V are excluded. This coverage extension does not apply to locations situated in Tier I or Tier II Counties. |
| | $   1,000,000 | Unscheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item for existing Named Insureds excluding Earthquake coverage for locations in Alaska and California. If flood coverage is purchased for scheduled locations, this extension includes Flood coverage for any location not situated in Flood Zones A or V. |
| | $ 5,000,000 or 110% of the scheduled values, whichever is greater, for | Scheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf, subject to 25 gallon maximum container size but not to exceed $25,000 per item |

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY CONT.** | $ 35,000,000 | Errors & Omissions (errors/omissions in the description, location of property, or valuation of property). This extension does not increase any more specific limit stated elsewhere in this policy. |
| | $ 25,000,000 | Course of Construction and Additions (including new) for projects with project values not exceeding the sub-limit shown. This sub-limit may be increased to $100,000,000 for non-combustible construction, subject to Underwriting review and approval. |
| | $ 250,000 | Prize Giveaways |
| | $ 2,500,000 | Money and Securities as respects perils of Fire, Wind, Hail, Explosion, Smoke, Lightning, Riot, Civil Commotion, Impact by Aircraft or Objects falling there from, Impact by vehicles, Water Damage and Theft (other than by an employee(s) of the Insured(s)) |
| | $ 2,500,000 | Unscheduled Fine Arts |
| | $ 25,000 | Per Occurrence and in the Annual Aggregate as respects Accidental Contamination for Owned Land, Land Values and Water owned by the Insured(s) |
| | $ 750,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| | $ 150,000,000 | Except $50,000,000 for Named Insureds in Decarlations 31 and 37 for Increased Cost of Construction due to the enforcement of building codes/ordinance or law (includes All Risk and Boiler & Machinery). Demolition, Compliance with Law and BI are restricted to $35,000,000 |
| | $ 25,000,000 | Transit |
| | $ 2,500,000 | Unscheduled Animals; subject to maximum of $50,000 per Animal, Per Occurrence |
| | $ 2,500,000 | Watercraft under 50 feet (watercraft over 50 feet must be scheduled subject to underwriting review and approval) |
| | $ 25,000,000 | Off Premises Services Interruption including Extra Expense resulting from a covered peril at non-owned/operated location(s) |
| | $ 3,000,000 | Separately as respects Contingent Business Interruption, Contingent Rental Value, and Contingent Extra Expense |
| | $ 3,000,000 | Tax Revenue Interruption – Per Policy Provisions. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $100,000 Per Occurrence – Per Policy Provisions. |

| | | |
|---|---|---|
| **SUB-LIMITS OF LIABILITY CONT.** | $          500,000 | Separately as respects Furs, Jewelry, Precious Metals and Precious Stones |
| | $       1,000,000 | Claims Preparation Expenses |
| | $     25,000,000 | Expediting Expenses |
| | $       1,000,000 | Personal Property Outside the USA |
| | 180 Days | Extended Period of Indemnity |
| | $ 100,000 | Per Occurrence while in Storage and In Transit coverage subject to $10,000 Deductible for Unmanned Aircraft as more fully defined in the Policy.  Not Covered while in Flight. |
| | $ 100,000 | Per Occurrence with a $1,000,000 Annual Aggregate per Declaration for Mold/Fungus Resultant Damage as more fully defined in the policy. |
| **BOILER & MACHINERY COVERAGES & LIMITS:** | $     100,000,000 | Boiler Explosion and Machinery Breakdown as respects Combined Property Damage and Business Interruption/Extra Expense (Including Bond Revenue Interest Payments where Values Reported and excluding Business Interruption for Power Generating Facilities unless otherwise specified).  Limit includes loss adjustment agreement and electronic computer or electronic data processing equipment with the following sub-limits: |
| | $     10,000,000 | Utility Interruption |
| | $     10,000,000 | Ammonia Contamination |
| | $     10,000,000 | Water Damage |
| | $     10,000,000 | Consequential Damage |
| | $       2,000,000 | Media Coverage |
| | $       1,000,000 | Hazardous Substance |
| | $     25,000,000 | Ordinance or Law - Included in Demo & ICC Limit above |
| **NEWLY ACQUIRED LOCATIONS:** | $     25,000,000 | Automatic Acquisition for Boiler & Machinery values at newly acquired locations. Values greater than $25,000,000 or Power Generating Facilities must be reported within 90 days and must have prior underwriting approval prior to binding |
| **"ALL RISK" BASIC DEDUCTIBLE:** | Varies by Named Insured | All Risk Deductible;  Per occurrence each and every loss except as specified below: |

| | | |
|---|---|---|
| **"ALL RISK" DEDUCTIBLES FOR SPECIFIC PERILS & COVERAGES:** | $       10,000 | Residential Property(ies) less than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater |
| | $       25,000 | Residential Property(ies) greater than $100,000 in value, or "All Risk" Policy Deductible as set forth above, whichever the greater |
| | Varies by Named Insured | All Flood Zones excluding Flood Zones A & V |
| | Varies by Named Insured | Flood Zones A & V (inclusive of all 100 year exposures) |
| | Varies by Named Insured | Earthquake Shock Per Unit of Insurance Per Occurrence separately as respects Real Property, Personal Property, Property in the Open and Time Element except 10% with $100,000 minimum for buildings constructed prior to 1940 where Earthquake Coverage is purchased |
| | $       1,000 | Specially Trained Animals |
| | $       500,000 | Unscheduled infrastructure including but not limited to Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadways or Highway Fencing, and all similar property unless a specific value has been declared. Unscheduled infrastructure coverage is excluded for the peril of Earthquake and excluded for Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs. |
| | 2.5% | of Annual Tax Revenue Value per Location for Tax Interruption |
| | 24 Hour Waiting Period | Service Interruption as respects All Perils and Coverages (other than Boiler and Machinery Breakdown) |
| | 24 Hour | Equivalent Business Interruption Deductible at the time of loss (24 hours to be calculated by dividing the total Business Interruption loss by the number of days business was interrupted) as respects All Perils and Coverages solely for Casino(s) with Total Insurable Values in excess of $50,000,000 |
| | Varies by Named Insured | Boiler & Machinery Deductible, per occurrence each and every loss |
| **SPECIAL TERMS & CONDITIONS:** | It is understood and agreed that not withstanding anything contained herein to the contrary the following shall apply to this Policy which vary by Named Insured. | |

## SURPLUS LINES DISCLOSURE

WISCONSIN

**This insurance contract is with an insurer which has not obtained a certificate of authority to transact a regular insurance business in the state of Wisconsin, and is issued and delivered as a surplus line coverage pursuant to s. 618.41 of the Wisconsin Statutes. Section 618.43(1), Wisconsin Statutes, requires payment by the policyholder of 3.0% tax on gross premium.**

Surplus Lines Licensee:
Name:   Blaise Harris
Address: 325 East Hillcrest Drive, Suite 250
         Thousand Oaks, CA 91360

## Excess Declarations Page

This document outlines and summarizes the coverages, limits, sublimits, and deductibles for this Named Insured, and is subject to the policy wording being the 'TPIP USA Form No. 15, Tribal Terrorism Policy, Tribal Excess Boiler Policy and Specific Carrier Policies' which forms an integral part of this insurance. This document does not create, modify extend or otherwise affect the terms, conditions, provisions or exclusions as outlined in the Declaration Page or Insurance Policies that have subscribed to the 2019 Tribal Property Insurance Program Placement. To the extent there exists any discrepancy between this document and the Declaration Page or Insurance Policies referred to herein, the Declaration Page or Policies shall control.

| | | |
|---|---|---|
| 1. | Policy Name: | **TRIBAL FIRST PROPERTY INSURANCE PROGRAM 17** |
| | Policy Number: | **SEE ATTACHED SCHEDULE OF CARRIERS** |
| | Policy Extension: | **9131** |
| 2. | Insured: | **Menominee Indian Tribe of Wisconsin** |
| 3. | Mailing Address of Insured: | P.O. Box 910, Keshena, WI, 54135-0910 |
| 4. | Policy Period: | From: 07/01/2019 To: 07/01/2020 |
| | | Both days at 12.01 a.m. Local Standard Time |

5. **Limits of Liability and Insured(s) Terms and Conditions:**
   To the extent there exists any discrepancy between the limits and/or sublimits described below and the Certificates of Insurance or Insurance Policies, the policies shall control. We recommend that you carefully review the Certificates or Policies complete list of limits and sublimits.

   **$259,999,093**      Per Occurrence/ Per Declaration: All Perils, Coverages (subject to policy exclusions) and Insured(s) combined, subject to the following per occurrence and/or aggregate sub-limits as noted.

6. **Sub-Limits of Liability:**

   (The Sub-limits of Liability set forth below apply for each Declaration, Per Occurrence excess of the Policy Deductibles set forth in Item 8. below, unless indicated otherwise. The Sub-Limits of Liability set forth below do not increase the Specific Limits of Liability set forth in Item 5. above)

   A.      $5,000,000      Per Occurrence and in the Annual Aggregate as respects the peril of **Flood** (for those Insured(s) / Entity(ies) that purchase this optional dedicated coverage).

   B.      $5,000,000      Per Occurrence and in the Annual Aggregate as respects the peril of **Earthquake Shock** (for those Insured(s) / Entity(ies) that purchase this optional dedicated coverage.

   C.      $Not Covered      Per Occurrence and in the Annual Aggregate for all locations in Flood Zones A, V, (inclusive of all 100 year exposures). This Sub-limit does not increase the specific flood limit of liability for those Insured(s) that purchase this optional dedicated coverage

   D.      $31,250,000      Combined Business Interruption and Rental Income. However, if specific values for such coverage have not been reported as part of the Insured(s) schedule of values, this sublimit is limited to $500,000 per Insured and $2,500,000 Per Occurrence for Business Interruption and Rental Income combined and $5,000,000 per occurrence for Tax Revenue Interruption. BI Coverage for Power Generating Plants is excluded unless otherwise specified

   E.      $35,000,000      **Extra Expense**

**F.**     **$40,000,000**     **Automatic Acquisition** for New locations for Existing Insureds for 120 days, excluding Earthquake Shock in the states of Alaska and California. If Flood Coverage is purchased for all locations, Flood is covered subject to Insured's Flood Limits, however, Flood Zones A & V are excluded. (If values are not reported within the stated reporting provision, a maximum sub-limit of $25,000,000 for any one occurrence will apply).  Additionally a sublimit of $2,500,000 applies for Tier 1 Wind Counties, Parishes and Independent Cities for 60 days for the states of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas and/or situated anywhere within the states of Florida and Hawaii.

**G.**     **$40,000,000**     **Miscellaneous Unnamed Locations** excluding Earthquake Shock in the states of Alaska and California, and if Flood Coverage is purchased for all locations, Flood is covered subject to Insured(s) Flood Limits, however, Flood Zones A&V are excluded.  This coverage extension does not apply to locations situated in Tier I or Tier II Counties.

**H.**     **$1,000,000**     **Unscheduled Landscaping, Tees, Sand Traps, Greens and Athletic Fields and artificial turf,** subject to 25 gallon maximum container size but not to exceed $25,000 per item for existing Named Insureds excluding Earthquake coverage for locations in Alaska and California.  If flood coverage is purchased for scheduled locations, this extension includes Flood coverage for any location not situated in Flood Zones A or V.

**I.**     **$5,000,000 or 110% of the scheduled values, whichever is greater, for**     **Scheduled Landscaping, Tees, Sand Traps, Greens and Athletic Fields and artificial turf,** subject to 25 gallon maximum container size but not to exceed $25,000 per item

**J.**     **$35,000,000**     **Errors & Omissions** (errors/omissions in the description, location of property, or valuation of property).  This extension does not increase any more specific limit stated elsewhere in this policy.

**K.**     **$25,000,000**     **Course of Construction and Additions** (including new) for projects with project values not exceeding the sub-limit shown.  This sub-limit may be increased to $100,000,000 for non-combustible construction, subject to Underwriting review and approval.

**L.**     **$250,000**     **Prize Giveaways**

**M.**     **$2,500,000**     **Money and Securities** as respects perils of Fire, Wind, Hail, Explosion, Smoke, Lightning, Riot, Civil Commotion, Impact by Aircraft or Objects falling there from, Impact by vehicles, Water Damage and Theft (other than by an employee(s) of the Insured(s))

**N.**     **$2,500,000**     **Unscheduled Fine Arts**

**O.**     **$25,000**     Per Occurrence and in the Annual Aggregate as respects **Accidental Contamination** for Owned Land, Land Values and Water owned by the Insured(s)

**P.**     **$750,000**     **Unscheduled Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadway or Highway Fencing, and all similar property** unless a specific value has been declared (excluding coverage for the peril of Earthquake Shock,  and excluding Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs).

**Q.**     **$150,000,000**     **Increased Cost of Construction** due to the enforcement of building codes/ ordinance or law (includes All Risk and Boiler & Machinery): Demolition, Compliance with Law and BI are restricted to $35,000,000.

**R.**     **$25,000,000**     **Transit**

| | | |
|---|---|---|
| S. | $2,500,000 | **Unscheduled Animals**; subject to maximum of $50,000 per Animal, Per Occurrence |
| T. | $2,500,000 | **Watercraft** under 50 feet (watercraft over 50 feet must be scheduled subject to underwriting review and approval) |
| U. | $25,000,000 | **Off Premises Services Interruption including Extra Expense** resulting from a covered peril at non-owned / operated location(s) |
| V. | $3,000,000 | Separately as respects **Contingent Business Interruption**, **Contingent Rental Value**, and **Contingent Extra Expense** |
| W. | $3,000,000 | **Tax Revenue Interruption** – Per Policy Provisions. However, if specific values for such coverage have not been reported as part of the Named Insured's schedule of values held on file with Alliant Insurance Services, Inc., this sub-limit amount is limited to $100,000 Per Occurrence – Per Policy Provisions. |
| X. | $500,000 | Separately as respects **Furs, Jewelry, Precious Metals and Precious Stones** |
| Y. | $1,000,000 | **Claim Preparation Expenses** |
| Z. | $25,000,000 | **Expediting Expenses** |
| AA. | $1,000,000 | **Personal Property Outside the USA** |
| AB. | 180 Days | Extended Period of Indemnity |

| | | | |
|---|---|---|---|
| 7. | **BOILER & MACHINERY COVERAGES & LIMITS:** | $100,000,000 | Boiler Explosion and Machinery Breakdown, Combined Property Damage and Business Interruption/Extra Expense (including Revenue Bond Interest Payments for locations where the income is reported). Limit includes Loss Adjustment Agreement, and Electronic Computer or Data Processing Equipment subject to the following sub-limits: |
| | | $ 10,000,000 | Utility Interruption |
| | | $ 10,000,000 | Ammonia Contamination |
| | | $ 10,000,000 | Water Damage |
| | | $ 10,000,000 | Consequential Damage |
| | | $ 2,000,000 | Media Coverage |
| | | $ 1,000,000 | Hazardous Substance |
| | | $ 25,000,000 | Ordinance or Law – Included in Demo & ICC Limit above |
| | **NEWLY ACQUIRED LOCATIONS:** | $ 25,000,000 | Automatic Acquisition for Boiler & Machinery values at newly acquired locations. Values greater than $25,000,000 or Power Generating Facilities must be reported within 90 days and must have prior underwriting approval prior to binding |
| | **VALUATION:** | | • Repair or Replacement Cost<br>• Actual Loss Sustained for Time Element Coverages<br>• Contractor's/Scheduled Equipment either Replacement Cost or Actual Cash Value as elected by declaring values in the manner losses are to be adjusted. If not declared, valuation will default to Actual Cash Value (ACV) |

**8.**     **Deductibles:**

To the extent there exists any discrepancy between the deductibles described below and the Certificate of Insurance, the Certificate or Policy shall control.  We recommend that you carefully review the Certificate or Policy for a complete list of deductibles.

(The Deductible amounts set forth below apply Per Occurrence unless indicated otherwise)

**A.**     **"Basic" All Perils and Coverages except as respects Specified Perils or Coverages Deductible(s) which set forth in Item 8. B. below:**

**i.**     Applicable as respects Single Entity Insured(s):

Basic Deductible:

$10,000                            **All Risk Deductible including Boiler & Machinery**; Per occurrence each and every loss except as specified below:

**B.**     **Specified Perils and Coverages Deductibles:**

**i.**     $100,000                 All Flood Zones **excluding Flood Zones A&V,**

**ii.**    $Not Covered              **Flood Zones A & V**

**iii.**   5% subject to a $100,000 minimum   **Earthquake Shock** Per Unit of Insurance Per Occurrence separately as respects Real Property, Personal Property, Property in the Open and Time Element except 10% with $100,000 minimum for buildings constructed prior to 1940 where Earthquake Coverage is purchased

**iv.**    $10,000                   **Residential Property(ies) less than $100,000 in value,** or "All Risk" Policy Deductible as set forth above, whichever the greater

**v.**     $25,000                   **Residential Property(ies) greater than $100,000 in value,** or "All Risk" Policy Deductible as set forth above, whichever the greater

**vi.**    $1,000                    **Specially Trained Animals**

**vii.**   $500,000                  **Unscheduled Tunnels, Bridges, Dams, Catwalks (except those not for public use), Roadways, Highways, Streets (including guardrails), Sidewalks (including guardrails), Culverts, Channels, Levees, Dikes, Berms, Embankments, Street Lights, Traffic Signals, Meters, Roadway or Highway Fencing, and all similar property** unless a specific value has been declared (excluding coverage for the peril of Earthquake Shock; and excluding Federal Emergency Management Agency (FEMA) and/or Office of Emergency Services (OES) declared disasters, providing said declaration provides funding for repairs).

**viii.**  2.5%                      **Tax Interruption** (Percentage of Annual Tax Value per Location)

| ix. | 24 Hour Waiting Period | **Service Interruption** as respects All Perils and Coverages (other than Boiler Explosion and Machinery Breakdown) |
| x. | 24 Hour | **Equivalent Business Interruption** Deductible at the time of loss (24 hours to be calculated by dividing the total Business Interruption loss by the number of days business was interrupted) as respects All Perils and Coverages solely for Casino(s) with Total Insurable Values in excess of $50,000,000 |

**9.**   **Special Terms and Conditions:**

It is understood and agreed that notwithstanding anything contained herein to the contrary the following shall apply to this Policy:

| Description: | Sub-Limit of Liability: | Applicable Deductible: |
| --- | --- | --- |
| 1) Add Mortgagee in relation to all BPP.: Associated Bank, N.A. ISAOA P.O. BOX 12768 Green Bay, WI 54307-2768 | 1) Not Applicable | 1) Not Applicable |

**The following stand-alone coverage is provided by the Tribal Property Insurance Program but is not covered in the Limit of Liability or the Sub-Limits of Liability above or attached to the Master Policy Form Wording.**

| $15,000,000 | Per Occurrence **Primary Terrorism** subject to $80,000,000 Annual Aggregate for TPIP Declarations combined |
| $485,000,000 | Per Occurrence **Terrorism Excess** of $15,000,000 Primary Subject to $520,000,000 Annual Aggregate for TPIP Declarations combined |
| Same as All-Risk Deductible | **Primary Terrorism** Deductible |

| **10.** | **NOTICE OF CANCELLATION:** | 90 days except 10 days for non-payment of premium |
| **11.** | **Notification of Claims to:** | Tribal First Attention: Claims Department, P.O. Box 609015 San Diego, California 92160 858-505-4022 |

This document does not amend, extend, or alter the coverage afforded by the policies indicated on the attached Schedule of Carriers and Participations.

Date of Issuance: 10/01/2019

Surplus Lines Disclosure Statement

Attached to and forming part of:     TPIP **2019-2020**

| State: | Disclosure: |
|---|---|
| Wisconsin | This insurance contract is with an insurer which has not obtained a certificate of authority to transact a regular insurance business in the state of Wisconsin, and is issued and delivered as a surplus lines coverage pursuant to s. 618.41 of the Wisconsin Statutes. Section 618.43(1), Wisconsin Statutes, requires payment by the policyholder of 3% tax on gross premium.<br><br>Surplus Lines Licensee:<br><br>Name:  George Shirahama Maggay<br>Address:  21550 Oxnard Street, Ste 1100<br>Woodland Hills, CA 91367 |

# LEXINGTON INSURANCE COMPANY
### ADMINISTRATIVE OFFICES: 99 High Street, Boston, Massachusetts 02110

### <u>BOILER AND MACHINERY BREAKDOWN FOLLOW FORM EXCESS POLICY</u>
### <u>BOILER AND MACHINERY BREAKDOWN DECLARATIONS</u>

Policy Number:  011660457/07                    Renewal of:  011660457/06

**Item 1.**   **Named Insured:**
Tribal First Property Insurance Program, as per Declaration page and its agency(ies), organizations(s), enterprise(s) and/or individual(s) as described in SECTION I,  GENERAL PROVISIONS, B. NAME OF INSURED, LEXINGTON TRIBAL FIRST POLICY WORDING, TPIP USA FORM No. 15.

Also as described in SECTION I, GENERAL PROVISIONS, B. NAME OF INSURED, lessors and other party(ies) of interest and mortgagees are included as Insureds.

Mailing Address of Insured:
As per Declaration page

**Item 2.**   **Policy Period:**
From: 07/01/2019            To:  07/01/2020
(At 12:01 A.M. Standard Time at the address of the Named Insured shown above.)

**Item 3.**   **Limits of Liability:**
Occurrence Limit:      7.5%   or   $2,625,000   part   of   $35,000,000   excess   of $15,000,000;  then
100%   or   $50,000,000   part   of   $50,000,000   excess   of $50,000,000.

**Item 4.**   **Premium:**
Total Premium:          **Per schedule on file with the insurer**

**Item 5.**   **A. Perils Covered:**
As per SECTION VIII, BOILER AND MACHINERY BREAKDOWN EXTENSION.

**B. Perils Excluded:** (shown below and/or by endorsement attached to this Policy)
Except as coverage is specifically provided by SECTION VIII, BOILER AND MACHINERY BREAKDOWN EXTENSION, all EXCLUSIONS and limitations as described in LEXINGTON TRIBAL FIRST POLICY WORDING, TPIP USA FORM No. 15 and all Exclusions, Special Provisions and Limitations as described in SECTION VIII, BOILER AND MACHINERY BREAKDOWN EXTENSION.

**Item 6.**   **Description of Property Covered:**
As per Covered Property described in SECTION VIII, BOILER AND MACHINERY BREAKDOWN EXTENSION, subject to limitations and exclusions described in SECTION II, PROPERTY DAMAGE, LEXINGTON TRIBAL FIRST POLICY WORDING, TPIP USA FORM No. 15.

**Item 7.**   **Followed Policy:**

Insurance Company:       Lexington Insurance Company
Policy Number:           LEXINGTON TRIBAL FIRST POLICY WORDING, TPIP USA FORM No. 15

AUTHORIZED REPRESENTATIVE
OR Countersignature
(In states where applicable)

**FORMS SCHEDULE**

Named Insured: TRIBAL FIRST PROPERTY INSURANCE PROGRAM

Policy No.: 011660457/07

Effective Date: July 1, 2019

| Form Number | Edition Date | Title |
|---|---|---|
| | | Boiler and Machinery Property Declarations |
| 91222 | 09/16 | Policyholder Notice |
| PR4225 | 07/13 | Economic Sanctions Endorsement |
| | | Boiler and Machinery Breakdown Follow Form Excess Policy |

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

## ENDORSEMENT

**This endorsement, effective 07/01/2019 @ 12:01 A.M. STANDARD TIME**

**Forms a part of Policy No.: 011660457/07**

**Issued to:  TRIBAL FIRST PROPERTY INSURANCE PROGRAM**

**By:  LEXINGTON INSURANCE COMPANY**

## ECONOMIC SANCTIONS ENDORSEMENT

The Insurer shall not be deemed to provide cover and the Insurer shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Insurer, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union or the United States of America.

All other terms and conditions of the policy remain the same.

_____

Authorized Representative

### *LEXINGTON* INSURANCE COMPANY
(hereinafter, the "Company")
**Administrative Offices:  99 High Street, Boston, Massachusetts 02110**

## BOILER AND MACHINERY BREAKDOWN FOLLOW FORM EXCESS POLICY

**I.    INSURING AGREEMENT**

    **A.**    This Boiler and Machinery Breakdown Policy insures direct physical loss or damage to property insured by the **followed policy** against the Boiler and Machinery Breakdown peril(s) the Company covers under this Boiler and Machinery Breakdown Policy as shown in Item 5.A. of the Boiler and Machinery Breakdown Declarations and also insures business income and additional coverage(s), but only to the extent provided by the **followed policy** as respects such peril(s).

    **B.**    Except with regard to terms and conditions of this Boiler and Machinery Breakdown Policy inconsistent with the **followed policy**, the provisions of the **followed policy** are incorporated as part of this Boiler and Machinery Breakdown Policy.

**II.    LIMITS OF INSURANCE**

    **A.**    The Occurrence Limit shown in Item 3. of the Boiler and Machinery Breakdown Declarations (hereinafter, the Occurrence Limit) is the Company's maximum liability for any one occurrence covered under this Boiler and Machinery Breakdown Policy.

    **B.**    The Occurrence Limit applies upon the exhaustion of the underlying occurrence limit by the payment or the obligation of the **underlying insurers** to pay the underlying occurrence limit and such Occurrence Limit only applies to the perils covered under this Boiler and Machinery Breakdown Policy.  If any coverage in the **underlying policies** is subject to: (1) a sublimit or (2) is excluded by this Boiler and Machinery Breakdown Policy, the Company will recognize the reduction of the underlying occurrence limit by the payment or the obligation of the **underlying insurers** to pay such sublimit or such excluded coverage.

    **C.**    The deductible of the **followed policy** shall apply to each occurrence and shall continue to apply in the same manner upon exhaustion of any underlying aggregate limit.

**III.    EXCLUSIONS**

Except as coverage is specifically provided by this Boiler and Machinery Breakdown Policy, the exclusions of the **followed policy** apply to this Boiler and Machinery Breakdown Policy. The Company may also exclude: (1) perils shown in Item 5.B. of the Boiler and Machinery Breakdown Declarations and/or (2) perils or property described by endorsement to this Boiler and Machinery Breakdown Policy.

**IV.    DEFINITIONS** – Any term not defined in this Boiler and Machinery Breakdown Policy shall have the meaning assigned to such term in the **followed policy**.

    **A.**    **Followed policy** means the policy shown in Item 7. of the Boiler and Machinery Breakdown Declarations.

    **B.**    **Underlying insurers** means all underlying insurers, including the insurer for the **Followed Policy.**

    **C.**    **Underlying policies** means all underlying policies, including the **followed policy.**

**V.    CONDITIONS**

**A.    JOINT LOSS**

If the loss includes loss or damage insured under this Boiler and Machinery Breakdown Policy and the Boiler and Machinery Breakdown coverage of the **underlying policies**, and loss or damage from causes of loss or perils not insured under this Boiler and Machinery Breakdown Policy and the underlying Boiler and Machinery Breakdown coverage, the attachment point for coverage provided under this Boiler and Machinery Breakdown Policy will be determined as follows:

The limits of the **underlying policies** will be apportioned in the same proportion that the liability under each respective coverage bears to the total liability for loss as finally determined. The Company's excess share under this Boiler and Machinery Breakdown Policy is excess of the amount of the **underlying policy(ies)** limit apportioned to Boiler and Machinery Breakdown loss or damage.

Example:  (for illustration only; actual policy limits not reflected)
Total loss = $20,000,000
Underlying policy limit (combined Property and Boiler and Machinery Breakdown Coverage) = $10,000,000
Liability determined to be $15,000,000 Property; $5,000,000 Boiler and Machinery Breakdown
15,000,000/20,000,000 = 75% apportioned to Property
$5,000,000/$20,000,000 = 25% apportioned to Boiler and Machinery Breakdown
25% of underlying policy apportioned to Boiler and Machinery Breakdown = $2,500,000
75% of underlying policy apportioned to Property = $7,500,000

Our share is 25% of the remaining amount of the loss up to the Boiler and Machinery Breakdown Limit shown on the Boiler and Machinery Breakdown Declarations, and is excess of the $2,500,000 paid for Boiler and Machinery Breakdown under the **underlying policy**.

**B.    CANCELLATION**

1.    This Boiler and Machinery Breakdown Policy can be canceled by the First Named Insured by providing the Company with:

   a.    An advance written request for cancellation stating when the cancellation shall be effective, and

   b.    The original Boiler and Machinery Breakdown Policy or a lost policy release signed by the First Named Insured or its legal representative.

2.    This Boiler and Machinery Breakdown Policy may be canceled by the Company by giving to the Insured at least ninety (90) days written notice of cancellation or in the case of non-payment of premium, at least ten (10) days' written notice of cancellation.  Such notice may be accompanied with the unearned premium, or if not included, the Company shall return the unearned premium upon demand by the First Named Insured.

3.    The cancellation will be effective even if the Company has not made or offered a refund.  If notice is mailed, proof of mailing will be sufficient proof of notice.

4.   If this Boiler and Machinery Breakdown Policy is canceled, the Company will send the First Named Insured any premium refund due. If the Company cancels, the refund will be pro rata. If the First Named Insured cancels, earned premium will be calculated in accordance with the customary short-rate table and procedure.

## C.   CHANGES IN TERMS OR CONDITIONS OF THE FOLLOWED POLICY

If during the policy period, the terms or conditions of the **followed policy** are changed in any manner, the Insured shall as a condition precedent to its rights under this Boiler and Machinery Breakdown Policy give the Company written notice of the full particulars thereof immediately. If such changes restrict coverage, this Boiler and Machinery Breakdown Policy shall become subject to any such restrictions upon the effective date of the changes in the **followed policy**. If, however, such changes broaden coverage, this Boiler and Machinery Breakdown Policy shall become subject to any such changes upon the effective date of the changes in the **followed policy**, but only upon the condition that the Company agrees to follow such changes by written endorsement attached hereto and the Insured agrees to any additional premium and/or amendment of the provisions of this Boiler and Machinery Breakdown Policy required by the Company relating to such changes. Further, such new coverage is conditioned upon the Insured paying when due any additional premium required by the Company relating to such changes.

## D.   MAINTENANCE OF UNDERLYING INSURANCE

It is a condition of this Boiler and Machinery Breakdown Policy that the **underlying policies** shall be maintained in full force and effect. Failure to comply with the foregoing shall not invalidate this Boiler and Machinery Breakdown Policy, but in the event of such failure, the Company shall be liable only to the extent that the Company would have been liable had the Insured complied with this condition.

## E.   MISREPRESENTATION AND FRAUD

This entire Boiler and Machinery Breakdown Policy shall be void if, whether before or after a loss, the Insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or in case of any fraud, or false swearing by the Insured relating thereto.

## F.   NOTICE OF CLAIM AND PROOF OF LOSS   ·

Notice of any claim which may affect this Boiler and Machinery Breakdown Policy or reduce any underlying aggregate limit shall be reported as soon as practicable to:

Lexington Insurance Company
99 High Street
Boston, Massachusetts 02110

A Proof of Claim shall be provided in accordance with the terms of the **followed policy**.

## G.   SALVAGE AND RECOVERIES

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Boiler and Machinery Breakdown Policy, shall reduce the loss accordingly.

**H.   SERVICE OF SUIT**

In the event of the Company's failure to pay any amount claimed to be due hereunder, the Company, at the Insured's request, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 99 High Street, Boston, Massachusetts, 02110 or his or her representative, and that in any suit instituted against the Company upon this Boiler and Machinery Breakdown Policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office as the Company's true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by the Insured or on the Insured's behalf or any beneficiary hereunder arising out of this Boiler and Machinery Breakdown Policy of insurance and hereby designate the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**I.   SUIT AGAINST COMPANY**

No suit, action or proceeding for the recovery of any claim under this Boiler and Machinery Breakdown Policy shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this Boiler and Machinery Breakdown Policy, nor unless the same be commenced within twenty four (24) months next after the date of the loss, provided however, that if under the laws of the jurisdiction in which the property is located such time limitation is invalid, then any such claims shall be void unless such action, suit or proceedings is commenced within the shortest limit of time permitted by the laws of such jurisdiction.

**J.   TERRITORIAL LIMITATIONS**

Payment of loss under this Boiler and Machinery Breakdown Policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

IN WITNESS WHEREOF, the Insurance Company identified on the Boiler and Machinery Breakdown Declarations has caused this policy to be signed by its President, Secretary and a duly authorized representative of the Insurance Company.

_____
Authorized Representative

Surplus Lines Disclosure Statement

Attached to and forming part of:     TPIP 2019-2020

| State: | Disclosure: |
|--------|-------------|
| Wisconsin | This insurance contract is with an insurer which has not obtained a certificate of authority to transact a regular insurance business in the state of Wisconsin, and is issued and delivered as a surplus lines coverage pursuant to s. 618.41 of the Wisconsin Statutes. Section 618.43(1), Wisconsin Statutes, requires payment by the policyholder of 3% tax on gross premium. |

Surplus Lines Licensee:

Name:   George Shirahama Maggay

Address:   21550 Oxnard Street, Ste 1100
              Woodland Hills, CA 91367

**Tribal First Property Insurance Program**
**Declaration #17 - TPIP I**
**SCHEDULE OF CARRIERS**
**Effective July 1, 2019 to July 1, 2020**

| Participation | Company | Policy # |
|---|---|---|
| **$ 50,000,000** | **All Risk including EQ, FL, B&M** | |
| $ 1,375,000 | Lexington Insurance Company | 017471589/06 |
| $ 8,750,000 | Lexington Insurance Company | 38412453 |
| $ 2,500,000 | Lexington Insurance Company | 38412468 |
| $ 4,750,000 | Underwriters at Lloyd's - Syndicates; ASC1414, XLC 2003, TAL 1183, MSP 318, ATL1861, KLN 510, AGR 3268 | PJ193647 |
| $ 500,000 | Underwriters at Lloyd's - Syndicate: CNP 4444 | PJ1900131 |
| $ 312,500 | Underwriters at Lloyd's - Aspen Specialty Insurance Company | PX006CP19 |
| $ 375,000 | Homeland Insurance Company of NY (One Beacon) | 798000237 |
| $ 937,500 | Hallmark Specialty Insurance Company | 73PRX19A1B7 |
| $ 16,625,000 | Underwriters at Lloyd's - Syndicates: KLN 0510, ATL 1861, ASC 1414, QBE 1886, MSP 0318, APL 1969, CHN 2015, XLC 2003 | PJ1933021 |
| $ 2,625,000 | Underwriters at Lloyd's - Syndicate BRT 2987 (excluding B&M) | PD-10363-05 |
| $ 8,750,000 | Lexington Insurance Company | 011660435/07 |
| $ 2,500,000 | Endurance Worldwide Insurance Ltd t/as Sompo International | PJ1900134 |
| $ 50,000,000 | | |

| Participation | Company | Policy # |
|---|---|---|
| **$ 50,000,000 Excess of $50,000,000** | **All Risk including EQ and FL excluding B&M** | |
| $ 17,500,000 | Underwriters at Lloyd's - Syndicates: KLN 0510, TMK 1880, BRT 2987, BRT 2988, CNP 4444, ATL 1861, Neon Worldwide Property Consortium, AUW 0609, TAL 1183, AUL 1274 | PJ1900067 |
| $ 7,500,000 | Arch Specialty Insurance Company | ESP7303914-02 |
| $ 12,500,000 | Evanston Insurance Company | MKLV14XP012536 |
| $ 5,000,000 | Hallmark Specialty Insurance Company | 73PRX19A1EF |
| $ 5,000,000 | Allied World National Assurance Company | 0310-8171-1N |
| $ 2,500,000 | Endurance Worldwide Insurance Ltd./t/as Sompo International | PJ1900134 |
| $ 50,000,000 | | |

| | | |
|---|---|---|
| **Excess of $100,000,000 See Liberty Mutual Excess Policy** | | |

| Participation | Company | Policy # |
|---|---|---|
| **$ 100,000,000 Excess of $100,000,000 DIC only Layer including EQ and FL excluding B&M and Terrorism** | | |
| $ 50,000,000 | Landmark American Insurance Company | LHQ424636 |
| $ 50,000,000 | SRU - Specialty Risk Underwriters, LLC | AQS-190984 |
| $ 100,000,000 | | |

| Participation | Company | Policy # |
|---|---|---|
| **$ 15,000,000  Primary Terrorism Per Occurrence / $80,000,000 Annual Aggregate** | | |
| $    15,000,000 | Underwriters at Lloyds-Syndicates; CNP 4444, BRT 2987, Aqueduct Portfolio Management - FOR and on behalf - CNP 4444, ADV 780, SCC 1301, ARG 2121, TRV 5000, AUL 1274, MKL 3000, AES 1225, LIB 4472, NEO 2468 | PJ1933868 |
| $    15,000,000 | | |
| **$ 185,000,000  Excess of $15,000,000      Terrorism Per Occurrence excess of $15,000,000/$220,000,000 Annual Aggregate excess of $80,000,000** | | |
| $   185,000,000 | Underwriters at Lloyds-Syndicates; CNP 4444, BRT 2987, Aqueduct Portfolio Management - FOR and on behalf - CNP 4444, ADV 780, SCC 1301, ARG 2121, TRV 5000, AUL 1274, MKL 3000, AES 1225, LIB 4472, NEO 2468 | PJ1933255 |
| $   185,000,000 | | |
| **$ 300,000,000  Excess of $200,000,000      Terrorism Per Occurrence excess of $200,000,000/$300,000,000 Annual Aggregate excess of $300,000,000** | | |
| $   300,000,000 | Underwriters at Lloyds-Syndicates; ASC 1414, XLC 2003, BRIT 9156 & BRT 2987, HIS 033 | PJ1900051 |
| $   300,000,000 | | |
| **$ 35,000,000  Excess of $15,000,000  Excess Boiler and Machinery** | | |
| $     2,625,000 | Lexington Insurance Co | 011660457/07 |
| **$ 50,000,000  Excess of $50,000,000  Excess Boiler and Machinery** | | |
| $    50,000,000 | Lexington Insurance Co | 011660457/07 |
| **Cyber Liability Policy** | | |
| | Lloyd's Syndicate - Beazley 2623-623 | PH1900358 |
| **Pollution Liability Policy** | | |
| | Ironshore Specialty Insurance Company | 004104200 |
| **Deadly Weapons Policy** | | |
| | Lloyd's Syndicate - Beazley 9779 | PJ1900072 |



# TRIBAL FIRST
# POLICY WORDING

### TPIP USA FORM No. <u>15</u>

## Coverage Incepting
## July 1, 2019 to July 1, 2020

# TABLE OF CONTENTS

Page

**SECTION I**........................................................................................................................**5**

**GENERAL PROVISIONS**...............................................................................................**5**

A. INSURING AGREEMENT ........................................................................... 5
B. NAMED INSURED ....................................................................................... 5
C. MAILING ADDRESS OF NAMED INSURED .......................................... 5
D. POLICY PERIOD ......................................................................................... 5
E. LIMITS OF LIABILITY .............................................................................. 5
F. OPTIONAL COVERAGE PARTICIPATION ............................................ 7
G. DEDUCTIBLE PROVISIONS ..................................................................... 7
H. UNIT OF INSURANCE DEFINED ............................................................. 7
I. PRIORITY OF PAYMENTS ........................................................................ 8

**SECTION II**......................................................................................................................**9**

**PROPERTY DAMAGE** ....................................................................................................**9**

A. COVERAGE................................................................................................... 9
B. EXTENSIONS OF COVERAGE.................................................................. 9
    *1. PERSONAL EFFECTS.......................................................................... 9*
    *2. PROPERTY IN COURSE OF CONSTRUCTION AND ADDITIONS ........... 9*
    *3. FIRE FIGHTING EXPENSES.............................................................. 10*
    *4. OFF PREMISES SERVICES INTERRUPTION ................................... 10*
    *5. ARCHITECTS AND ENGINEERS FEES AND LOSS ADJUSTMENT EXPENSES............. 10*
    *6. EXPEDITING EXPENSES................................................................... 11*
    *7. DEBRIS REMOVAL............................................................................ 11*
    *8. BUILDING LAWS............................................................................... 11*
    *9. DEMOLITION COST.......................................................................... 11*
    *10. INCREASED COST OF CONSTRUCTION ......................................... 11*
    *11. ERRORS & OMISSIONS..................................................................... 12*
    *12. ANIMALS ........................................................................................... 12*
    *13. VALUABLE PAPERS.......................................................................... 12*
    *14. TRANSIT ............................................................................................ 12*
    *15. ASBESTOS CLEAN UP AND REMOVAL........................................... 12*
    *16. PROTECTION AND PRESERVATION OF PROPERTY ...................... 13*
    *17. LEASEHOLD INTEREST.................................................................... 13*
    *18. AUTOMATIC ACQUISITION AND REPORTING CONDITIONS......... 14*
    *19. MISCELLANEOUS UNNAMED LOCATIONS..................................... 15*
    *20. ACCIDENTAL CONTAMINATION..................................................... 15*
C. PROPERTY NOT COVERED ..................................................................... 16
D. LOSS PAYMENT BASIS / VALUATION ................................................. 16

**SECTION III**....................................................................................................................**19**

**BUSINESS INTERRUPTION, EXTRA EXPENSE & RENTAL INCOME** ....................**19**

A. COVERAGE................................................................................................... 19
    *1. BUSINESS INTERRUPTION .............................................................. 19*
    *2. EXTRA EXPENSE.............................................................................. 19*
B. EXTENSIONS OF COVERAGE.................................................................. 20
    *1. INGRESS / EGRESS........................................................................... 20*
    *2. INTERRUPTION BY CIVIL AUTHORITY ......................................... 20*
    *3. DEMOLITION AND INCREASED TIME TO REBUILD...................... 20*
    *4. CONTINGENT TIME ELEMENT COVERAGE.................................. 20*
    *5. TAX REVENUE INTERRUPTION....................................................... 21*
    *6. EXTENDED PERIOD OF INDEMNITY.............................................. 21*
    *7. EXPENSES TO REDUCE LOSS.......................................................... 21*
C. EXCLUSIONS ............................................................................................... 22
D. CONDITIONS APPLICABLE TO THIS SECTION.................................... 22
E. DEFINITIONS............................................................................................... 22

|  |  |  |  |
|---|---|---|---|
| *1.* | *GROSS EARNINGS* | | *22* |
| *2.* | *MERCHANDISE* | | *23* |
| *3.* | *EXTRA EXPENSE* | | *23* |
| *4.* | *RENTAL VALUE* | | *23* |
| *5.* | *PERIOD OF RESTORATION* | | *23* |

**SECTION IV** ........................................................................................................ **24**

**GENERAL CONDITIONS** ....................................................................................... **24**

| | | |
|---|---|---|
| A. | PERILS COVERED | 24 |
| B. | EXCLUSIONS | 24 |
| C. | STATUTES | 29 |
| D. | TERRITORIAL LIMITS | 29 |
| E. | REINSTATEMENT | 29 |
| F. | FREE ON BOARD (F.O.B.) SHIPMENTS | 29 |
| G. | BREACH OF CONDITIONS | 29 |
| H. | PERMITS AND PRIVILEGES | 29 |
| I. | PROTECTIVE SAFEGUARDS | 30 |
| J. | NOTICE OF LOSS | 30 |
| K. | ARBITRATION OF VALUE | 30 |
| L. | PROOF OF LOSS | 31 |
| N. | CANCELLATION | 31 |
| O. | ABANDONMENT | 32 |
| P. | ASSIGNMENT | 32 |
| Q. | SALVAGE | 32 |
| R. | OTHER INSURANCE | 32 |
| S. | EXCESS INSURANCE | 32 |
| T. | RIGHT TO REVIEW RECORDS FOLLOWING AN INSURED LOSS | 32 |
| U. | CONCEALMENT AND FRAUD | 33 |
| V. | FULL WAIVER | 33 |
| W. | SUIT AGAINST COMPANY | 33 |
| X. | JOINT LOSS ADJUSTMENT – BOILER & MACHINERY | 33 |
| Y. | JOINT LOSS ADJUSTMENT – EXCESS PROPERTY | 34 |
| Z. | LENDER'S LOSS PAYABLE | 35 |
| AA. | SEVERAL LIABILITY NOTICE | 36 |
| AB. | LOSS PAYABLE PROVISIONS | 36 |
| AC. | ELECTRONIC DATA | 38 |
| AD. | LOSS ADJUSTMENT SERVICES | 39 |
| AE. | SERVICE OF SUIT (U.S.A.) | 39 |
| AF. | DEFINITIONS: | 40 |
| | *1. OCCURRENCE* | *40* |
| | a. Windstorm | 40 |
| | b. Flood | 40 |
| | d. Earthquake Shock | 41 |
| | *2. PERSONAL PROPERTY OF OTHERS* | *42* |
| | *3. IMPROVEMENTS AND BETTERMENTS* | *42* |
| | *4. VALUABLE PAPERS AND RECORDS* | *42* |
| | *5. TIER I WINDSTORM COUNTIES* | *43* |
| | *6. RESIDENTIAL/HABITATIONAL* | *43* |
| AG. | ADDITIONAL INSURED'S / LOSS PAYEES | 43 |

**SECTION V** ......................................................................................................... **44**

**FINE ARTS FLOATER** ........................................................................................... **44**

| | | |
|---|---|---|
| A. | COVERAGE | 44 |
| | *1. PROPERTY COVERED* | *44* |
| | *2. "WALL TO WALL" ("NAIL TO NAIL") COVERAGE* | *44* |
| B. | EXCLUSIONS | 44 |
| C. | LOSS PAYMENT BASIS / VALUATION | 45 |
| D. | SPECIAL CONDITIONS | 46 |

**SECTION VI** ........................................................................................................ **48**

**MOBILE / CONTRACTORS EQUIPMENT** ................................................................ **48**

A.   COVERAGE.................................................................................................................. 48
B.   PERILS EXCLUDED....................................................................................................... 48
C.   PROPERTY EXCLUDED................................................................................................. 49
D.   LOSS PAYMENT BASIS / VALUATION ........................................................................ 50
E.   SPECIAL CONDITIONS................................................................................................. 50

**SECTION VII** ................................................................................................................. **51**

**ACCOUNTS RECEIVABLE** .......................................................................................... **51**

A.   COVERAGE.................................................................................................................. 51
B.   EXCLUSIONS............................................................................................................... 51
C.   LOSS PAYMENT BASIS / VALUATION ........................................................................ 51
D.   DEFINITIONS: ............................................................................................................. 52

**SECTION VIII** ................................................................................................................ **53**

**UNMANNED AIRCRAFT** ............................................................................................. **53**

A.   COVERAGE.................................................................................................................. 54
B.   PERILS EXCLUDED....................................................................................................... 514
C.   PROPERTY EXCLUDED................................................................................................. 55
D.   LOSS PAYMENT BASIS/VALUATION .......................................................................... 56
E.   SPECIAL CONDITIONS................................................................................................. 56
F.   DEFINITIONS............................................................................................................... 56
       *1.    UNMANNED*.................................................................................................... *56*
       *1.    IN FLIGHT*....................................................................................................... *56*
       *1.    IN MOTION*..................................................................................................... *56*

**SECTION IX** .................................................................................................................. **57**

**BOILER AND MACHINERY BREAKDOWN EXTENSION** ......................................... **57**

1.   PERILS INSURED........................................................................................................... 56
2.   ADDITIONAL COVERAGE............................................................................................. 56
3.   DEFINITION OF ACCIDENT........................................................................................... 58
4.   DEFINITION OF OBJECT ............................................................................................... 58
5.   COVERED CAUSE OF LOSS........................................................................................... 59
6.   COVERED PROPERTY ................................................................................................... 59
7.   SPECIAL PROVISIONS .................................................................................................. 59
8.   VALUATION ................................................................................................................ 60
9.   EXCLUSIONS................................................................................................................ 63
10.  CONDITIONS................................................................................................................ 63

**ENDORSEMENTS**.......................................................................................................... **65**

# SECTION I

# GENERAL PROVISIONS

**A.    INSURING AGREEMENT**

In consideration of the premium paid by the Named Insured to the Company, the Company agrees to insure the following per the terms and conditions herein.

**B.    NAMED INSURED**

As shown on the Declaration page, or as listed in the Declaration Schedule Addendum attached to this policy.

Agency(ies), organization(s), enterprise(s) and/or individual(s) for whom the Named Insured is required or has agreed to provide coverage, or as so named in the "Named Insured Schedule" on file with Tribal First, as their interests may appear which now exist or which hereafter may be created or acquired and which are owned, financially controlled or actively managed by the herein named interest, all jointly, severally or in any combination of their interests, for account of whom it may concern, are covered within the limits provided to the individual Named Insured.

Lessors and other party(ies) of interest in all property of every description covered hereunder are included herein as Insured's for their respective rights and interests, it being understood that the inclusion hereunder of more than one covered party shall not serve to increase the Company's limit of liability.

Mortgagees to whom certificates of coverage have been issued are covered hereunder as Insured's in accordance with the terms and conditions of Form 438 BFU NS, CP12 18 1091, or equivalent as required by the mortgagee.

**C.    MAILING ADDRESS OF NAMED INSURED**

AS PER DECLARATION PAGE

**D.    POLICY PERIOD**

AS PER DECLARATION PAGE

**E.    LIMITS OF LIABILITY**

Subject to specific exclusions, modifications, and conditions hereinafter provided, the liability of the Company in any one occurrence regardless of whether one or more of the coverages of this Policy are involved shall not exceed:

1. : LIMITS OF LIABILITY

    The Specific Limits of Liability as described in the Declaration Page apply per occurrence unless indicated otherwise.

2.   SUB-LIMITS OF LIABILITY

The following sub-limits of liability are provided as described in the Declaration Page and apply per occurrence unless indicated otherwise. Coverage is provided only if a sub-limit of liability is shown in the Declaration Page for that item, and do not increase the specific limits of liability. The absence of a sub-limit of liability amount in the Declaration Page means that no coverage is provided for that item.

a.   Per occurrence, and in the annual aggregate as respects the peril of flood (for those Named Insured(s) that participate in this optional dedicated coverage);

b.   Per occurrence, and in the annual aggregate as respects the peril of earthquake shock (for those Named Insured(s) that participate in this optional dedicated coverage);

c.   Combined Business Interruption, Rental Income, Tax Interruption and Tuition income (and related fees);

d.   Extra Expense;

e.   Miscellaneous Unnamed locations;

f.   Automatic Acquisition. As per policy provisions;

g.   Unscheduled Landscaping, tees, sand traps, greens, athletic fields and artificial turf if specific values for such items have not been reported as part of the Named Insured(s) schedule of values held on file with Tribal First. This coverage extension does not apply to the peril of Earthquake in the states of California, or Alaska. If Flood coverage is purchased for scheduled locations this extension will extend to include Flood coverage for any location not situated in Flood Zones A or V;

h.   Scheduled Landscaping, tees, sand traps, greens, athletic fields and artificial fields if specific values for such items have been reported as part of the Named Insured(s) schedule of values held on file with Tribal First;

i.   Errors & Omissions;

j.   Course of Construction and Additions;

k.   Money and Securities for Fire, Wind, Hail, Explosion, Smoke, Lightning, Riot, Civil Commotion, Impact by Aircraft or Objects falling there from, Impact by Vehicles, Water Damage and Theft (other than by an employee of the Named Insured(s)

l.   Prize Giveaways

m.   Unscheduled Fine Arts (as more fully defined herein);

n.   Accidental Contamination including owned land, land values and water owned by the Named Insured(s)

o.   Unscheduled infrastructure including but not limited to tunnels, bridges, dams, catwalks (except those not for public use), roadways, highways, streets (including guardrails), sidewalks (including guardrails), culverts, channels, levees, dikes, berms, embankments, street lights, traffic signals, meters, road way or highway fencing, and all similar property unless specific values for such items have been reported as part of the Named Insured(s) schedule of values held on file in the offices of Tribal First. Unscheduled Infrastructure coverage is excluded for the peril of Earthquake and for Federal Emergency Management Agency (F.E.M.A.) and/or any State Office of Emergency Services (O.E.S.) declared disasters, providing said declaration provides funding for repairs;

p.   Increased Cost of Construction due to the enforcement of building codes / ordinance or law. As per policy provisions;

q.   Transit;

| r. | Unscheduled Animals; |
|---|---|
| s. | Unscheduled Watercraft; up to 50 feet. Unscheduled watercraft over 50 feet if held for sale by the Named Insured. |
| t. | Off premises services interruption including extra expense resulting from a covered peril at non-owned/operated location(s); |
| u. | Separately as respects Contingent Business Interruption, Contingent Extra Expense, Contingent Rental Value, and Contingent Tuition Income; |
| v. | Claim Preparation Expenses; |
| w. | Expediting Expenses; |
| x. | Separately as respects Furs, jewelry, precious metals and precious stones; |
| y. | Personal Property outside the U.S.A.; |
| z. | Unmanned Aircraft. As per policy provisions |
| aa. | Mold/Fungus Resultant Damage. As per policy provisions |
| ab. | Boiler Explosion and Machinery Breakdown (for those Named Insured(s) that participate in this optional dedicated coverage). |

**F.   OPTIONAL COVERAGE PARTICIPATION**

It is understood and agreed that certain Named Insureds participate in Optional Coverage on this Policy as set forth below.

OPTIONAL COVERAGES IDENTIFICATION:

1. Earthquake Shock
2. Licensed Vehicles – Off Premises
3. Scheduled Fine Arts
4  Flood
5. Boiler Explosion & Machinery Breakdown
6. Contractors Equipment/Unlicensed Vehicles
7. Business Interruption, Rental Income

Such participation in the optional coverage(s) by the Named Insured is indicated in the Declaration Page, and/or by endorsement to this policy.

**G.   DEDUCTIBLE PROVISIONS**

If two or more deductible amounts provided in the Declaration Page apply for a single occurrence the total to be deducted shall not exceed the largest per occurrence deductible amount applicable.

Unless a more specific deductible is applicable for a particular loss, the "Basic Deductible" shown in the Declaration Page, shall apply per occurrence. The company will not pay for loss or damage in any one occurrence until the amount of the loss or damage exceeds the applicable deductible.

**H.   UNIT OF INSURANCE DEFINED**

In the application of the Earthquake Shock, or specified Wind deductibles, in accordance with the provisions of this Policy, each of the following shall be considered a Separate Unit of Insurance:

1. Each Separate Building or Structure;
2. The Contents of each Building or Structure;
3. Applicable Time Element Coverage of each separate Building or Structure; and
4. Property in each Yard.

The Company shall not be liable for loss to any Unit of Insurance covered hereunder unless such loss exceeds the percentages stated in this Policy of the replacement values of such Unit of Insurance at the time when such loss shall happen, and then only for its proportion of such excess.

## I.  PRIORITY OF PAYMENTS

In the event of loss caused by or resulting from more than one peril or coverage, the limit of liability of the primary / underlying coverage shall apply first to the peril(s) or coverage(s) not insured by the excess layers and the remainder, if any, to the peril(s) or coverage(s) insured hereunder.  Upon exhaustion of the limit of liability of the primary / underlying coverage, this Policy shall then be liable for loss uncollected from the peril(s) or coverage(s) insured hereunder, subject to the limit of liability and the other terms and conditions as specified.

# SECTION II

# PROPERTY DAMAGE

**A.   COVERAGE**

Subject to the terms, conditions and exclusions hereinafter contained, this Policy insures all property of every description both real and personal (including improvements, betterments and remodeling), of the Named Insured or property of others in the care, custody or control of the Named Insured, for which the Named Insured is liable or under obligation to insure.

**B.   EXTENSIONS OF COVERAGE**

All coverage extensions are subject to the terms, conditions and exclusions of the policy except insofar as they are explicitly providing additional coverage.

**1.   PERSONAL EFFECTS**

This Policy is extended to cover only such personal effects and wearing apparel of any of the officials, employees, students and personal effects of the Named Insured named in this Policy for which the Named Insured may elect to assume liability while located in accordance with the coverage hereof, but loss, if any, on such property shall be adjusted with and payable to the Named Insured.

**2.   PROPERTY IN COURSE OF CONSTRUCTION AND ADDITIONS**

It is understood and agreed that as respects course of construction projects and additions, this Policy will provide automatic coverage subject to the following conditions:

a.   Project involves only real property on new or existing locations (excluding dams, roads, and bridges)

b.   Value of the project at the location does not exceed <u>USD as per Declaration Page.</u>  Projects that exceed this amount are subject to underwriting approval prior to binding.  However, inadvertent failure to report projects within USD as per Declarations Page shall not void coverage of said Project.

Additional Expense Soft Cost: This coverage applies to new buildings or structures in the course of construction up to the time that the new building (s) or  structure (s) is initially occupied or put to its intended use whichever occurs first.

The Company will cover the additional expenses of the Named Insured as defined below for up to 25% of the estimated completed value of the project which results from a delay in the completion of the project beyond the date it would have been completed had no loss or damage occurred.  The delay must be due to direct physical loss or damage to property insured and be caused by or result from a peril not excluded by this Policy.  The Company will pay covered expenses when they are incurred.

a.   Additional Interest Coverage – The Company will pay the additional interest on money the Named Insured borrows to finance construction or repair.

b.   Rent or Rental Value Coverage – The Company will pay the actual loss of net rental income that results from delay beyond the projected completion date.

But the Company will not pay more than the reduction in rental income less charges and expenses that do not necessarily continue.

c.   Additional Real Estate Taxes or Other Assessments – The Company will pay the additional real estate taxes or other assessments the Named Insured incurs for the period of time that construction is extended beyond the completion date.

d.   Additional Advertising and Promotional Expenses – The Company will pay the additional advertising and promotional expense that becomes necessary as a result of a delay in the completion of the project.

e.   Additional Commissions Expense – The Company will pay the additional expenses, which result from the renegotiating of leases following an interruption in the project.

f.   Additional Architectural and Engineering Fees – The Company will pay the additional architectural and engineering fees that become necessary as a result of a delay in the completion of the project.

g.   Additional License and Permit Fees – The Company will pay the additional license and permit fees that become necessary as a delay in the completion of the project.

h.   Legal and Accounting Fees – The Company will pay the additional legal and accounting fees the Named Insured incurs as a result of a delay in the completion of the project.

**3.   FIRE FIGHTING EXPENSES**

It is understood and agreed that the Company shall be liable for the actual charges of fire fighting expenses including but not limited to those charged by municipal or private fire departments responding to and fighting fire in / on, and/or protecting property included in coverage provided by this Policy.

**4.   OFF PREMISES SERVICES INTERRUPTION**

It is understood and agreed that coverage under this Policy is extended to include physical damage, business interruption loss and/or extra expense incurred and/or sustained by the Named Insured as a result of physical damage to or destruction of by the perils insured against occurring during the policy period of any suppliers furnishing heat, light, power, gas, water, telephone or similar services to an Named Insured's premises. The coverage provided by this clause is sub-limited to USD as per Declaration Page, and Section 1 (General Provisions) of this form.

**5.   ARCHITECTS AND ENGINEERS FEES AND LOSS ADJUSTMENT EXPENSES**

This Policy also insures as a direct result of physical loss or damage insured hereunder, any of the following:

a.   Architects and engineers fees

b.  Loss adjustment expenses including, but not limited to, auditors, consultants and accountants. However the expenses of public adjusters are specifically excluded.

## 6.  EXPEDITING EXPENSES

In the event of physical loss or damage insured hereunder, it is understood and agreed that coverage under this Policy includes the reasonable extra cost of temporary repair and of expediting the repair of such damaged property of the Named Insured, including overtime and the extra costs of express or other rapid means of transportation. This coverage provided by this clause is sub-limited to <u>USD as per the Declaration Page.</u>

## 7.  DEBRIS REMOVAL

This Policy also covers expenses incurred in the removal of debris of the property covered hereunder from the premises of the Named Insured that may be destroyed or damaged by a covered peril(s). This debris removal coverage does not apply to the cost to extract pollutants from land or water, or to remove, restore or replace polluted land or water.

## 8.  BUILDING LAWS

This Policy is extended to include physical damage, business interruption loss, loss of interest and/or extra expense incurred and/or sustained by the Named Insured as a result of physical damage to or destruction of property, by the perils insured against occurring during the policy period and occasioned by the enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures, which is in force at the time such a loss occurs, which necessitates the demolition of any portion of the covered building not damaged by the covered peril(s).

The Company shall also be liable for loss due to the additional period of time required for repair or reconstruction in conformity with the minimum standards of such ordinance or law of the building(s) described in this Policy damaged by a covered peril.

The Company shall not be liable under this clause for more than the limit of liability as shown elsewhere in this Policy.

## 9.  DEMOLITION COST

In the event of physical damage to property insured by a covered peril, this policy is extended to cover the cost of demolishing any undamaged portion of the covered property including the cost of clearing the site thereof, caused by loss from any covered peril(s) under this Policy and resulting from enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures and in force at the time of loss which necessitates such demolition.

## 10.  INCREASED COST OF CONSTRUCTION

In the event of physical damage to property insured by a covered peril this Policy is extended to cover the increased cost of repair or replacement occasioned by the enforcement of any local or state ordinance or law including written guidelines used by the department of corrections in any state regulating the construction, repair or demolition of buildings or structures, which is in force at the time such a loss occurs

or which comes into force within 6 months after such a loss occurs, which necessitates in repairing or replacing the building covered hereunder which has suffered damage or destruction by the covered peril(s) or which has undergone demolition, limited, however, to the minimum requirements of such ordinance or law.

11. **ERRORS & OMISSIONS**

No unintentional errors or unintentional omissions in description, location of property or valuation of property will prejudice the Named Insured's right of recovery but will be reported to the Company as soon as practicable when discovered. The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>, and Section 1 (General Provisions) Clause E of this form. This extension does not increase any more specific limit stated elsewhere in this policy or Declarations.

12. **ANIMALS**

This policy is extended to cover retraining expenses associated with the loss of specially trained animals. Re-training expenses are included within the sub-limit provided, unless otherwise scheduled.

13. **VALUABLE PAPERS**

This policy is extended to cover Valuable Papers or the cost to reconstruct valuable papers (including but not limited to research, redrawing or duplicating) physically lost or damaged by a peril insured against during the term of this Policy.

14. **TRANSIT**

This policy is extended to cover Personal Property of the Named Insured or property held by the Named Insured in trust or on commission or on consignment for which the Named Insured may be held legally liable while in due course of transit, worldwide, against all risks of Direct Physical Loss or Damage not excluded by this Policy to the property insured occurring during the period of this Policy.

The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>, and Section 1 (General Provisions) Clause E of this form.

15. **ASBESTOS CLEAN UP AND REMOVAL**

This policy specifically excludes asbestos materials clean-up or removal, unless asbestos is itself damaged by a peril covered by this policy, then asbestos clean up or removal within the damaged area, and applicable time element coverages, will be covered by this policy.

In no event will coverage be extended to cover undamaged asbestos, including undamaged asbestos in any portion of the building mandated by any governmental direction or request declaring that asbestos material present in any undamaged portion of the Named Insured's property must be removed or modified, or;

any loss or expense including investigation or defense costs, caused by, resulting from, or arising out of asbestos, exposure to asbestos, or any product containing asbestos, or;

any loss or expense normally provided by demolition, increased cost or building ordinance.

*12 of 68*

The Named Insured must report to Underwriters the existence of the damage as soon as practicable after the loss. However, this Policy does not insure any such damage first reported to the Underwriters more than 36 (thirty six) months after the expiration, or termination, of this policy.

## 16.   PROTECTION AND PRESERVATION OF PROPERTY

In the event of loss likely to be covered by this Policy, the Named Insured shall endeavor to protect covered property from further damage and shall separate the damaged and undamaged personal property and store in the best possible order, and shall furnish a complete inventory of the destroyed, damaged and undamaged property to the Insurer.

In case of actual or imminent physical loss or damage of the type insured against by this Policy, the expenses incurred by the Named Insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage otherwise recoverable under the Policy and be subject to the applicable deductible and without increase in the limit provisions contained in this Policy.

## 17.   LEASEHOLD INTEREST

In the event of physical loss or damage of the type insured against by this Policy to real property of the type insured this Policy, which is leased by the Named Insured, this Policy is extended to cover:

(1)   If as a result of such loss or damage the property becomes wholly untenantable or unusable and the lease agreement requires continuation of the rent, the Company shall indemnify the Named Insured for the actual rent payable for the unexpired term of the lease; or

(2)   If as a result of such loss or damage the property becomes partially untenantable or unusable and the lease agreement requires continuation of the rent, the Company shall indemnify the Named Insured for the proportion of the rent applicable thereto; or

(3)   If as a result of such loss or damage the lease is cancelled by the lessor pursuant to the lease agreement or by operation of law, the Company shall indemnify the Named Insured for its Lease Interest for the first three months following such loss or damage and for its Net Lease Interest for the remaining unexpired term of the lease;

provided, however, that the Company shall not be liable for any increase in the amount recoverable hereunder resulting from the suspension, lapse or cancellation of any license, or from the Named Insured exercising an option to cancel the lease; or from any act or omission of the Named Insured which constitutes a default under the lease; and provided further that the Named Insured shall use any suitable property or service owned or controlled by the Named Insured or obtainable from another source to reduce the loss hereunder.

The following definitions shall apply to this coverage:

(1)   Lease Interest means the excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid

(including any maintenance or operating charges) for each month during the unexpired term of the Named Insured's lease.

(2)    Net Lease Interest means that sum which placed at 8% interest compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

## 18.    AUTOMATIC ACQUISITION AND REPORTING CONDITIONS

This Policy is automatically extended to insure additional property and/or interests as described in this Policy, which may be acquired or otherwise become at the risk of the Named Insured during the Policy Term, within the United States of America, subject to the values of such additional property and/or interests not exceeding USD25,000,000 or Named Insured's Policy Limit of Liability if less than USD25,000,000 any one acquisition. Additionally a sub-limit of $2,500,000 applies to Tier 1 Wind counties, parishes and independent cities for 60 days for the states of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, Louisiana, Texas and/or situated anywhere within the states of Florida and Hawaii.

If Flood coverage is purchased for all scheduled locations, this extension will extend to include Flood coverage for any location not situated in Flood Zones A or V.  In the event that coverage for Flood for any location situated in Flood Zones A or V is required, it is to be agreed by the Company prior to attachment hereunder.

This coverage extension does not apply to the peril of Earthquake Shock in the States of California, or Alaska except as follows:

(1)    At Policy annual inception, for those Named Insureds that purchase the earthquake shock peril only, per the sub-limit that appears on the Declaration Page, automatic coverage applies for the peril of earthquake shock for a period of 30 days from date of contractual requirement by any bond, certificate of participation or any similar investment, for any new locations where there is such a contractual requirement to provide earthquake shock coverage. Otherwise there is no Automatic Coverage for Earthquake Shock for any other new locations in California or Alaska.

In the event of coverage being required for additional property and/or interest where the value exceeds USD25,000,000 or Named Insured's Policy Limit of Liability if less than USD25,000,000 any one acquisition details of said property and/or interest are to be provided to the Company for its agreement not later than one hundred twenty (120) days from the date of the said additional property and/or interest have become at the risk of the Named Insured, this Policy providing coverage automatically for such period of time up to a maximum limit of USD40,000,000 for combustible construction (USD50,000,000 for non-combustible construction).

After the reporting of a location added under automatic acquisition, the Company retains the right to determine acceptability of all such property(ies).  Additional premium will be calculated from the date of acquisition, if values are in excess of USD25,000,000.

In the event that the Named Insured fails to comply with the above reporting provision, then coverage hereunder is sub-limited to USD25,000,000 any one occurrence.

Additional, or return premium due for endorsements issued during the policy term,

such as those for additions or deletions of values within or greater than as that which is provided in any "Automatic Acquisition sub-limit" (including those for existing Named Insureds or new Named Insureds to the Tribal program) will be processed on a quarterly basis. Issuance of the endorsements and calculation of pro-rata or return premium, for these changes will be processed as of, and at the time of the transaction.

## 19.  MISCELLANEOUS UNNAMED LOCATIONS

Coverage is extended to include property at locations (including buildings, or structures, owned, occupied or which the Named Insured is obligated to maintain insurance) located within the territorial limitations set by this Policy. Coverage provided by this clause is limited to any sub-limit noted on the Declaration Page attached to this form, and by terms and conditions of this policy form. This coverage extension does not apply to the peril of Earthquake in the states of California or Alaska. If Flood coverage is purchased for scheduled locations, this extension will extend to include Flood coverage for any location not situated in Flood Zones A or V.

## 20.  ACCIDENTAL CONTAMINATION

This Policy is hereby extended to cover Business Interruption and Property Damage loss as a result of accidental contamination, discharge or dispersal from any source to Covered Property, including expenses necessarily incurred to clean up, remove and dispose of contaminated substances so as to restore the Covered Property to the same condition as existed prior to loss. The coverage provided is sub-limited to USD as per Declaration Page.

If such contamination or dispersal is itself caused by fire, lightning, impact from aircraft, explosion, riot, civil commotion, smoke, collapse, vehicles, windstorm, hail, vandalism, malicious mischief or leakage and accidental discharge from automatic fire protective systems whereupon this extension shall provide coverage up to full limit of liability provided by this Policy.

For the purposes of this Accidental Contamination clause only, the term "Covered Property", as covered by this Policy, is held to include Land (and Land Values) on which Covered Property is located, whether or not the same are excluded by this Policy.

It is further understood and agreed that this coverage clause shall not override anything contained in Asbestos Clean Up and Removal in this Policy.

C.   **PROPERTY NOT COVERED**

Except as for that which may be provided as an Extension of Coverage, this policy does not cover:

1.   Aircraft, vehicles, watercraft over 50 feet in length (other than watercraft held for sale by the Named Insured), and rolling stock, except scheduled watercraft, and rolling stock, light rail vehicles, subway trains and related track maintenance vehicles for light rail and subway lines.

2.   Standing timber, bodies of water, growing crops.

3.   Land, (including land on which covered property is located), and land values (except athletic fields, landscaping, artificial turf, sand traps, tees and greens).

4.   Property in due course of ocean marine transit.

5.   Shipment by mail after delivery into the custody of the United States Post Office.

6.   Power transmission lines, feeder lines and more than 1,000 feet from the premises of the Named Insured unless scheduled and specifically approved by the Company.

7.   Underground pipes more than 1,000 feet from the premises of the Named Insured unless scheduled and specifically approved by the Company.

8.   Offshore property, oilrigs, underground mines, caverns and their contents. Railroad track is excluded unless values have been reported by the Named Insured.

D.   **LOSS PAYMENT BASIS / VALUATION**

In case of loss to property of a Named Insured covered hereunder, the basis of adjustment shall be as of the time and place of loss as follows:

1.   On all real and personal property, including property of others in the care or control of the Named Insured at the replacement cost (as defined below) at the time of the loss without deduction for depreciation. If property is not replaced within a reasonable period of time, then the actual cash value shall apply.

2.   On improvements and betterments at the replacement cost at time of loss without deduction for depreciation. If property is not repaired or replaced within a reasonable period of time, then the actual cash value shall apply. If replaced or repaired by others for the use of the Named Insured, there shall be no liability hereunder. The Company agrees to accept and consider the Named Insured as sole and unconditional owner of all improvements and betterments, any contract or lease the Named Insured may have made to the contrary notwithstanding.

3.   On manuscripts, mechanical drawings, patterns, electronic data processing media, books of accounting and other valuable papers, the full replacement cost of the property at the time of loss (including expenses incurred to recreate the information lost, damaged or destroyed, except as may be limited by any separate policy provision) or what it would then cost to repair, replace or reconstruct the property with other of like kind and quality. If not repaired, replaced or reconstructed within a reasonable period of time, then not to exceed the cost of blank or unexposed material.

4.    On antique, restored or historical buildings, the cost of acquisition, relocation to the site and renovation or reconstruction.  In the event of a partial loss, replacement cost for antique, restored or historical buildings shall mean the cost of repairing, replacing, constructing or reconstructing (whichever is less) the property on the same site using materials of like kind and quality necessary to preserve or maintain a buildings' historical significance without deduction for depreciation.

5.    On property of others for which the Named Insured is liable under contract or lease agreement the Company's liability in the event of loss is limited to the Named Insured's obligation as defined in said contract or lease agreement but not to exceed the replacement cost.

6.    On library contents, at replacement cost, or as follows, whichever is greater:

| Category | Value (per item) | |
|---|---|---|
| Juvenile Materials | USD | 49.62 |
| Pamphlets | USD | 6.38 |
| Magazines | USD | 12.87 |
| Fiction | USD | 24.00 |
| Non-Fiction | USD | 86.40 |
| Dictionary | USD | 125.75 |
| Encyclopedia | USD | 300.96 |
| Thesaurus | USD | 46.42 |
| Reference (other) | USD | 120.77 |
| Abstracts | USD | 295.74 |
| Textbook | USD | 109.40 |
| Art Books | USD | 65.16 |
| Film | USD | 290.15 |
| Book/Diskette | USD | 109.54 |
| Vinyl Records | USD | 87.50 |
| DVD/VHS | USD | 58.03 |
| Audio Cassette | USD | 31.91 |
| Compact Discs | USD | 25.47 |
| CD ROM | USD | 41.21 |
| Audio Books | USD | 78.05 |
| Medical Atlas | USD | 186.47 |
| Technical Law | USD | 158.24 |
| Nanotechnology | USD | 182.73 |
| Biotechnology | USD | 172.90 |

The above valuation is predicated on the values provided by the Library of Congress Dewey Decimal system and adjusted for inflation.

The figures above do not include the "shelving cost" of each book.   Therefore, the formula for adjusting a library contents loss is:

"Number of items in a category that are replaced multiplied by the valuation figure plus associated shelving costs".

The actual cost per item in the final adjustment is to be computed as of the time and place of loss or damage.

7.   Animals:  The stated value as per schedule on file with the Named Insured.

8.   Landscaping, artificial turf, sand traps, tees, putting greens and athletic fields; the actual replacement cost of sod, shrubs, sand, plants and trees; however the Company's liability for replacement of trees, plants and shrubs will be limited to the actual size of the destroyed plant, tree or shrub at the time of the loss up to a maximum size of 25 gallons per item but not to exceed USD 25,000 per item.

For the purpose of determining coverage under this policy landscaping, trees, plants and shrubs are only insured if their position and planting was undertaken by human agency for cosmetic effect.

The aforementioned valuations shall also be used for the purpose of any minimum earned premium and/or quarterly adjustments incurred.

Wherever the term "actual cash value" is used as respects real property or improvements and betterment's in this clause, or elsewhere herein, it shall mean replacement cost less depreciation.

"Replacement Cost" shall mean the cost of repairing, replacing, constructing or reconstructing (whichever is the least) the property on the same site, using new materials of like kind and quality and for like occupancy without deduction for depreciation, subject to the following:

(i)    Until the property is actually repaired, replaced or reconstructed, the maximum amount recoverable shall be the actual cash value of the lost or damaged property;

(ii)   Replacement shall be effected by the Named Insured with due diligence and dispatch;

(iii)  Replacement need not be on same site, or of same or similar construction or occupancy provided that the Company shall not be liable for any additional costs that are directly attributable to the inclusion of this provision.

(iv.)  For historical buildings as more specifically defined in this Section.

(v.)   In no event shall the Company's liability exceed the amount actually and necessarily expended in repairing or replacing (whichever is less) Covered Property or any part thereof.

It is understood and agreed that as respects replacement cost, the Named Insured shall have the option of replacement with electrical and mechanical equipment having technological advantages and/or representing an improvement in function and/or forming part of a program of system enhancement provided that such replacement can be accomplished without increasing the Company's liability.  The Company shall be allowed to dispose of, as salvage, any non-proprietary property deemed unusable by the Named Insured.

**In the event the Named Insured should fail to comply with any of the foregoing provisions settlement shall be made as if this Replacement Cost provision had not been in effect.**

# SECTION III

# BUSINESS INTERRUPTION, EXTRA EXPENSE & RENTAL INCOME

Subject to the terms, conditions and exclusions stated elsewhere herein, this Policy provides coverage for:

## A.    COVERAGE

### 1.    BUSINESS INTERRUPTION

Against loss resulting directly from interruption of business, services or rental value caused by direct physical loss or damage, as covered by this Policy to real and/or personal property insured by this Policy, occurring during the term of this Policy.

In the event of such loss or damage the Company shall be liable for the actual loss sustained by the Named Insured for gross earnings as defined herein and rental value as defined herein resulting from such interruption of business, services, or rental value; less all charges and expenses which do not necessarily continue during the period of restoration. Due consideration shall be given to the continuation of normal charges and expenses including ordinary payroll expenses to the extent necessary to resume operations of the Named Insured with the same quality of service which existed immediately preceding the loss.

Ordinary payroll means payroll expenses for the Named Insured's employees EXCEPT: officers, executives, department managers, employees under contract, or additional exemptions such as specific job classes or specific employees. Ordinary payroll expenses does include payroll, employee benefits (if directly related to payroll), FICA (employers portion), union dues, and workers' compensation premiums.

With respect to business interruption for power generation facilities, the coverage provided hereunder is sub-limited to <u>USD as per Declaration Page</u>.

### 2.    EXTRA EXPENSE

This Policy is extended to cover the necessary and reasonable extra expenses occurring during the term of this Policy at any location as hereinafter defined, incurred by the Named Insured in order to continue as nearly as practicable the normal operation of the Named Insured's business following damage to or destruction of covered property by a covered peril which is on premises owned, leased or occupied by the Named Insured. In the event of such damage or destruction, the Company shall be liable for such necessary extra expense incurred for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property as has been damaged or destroyed commencing with the date of damage or destruction and not limited by the date of expiration of this Policy (hereinafter referred to as the period of restoration).

**B.   EXTENSIONS OF COVERAGE**

**1.   INGRESS / EGRESS**

This Policy is extended to insure the actual loss sustained during the period of time not exceeding 30 days, when as a direct result of physical loss or damage caused by a covered peril(s) specified by this Policy and occurring at property located within a 10 mile radius of covered property, ingress to or egress from the covered property covered by this Policy is prevented. Coverage under this extension is subject to a 24-hour waiting period.

**2.   INTERRUPTION BY CIVIL AUTHORITY**

This Policy is extended to include the actual loss sustained by the Named Insured, as covered hereunder during the length of time, not exceeding 30 days, when as a direct result of damage to or destruction of property by a covered peril(s) occurring at a property located within a 10 mile radius of covered property, access to the covered property is specifically prohibited by order of a civil authority. Coverage under this extension is subject to a 24-hour waiting period.

**3.   DEMOLITION AND INCREASED TIME TO REBUILD**

The Company shall, in the case of loss covered under this Policy, be liable also for loss to the interest covered by the Policy, occasioned by the enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures and in force at the time such loss occurs, which necessitates the demolition of any portion of the described building(s) not damaged by the covered peril(s). The Company shall also be liable for loss due to the additional period of time required for repair or reconstruction in conformity with the minimum standards of such ordinance or law of the building(s) described in this Policy damaged by a covered peril.

THE COMPANY SHALL NOT BE LIABLE UNDER THIS CLAUSE FOR:

a.   More than the limit of liability as shown elsewhere in this Policy.

b.   Any greater proportion of any loss to the interest covered by this Policy than the amount covered under this Policy on said interest bears to the total insurance and coverage on said interest, whether all such insurance contains this clause or not

**4.   CONTINGENT TIME ELEMENT COVERAGE**

Business interruption, rental income, and extra expense coverage provided by this Policy is extended to cover loss directly resulting from physical damage to property of the type not otherwise excluded by this Policy at direct supplier or direct customer locations that prevents a supplier of goods and/or services to the Named Insured from supplying such goods and/or services, or that prevents a recipient of goods and/or services from the Named Insured from accepting such goods and/or services. The coverage provided by this clause separately as respects each of these coverage's is sub-limited to <u>USD as per Declaration Page</u>.

### 5.   TAX REVENUE INTERRUPTION

Except as hereinafter or heretofore excluded, this Policy insures against loss resulting directly from  necessary interruption of sales, property or other tax revenue including, but not limited to Tribal Incremental Municipal Services Payments collected by or due the Named Insured caused by damage, or destruction by a peril not excluded from this Policy to property which is not operated by the Named Insured and which wholly or partially prevents the generation of revenue for the account of the Named Insured.

The Company shall be liable for the actual loss sustained for only the length of time as would be required with exercise of due diligence and dispatch to rebuild, replace or repair the contributing property commencing with the date of damage to the contributing property, but not limited by the expiration date of this Policy.

If the Named Insured has reported Tax Revenue Interruption values for which premium has been charged, such loss recovery after deductible shall be limited to whichever is the least of:

1.   The sub-limit USD3,000,000 insured on the Policy;

2.   The actual loss sustained.

3.   The difference in amount between 97.5% of the anticipated revenue and the actual total revenue after the loss.

If the Named Insured has not reported Tax Revenue Interruption values, such loss recovery after deductible shall be limited to whichever is the least of:

1.   The actual loss sustained;

2.   USD100,000 per occurrence.

**DEDUCTIBLE:** Each loss or series of losses arising out of one event at each location shall be adjusted separately and from the aggregate amount of all such losses 2.50% of the annual revenue value shall be deducted.

### 6.   EXTENDED PERIOD OF INDEMNITY

Business interruption including rental income, tax interruption, tuition income and extra expense coverage provided by this Policy is extended for the additional length of time required to restore the business of the Named Insured to the condition that would have existed had no loss occurred commencing on either;

a.   the date on which the Company's liability would otherwise terminate or;

b.   the date on which rebuilding, repairing or replacement of such property as has been lost, damaged or destroyed is actually completed, whichever is later.

The Company's liability shall terminate no later than **180 (one hundred and eighty) days** from the commencement date set forth above, unless a different time period is agreed to by the Company through an endorsement to this policy.

### 7.   EXPENSES TO REDUCE LOSS

This Policy also covers such expenses as are necessarily incurred for the purpose of reducing loss under this section (except incurred to extinguish a fire); but in no event to exceed the amount by which loss is thereby reduced.

## C.    EXCLUSIONS

1. The Company shall not be liable for any increase of loss which may be occasioned by the suspension, lapse, or cancellation of any lease or license, contract or order, unless such suspension, lapse, or cancellation results directly from the interruption of business caused by direct physical loss or damage covered by this policy and, then the Company shall only be liable for such loss as affects the Named Insured's earnings during and limited to, the period of indemnity covered under this Policy.

2. With respect to loss resulting from damage to or destruction of media for, or programming records pertaining to, electronic data processing or electronically controlled equipment, including data thereon, by the perils insured against, the length of time for which the Company shall be liable hereunder shall not exceed:

   i.    Thirty (30) consecutive calendar days or the time required with exercise of due diligence and dispatch to reproduce the data thereon from duplicates or from originals of the previous generation, whichever is less; or,

   ii.   the length of time that would be required to rebuild, repair or replace such other property herein described as has been damaged or destroyed, but not exceeding eighteen (18) calendar months, whichever is the greater length of time.

## D.    CONDITIONS APPLICABLE TO THIS SECTION

If the Named Insured could reduce the loss resulting from the interruption of business:

1. by complete or partial resumption of operation of the property whether or not such property be lost or damaged, or;
2. by making use of merchandise or other property at the Named Insured's location or elsewhere;

such reduction shall be taken into account in arriving at the amount of the loss hereunder.

## E.    DEFINITIONS

### 1.    GROSS EARNINGS

"Gross Earnings" is defined as the sum of:

a.    total net sales and;

b.    other earnings derived from the operation of the business

   *less the cost of;*

c.    merchandise sold including packaging materials and;

d.    materials and supplies consumed directly in supplying the service(s) sold by the Named Insured, and;

e.    service(s) purchased from outside (not employees of the Named Insured) for resale that does not continue under contract.

No other cost shall be deducted in determining gross earnings.

In determining gross earnings, due consideration shall be given to the experience of the business before the date of loss or damage and the probable experience thereafter, had no loss occurred.

In the event that Real and/or Personal Property that does not normally produce an income sustain damage covered under this policy, the actual recovery under this policy shall be the continuing fixed charges and expenses directly attributable to such non-productive property.

**2.    MERCHANDISE**

Shall be understood to mean, goods kept for sale by the Named Insured, which are not the products of manufacturing operations conducted by the Named Insured.

**3.    EXTRA EXPENSE**

The term "extra expense", whenever used in this Policy, is defined as the excess (if any) of the total cost incurred during the period of restoration chargeable to the operation of the Named Insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no damage or destruction occurred.   Any salvage value of property obtained for temporary use during the period of restoration, which remains after the resumption of normal operations, shall be taken into consideration in the adjustment of any loss hereunder.

**4.    RENTAL VALUE**

The term "rental value" is defined as the sum of:

a.    the total anticipated gross rental income from tenant occupancy as furnished and equipped by the Named Insured, and;

b.    the amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Named Insured, and;

c.    the fair rental value of any portion of said property which is occupied by the Named Insured, and;

d.    any amount in excess of a., b. and c. (above) which an obligation due under the terms and conditions of any revenue bond, certificate of participation or other financial instrument.

In determining rental value, due consideration shall be given to the experience before the date of loss or damage and the probable experience thereafter had no loss occurred.

**5.    PERIOD OF RESTORATION**

The period during which business interruption and or rental interruption applies will begin on the date direct physical loss occurs and interrupts normal business operations and ends on the date that the damaged property should have been repaired, rebuilt or replaced with due diligence and dispatch, but not limited by the expiration of this policy.

# SECTION IV
# GENERAL CONDITIONS

**A.   PERILS COVERED**

Subject to the terms, conditions and exclusions stated elsewhere herein, this Policy provides insurance against all risk of direct physical loss or damage occurring during the period of this Policy.

**B.   EXCLUSIONS**

This Policy does not insure against any of the following:

1.   Loss or damage caused by or resulting from moths, vermin, termites, or other insects, inherent vice, latent defect, faulty materials, error in design, faulty workmanship, wear, tear or gradual deterioration, rust, corrosion, wet or dry rot, unless physical loss or damage not otherwise excluded herein ensues and then only for such ensuing loss, or damage.

2.   Physical loss or damage by normal settling, shrinkage or expansion in building or foundation.

3.   Delay or loss of markets (this exclusion shall be inapplicable to the extent inconsistent with any time element coverage provided elsewhere herein).

4.   Breakdown or derangement of machinery and/or steam boiler explosion, unless physical loss or damage not otherwise excluded herein ensues and then only for such ensuing loss.

5.   Loss or damage caused by or resulting from misappropriation, conversion, inventory shortage, unexplained disappearance, infidelity or any dishonest act on the part of the Named Insured, it's employees or agents or others to whom the property may be entrusted (bailees and carriers for hire excepted) or other party of interest.

6.   Loss or damage caused by or resulting from electrical injury or disturbance from artificial causes to electrical appliances, devices of any kind or wiring, unless physical loss or damage not otherwise excluded herein ensues and then only for such ensuing loss.  This exclusion does not apply to data processing equipment or media.

7.   Loss or damage to personal property resulting from shrinkage, evaporation, loss of weight, leakage, breakage of fragile articles, marring, scratching, exposure to light or change in color, texture or flavor, unless such loss is caused directly by fire or the combating thereof, lightning, windstorm, hail, explosion, strike, riot, or civil commotion, aircraft, vehicles, breakage of pipes or apparatus, sprinkler leakage, vandalism and malicious mischief, theft, attempted theft, flood or earthquake shock. (Earthquake Shock, and Flood, in the states of Alaska or California shall only apply to locations that are scheduled for Earthquake Shock and Flood).

8.     Loss or damage caused by rain, sleet or snow to personal property in the open (except in the custody of carriers or bailees for hire).

9.     Loss caused directly or indirectly, by:

    a.     War, hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack

        i.     by any government or sovereign power (de jure or de facto), or by any Authority maintaining or using military, naval or air forces; or

        ii.     by military, naval or air forces; or

        iii.     by an agent of any such government, power, authority or forces;

    b.     any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

    c.     insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental Authority or hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

10.     Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or is contributed to or aggravated by a Covered Cause of Loss. However:

    a.     If fire not otherwise excluded results, the Company shall be liable for the direct physical loss or damage by such resulting fire, but not including, any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination, and

    b.     This Policy does insure against physical loss or damage caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the Named Insured premises, provided that, at the time of such loss or damage, there is neither a nuclear reactor nor any new or used nuclear fuel on the Named Insured premises

11.     As respects course of construction, the following exclusions shall apply:

    a.     The cost of making good: faulty or defective workmanship, materials, construction and/or design, but this exclusion shall not apply to damage by a peril not excluded resulting from such faulty or defective workmanship, materials, construction and/or design.

    b.     The cost of non-compliance of, or delay in completion of contract.

    c.     The cost of non-compliance with contract conditions.

    d.     Contractors' equipment or tools not a part of or destined to become a part of the installation.

12. Loss or damage caused by Earthquake Shock unless a limit is shown on the Declarations for Earthquake Shock this exclusion will apply.

13. Loss or damage caused by Flood unless a limit is shown on the Declarations for Flood this exclusion will apply.

14. Loss, damage, cost, claim or expense, whether preventative, remedial or otherwise, directly or indirectly arising out of or relating to:

   a) the recognition, interpretation, calculation, comparison, differentiation, sequencing or processing of data involving one or more dates or times, by any computer system, hardware, program or software, or any microchip, integrated circuit or similar device in computer equipment or non-computer equipment, whether the property of the Named Insured or not; or

   b) any change, alteration, correction or modification involving one or more dates or times, to any such computer system, hardware, program or software, or any microchip, integrated circuit or similar device in computer equipment or non-computer equipment, whether the property of the Named Insured or not.

   Except as provided in the next paragraph, this Electronic Date Recognition Clause shall apply regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, cost, claim or expense.

   If direct physical loss or damage not otherwise excluded by this Policy results, then subject to all its terms and conditions, this Policy shall be liable only for such resulting loss or damage. Such resulting loss or damage shall not include physical loss or damage to data resulting directly from a) or b) above, nor the cost, claim or expense, whether preventative, remedial, or otherwise, arising out of or relating to any change, alteration, correction or modification relating to the ability of any damaged computer system, hardware, program or software, or any microchip, integrated circuit or similar device in computer equipment or non-computer equipment to recognize, interpret, calculate, compare, differentiate sequence or process any data involving one or more dates or times.

15. Loss or damage in the form of, caused by, arising out of, contributed to, or resulting from fungus, mold(s), mildew or yeast; or any spores or toxins created or produced by or emanating from such fungus, mold(s), mildew or yeast;

   a) fungus includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including mold(s), rusts, mildews, smuts and mushrooms;

   b) mold(s) includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce mold(s);

   c) spores means any dormant or reproductive body produced by or arising or emanating out of any fungus, mold(s), mildew, plants, organisms or microorganisms,

regardless of any other cause or event that contributes concurrently or in any sequence to such loss.

This exclusion shall not apply to any loss or damage in the form of, caused by, contributed to or resulting from fungus, mold(s), mildew or yeast, or any spores or toxins created or produced by or emanating from such fungus, mold(s), mildew or yeast which the Insured establishes is a direct result of a Covered Loss not otherwise excluded by the Policy, provided that such fungus, mold(s), mildew or yeast loss or damage is reported to the Company within twelve months from the expiration date of the Policy. Notwithstanding Section IV, Item R., Other Insurance, coverage provided under this paragraph shall apply as primary. Nothing herein contained shall be held to waive, vary, alter or extend any condition or provision of the policy other than as above stated.

16. Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

17. The following additional exclusions apply to animals covered under this Policy:

    a. Death of any animal(s) from natural causes.

    b. Death of any animal(s) that dies from an unknown cause unless:

        i. upon the death of such animal a post-mortem examination conducted on the animal by a licensed veterinarian, and if
        ii. the veterinarian's post-mortem report shows the cause of death to clearly fall within the coverages of this Policy.

    c. Death of any animal(s) as a result of surgical operation, including inoculation, unless the necessity for same arises from a loss otherwise covered by this Policy.

    d. The death or destruction of any animal(s) caused by, resulting from, or made necessary by physical injury caused by or resulting from the activities of the injured animal or other animals unless such death or destruction is the result of a loss otherwise covered by this Policy.

    e. The death of any animal(s) caused directly or indirectly by the neglect or abuse of the Named Insured, his agent, employees or bailees (carriers for hire excepted) unless such death is a result of a loss otherwise covered by this Policy.

    f. The loss by death of any animal(s) as a result of parturition or abortion.

    g. Loss resulting from depreciation in value caused by any animal(s) covered hereunder becoming unfit for or incapable of filling the function or duties for which it is kept, employed or intended unless such depreciation is a result of a loss otherwise covered by this Policy.

    h. Loss by destruction of any animal(s) on the order of the federal or any state government, or otherwise as a result of having contracted or been exposed to any contagious or communicable disease.

i.  The removal or disposal of the remains of any animal(s) or the expense thereof unless such removal or disposal is the result of a loss otherwise covered by this Policy.

j.  The loss of any animal(s) that has been unnerved (the term "unnerved" to be considered as meaning the operation of neurotomy for lameness.)

k.  Any claim consequent upon delay, deterioration, or loss of use or loss of market arising from an event covered by this Policy.

18.  Loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever. Except as provided in Section II Property Damage, B. Extension of Coverage, 21. Accidental Contamination.

Nevertheless if fire is not excluded from this Policy and a fire arises directly or indirectly from seepage and/or pollution and/or contamination, any loss or damage covered under this Policy arising directly from that fire shall, (subject to the terms, conditions and limitations of the Policy) be covered.

However, if the covered property is the subject of direct physical loss or damage for which the Company has paid or agreed to pay, then this Policy (subject to its terms, conditions and limitations) insures against direct physical loss or damage to the property covered hereunder caused by resulting seepage and/or pollution and/or contamination.

The Named Insured shall give notice to the Company of intent to claim **NO LATER THAN TWELVE (12) MONTHS AFTER THE DATE OF THE ORIGINAL PHYSICAL LOSS OR DAMAGE.**

Notwithstanding the provisions of the preceding exclusions or any provision respecting seepage and/or pollution and/or contamination, and/or debris removal and/or cost of clean up in the Policy, in the event of direct physical loss or damage to the property covered hereunder, this Policy (subject otherwise to its terms, conditions and limitations, including but not limited to any applicable deductible) also insures, within the sum covered:

(a)  expenses reasonably incurred in removal of debris of the property hereunder destroyed or damaged from the premises of the Named Insured; and/or;
(b)  cost of clean up at the premises of the Named Insured made necessary as a result of such direct physical loss or damage;

PROVIDED that this Policy does not insure against the costs of decontamination or removal of water, soil or any other substance on or under such premises.

19.  **AUTHORITIES EXCLUSION**

Fines, penalties or cost incurred or sustained by the Named Insured or imposed on the Named Insured at the order of any Government Agency, Court or other Authority, in connection with any kind or description of environmental impairment including seepage or pollution or contamination from any cause.

20.  The following exclusion applies to Terrorism:

Any act of terrorism. An act of terrorism means an act, including but not limited to the use of the force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purpose including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This Policy also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to the paragraph above.

## C.   STATUTES

If any of the articles of this Policy conflict with the laws or statutes of any jurisdictions in which this Policy applies this Policy is amended to conform to such laws or statutes.

## D.   TERRITORIAL LIMITS

This Policy insures Real and Personal Property within the United States of America. Personal Property is extended to Worldwide coverage. The coverage provided by this clause for Personal Property is sub-limited to USD as per Declaration Page.

## E.   REINSTATEMENT

Any reduction in the amount insured hereunder due to payment of any loss or losses shall be automatically reinstated for the balance of the term of this contract except as respects to the perils of Earthquake Shock and Flood.

## F.   FREE ON BOARD (F.O.B.) SHIPMENTS

The Company shall be liable for the interest of the Named Insured at sole option of the Named Insured, the interest of the consignee in merchandise, which has been sold by the Named Insured under terms of F.O.B. point of origin or other terms usually regarded as terminating shippers' responsibility short of point of delivery.

## G.   BREACH OF CONDITIONS

If any breach of a clause, condition or warranty of this Policy shall occur prior to a loss affected thereby under this Policy, such breach shall not void the Policy nor avail the Company to avoid liability unless such breach shall exist at the time of such loss under this contract or Policy, and be a contributing factor to the loss for which claim is presented hereunder, it being understood that such breach of clause or condition is applicable only to the property affected thereby. Notwithstanding the foregoing, if the Named Insured establishes that the breach, whether contributory or not, occurred without its knowledge or permission or beyond its control, such breach shall not prevent the Named Insured from recovering under this Policy.

## H.   PERMITS AND PRIVILEGES

Anything in the printed conditions of this Policy to the contrary notwithstanding, permission is hereby granted:

1.   to maintain present hazards and   hazards which are consistent with the current operation of insured facilities;

2.   to make additions, alterations, extensions, improvements and repairs, to delete, demolish, construct and reconstruct, and also to include all materials, equipment and supplies incidental to the foregoing operations of the property covered hereunder, while in, on and/or about the premises or adjacent thereto;

3.   for such use of the premises as usual and/or incidental to the business as conducted therein and to keep and use all articles and materials usual and/or incidental to said business in such quantities as the exigencies of the business require;

This Policy shall not be prejudiced by:

1.   any error in stating the name, number, street, or location of any building(s) and contents covered hereunder, or any error or omission involving the name or title of the Named Insured;

2.   any act or neglect of the owner of the building, if the Named Insured hereunder is not the owner, or of any occupant of the within described premises other than the Named Insured, when such act or neglect is not within the control of the Named Insured, named herein; or

3.   by failure of the Named Insured to comply with any of the warranties or conditions endorsed hereon in any portion of the premises over which the Named Insured has no control.

## I.   PROTECTIVE SAFEGUARDS

The Named Insured shall exercise due diligence in maintaining in complete working order all protective safeguard equipment and services.

## J.   NOTICE OF LOSS

In the event of loss or damage insured against under this Policy, the Named Insured shall give notice thereof to Tribal First, P.O. Box 609015, San Diego, CA 92160, Phone: 858-505-4022, Fax: 619-699-0929, of such loss. Such notice is to be made as soon practicable upon knowledge within the risk management or finance division of the insured that a loss has occurred.

## K.   ARBITRATION OF VALUE

In case the Named Insured and the Company shall fail to agree as to the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraisers selected.  The appraiser shall first select a competent and disinterested umpire, and failing to agree upon such umpire, then, on request of the Named Insured or the Company such umpire shall be selected by judge of a court of record in the state in which the property covered is located.

The appraisers shall as soon as practicable, appraise the loss stating separately the loss of each item and failing to agree, shall submit their differences only to the umpire.  An award in writing so itemized, of any two appraisers when filed with the Company shall determine the amount of loss.  The party selecting him shall pay each appraiser and the expenses of appraisal and umpire shall be paid by the parties equally.

**L.**     **PROOF OF LOSS**

The Named Insured shall render a signed and sworn proof of loss as soon as practical after the occurrence of a loss, stating the time, place and cause of loss, the interest of the Named Insured and of all others in the property, the value thereof and the amount of loss or damage thereto.

**M.**     **SUBROGATION**

In the event of any loss payment under this Policy, the Company, shall be subrogated to all the Named Insured's rights of recovery thereof against any person or organization and the Named Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

As respects subrogation it is agreed that, after expenses incurred in subrogation are deducted, the Named Insured and the Company shall share proportionately to the extent of their respective interests as determined by the amount of their net loss. Any amount thus found to be due to either party from the other shall be paid promptly.

Notwithstanding the above wording, the Named Insured has the right to enter into an agreement that releases or waives the Named Insured's right to recovery against third parties responsible for the loss if made before the loss occurred.

**N.**     **CANCELLATION**

This Policy may be cancelled by the Named Insured at any time by written notice or surrender of this Policy. This Policy may also be cancelled by or on behalf of the Company by delivering to the Named Insured or by mailing to the Named Insured, by registered, certified or other first class mail at the Named Insured's address as shown in this Policy, written notice, not less than ninety (90) days prior to the effective date of cancellation. The mailing of such notice as aforesaid shall be sufficient proof and this Policy and shall terminate at the date and hour specified in such notice. Notwithstanding what has been stated above, however, should this Policy be cancelled for non-payment of assessment, the Company shall only be required to give the Named Insured ten (10) days notice.

If this insurance in total shall be cancelled by the Named Insured, the Company shall retain the customary short rate proportion of the premium hereon. If the Company elects to cancel coverage mid-term, then such cancellation shall be handled on a pro-rata basis without short rate penalty.

In the event of cancellation the aggregate retention and specific limit amount shall be applied pro rata with the balance, if any, to be paid to the Named Insured.

Payment or tender of any unearned premium by the Company shall not be condition precedent to the effectiveness of cancellation but such payment shall be made forthwith.

Cancellation shall not affect coverage on any shipment in transit on date of cancellation. Coverage will continue in full force until such property is safely delivered and accepted at place of final destination.

It is understood and agreed that if the Named Insured cancels this Policy, the Policy is subject to 25% minimum earned premium regardless of the length of time coverage is in force.

**O.    ABANDONMENT**

There shall be no abandonment to the Company of any property.

**P.    ASSIGNMENT**

Assignment or transfer of this Policy shall not be valid except with the written consent of the Company.

**Q.    SALVAGE**

When, in connection with any loss hereunder, any salvage is received prior or subsequent to the payment of such loss, the loss shall be figured on the basis on which it would have been settled had the amount of salvage been known at the time the loss was originally determined. The salvage value will be deducted from the claim or returned to the Company.

**R.    OTHER INSURANCE**

Permission is hereby granted to the Named Insured to carry more specific insurance on any property covered under this Policy.  This Policy shall not attach or become insurance upon any property which at the time of loss is more specifically described and covered under any other policy form until the liability of such other insurance has first been exhausted and shall then cover only the excess of value of such property over and above the amount payable under such other insurance, whether collectible or not.  This Policy, subject to its conditions and limitations, shall attach and become insurance upon such property as respects any peril not covered by such other insurance and not otherwise excluded herein.

In the event of a loss that is covered by other insurance, wherein this Policy is excess of any amount paid by such other insurer, the other insurance shall be applied to the deductible amount stated elsewhere.  Should the amount paid by such other insurance exceed these deductibles, no further deductibles shall be applied under this Policy.

**S.    EXCESS INSURANCE**

Permission is granted for the Named Insured to maintain excess insurance over the limit of liability set forth in this Policy without prejudice to this Policy and the existence of such insurance, if any, shall not reduce any liability under this Policy.  Also it is understood and agreed as respects earthquake shock or flood, that in the event of reduction or exhaustion of the aggregate limits of liability under the underlying Policy(s) by reason of loss(es) hereunder, this Policy shall:

1.    in the event of reduction, pay out excess of the reduced underlying limit and

2.    in the event of exhaustion, continue in force as the underlying Policy.

**T.    RIGHT TO REVIEW RECORDS FOLLOWING AN INSURED LOSS**

The Named Insured as often as may be reasonably required, shall submit and so far as within their power, cause all other persons interested in the property or employees to submit to examination under oath by any person named by the Company relative to any and all matters in connection with a claim, and produce for examination all books of account, bills, invoices and other vouchers or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or their representatives and shall permit extracts and copies thereof to be made.

**U.   CONCEALMENT AND FRAUD**

This entire Policy shall be void, if whether before or after a loss, the Named Insured has willfully concealed or misrepresented any material facts or circumstance concerning this Policy of the subject thereof, or the interest of the Named Insured therein, or in case of any fraud or false swearing by the Named Insured relating thereto.

**V.   FULL WAIVER**

The terms and conditions of this form and any approved endorsements, supersede any policy jacket that may be attached hereto.

**W.   SUIT AGAINST COMPANY**

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the Named Insured shall have complied with all the requirements of this Policy, nor unless the suit is commenced within twelve (12) months after the date that the Company has made its final offer of settlement or denial of the loss. However, that if under the laws of the jurisdiction in which the property is located such limitation is invalid, then any such claims shall be void unless such action, suit or proceedings be commenced within the shortest limit of time permitted by the laws of such jurisdiction.

**X.   JOINT LOSS ADJUSTMENT – BOILER & MACHINERY**

In the event of damage to or destruction of property, at a location designated in this Policy and also designated in a boiler and machinery insurance policy, and there is a disagreement between the Company and the Named Insured with respect to:

(1)   Whether such damage or destruction was caused by a peril covered against by this Policy or by an accident covered against by such boiler and machinery insurance policy(ies) or

(2)   The extent of participation of this Policy and of such boiler and machinery insurance policy in a loss that is covered against, partially or wholly, by one or all of said policy(ies).

The Company shall, upon written request of the Named Insured, pay to the Named Insured one-half of the amount of the loss which is in disagreement, but in no event more than the Company would have paid if there had been no boiler and machinery insurance policy(ies) in effect, subject to the following conditions:

(1)   The amount of loss which is in disagreement after making provisions for any undisputed claims payable under the said policy(ies) and after the amount of the loss is agreed by the Named Insured and the Boiler and Machinery Insurer and the Company is limited to the minimum amount remaining payable under either the boiler and machinery insurance policy(ies).

(2)   The boiler and machinery insurer(s) shall simultaneously pay to the Named Insured, one-half of the said amount, which is in disagreement.

(3)   The payments by the Company and acceptance of the same by the Named Insured signify the agreement of the Company to submit to and proceed with arbitration within ninety (90) days of such payments:

The arbitrators shall be three (3) in number, one of whom shall be appointed by the boiler insurer(s) and one of whom shall be appointed by the Company hereon and the third appointed by consent of the other two, and the decision by the arbitrators shall be binding on the insurer(s) and the Named Insured and that judgment upon such award may be entered in any court of competent jurisdiction.

(4)     The Named Insured agrees to cooperate in connection with such arbitration but not to intervene therein.

(5)     This agreement shall be null and void unless the Policy of the boiler and machinery Insurer is similarly endorsed.

In no event shall an Insurer be obligated to pay more than their total single limit.

## Y.   JOINT LOSS ADJUSTMENT – EXCESS PROPERTY

In the event of damage to or destruction of property at a location designated in this Policy and also designated in an excess insurance policy(ies) and if there is disagreement between the insurers with respect to:

(1)     whether such damage or destruction was caused by a single event or by multiple events or;

(2)     the extent of participation of this Policy and any excess insurance policy in a loss covered against partially or wholly, by one of said Policy or policy(ies).

The Company shall, upon written request of the Named Insured, pay to the Named Insured one-half of the amount of the loss which is in disagreement, but in no event more than the Company would have paid if there had been no excess insurance or policy(ies) in effect, subject to the following conditions:

(1)     the amount of loss which is in disagreement after making provisions for any undisputed claims payable under the said policy(ies) and after the amount of the loss is agreed by the Named Insured and the Company is limited to the minimum amount remaining payable under either the primary insurance policy or excess insurance policy(ies);

(2)     the excess insurers shall simultaneously pay to the Named Insured one-half of the said amount which is in disagreement; and,

(3)     the payments by the Company hereunder and acceptance of the same by the Named Insured signify the agreement of the Company to submit to and proceed with arbitration within ninety (90) days of such payments.

The arbitrators shall be three (3) in number, one of whom shall be appointed by the excess insurer(s) and one of whom shall be appointed by the Company and the third appointed by consent of the other two, and the decision by the arbitrators shall be binding on the Company and the Named Insured, and that judgment upon such award may be entered in any court of competent jurisdiction.

(4)     The Named Insured agrees to cooperate in connection with such arbitration but not to intervene therein.

## Z.   LENDER'S LOSS PAYABLE

The following provisions (or equivalent) apply as required by "mortgages" and "lenders" to whom certificates of coverage have been issued.

1. Loss or damage, if any, under this policy, shall be paid to the Payee named on the first page of this policy, its successors and assigns, hereinafter referred to as "the Lender," in whatever form or capacity its interests may appear and whether said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

2. The insurance under this policy, or any rider or endorsement attached thereto, as to the interest only of the Lender, its successors and assigns, shall not be invalidated nor suspended: (a) by any error, omission, or change respecting the ownership, description, possession, or location of the subject of the insurance or the interest therein, or the title thereto; (b) by the commencement of foreclosure proceedings or the giving of notice of sale of any of the property covered by this policy by virtue of any mortgage or trust deed; (c) by any breach of warranty, act, omission, neglect, or non-compliance with any of the provisions of this policy, including any and all riders now or hereafter attached thereto, by the Named Insured, the borrower, mortgagor, trustor, vendee, owner, tenant, warehouseman, custodian, occupant, or by the agents of either or any of them or by the happening of any event permitted by them or either of them, or their agents, or which they failed to prevent, whether occurring before or after the attachment of this endorsement, or whether before or after a loss, which under the provisions of this policy of insurance or of any rider or endorsement attached thereto would invalidate or suspend the insurance as to the Named Insured, excluding here from, however, any acts or omissions of the Lender while exercising active control and management of the property.

3. In the event of failure of the Named Insured to pay any premium or additional premium which shall be or become due under the terms of this policy or on account of any change in occupancy or increase in hazard not permitted by this policy, the Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from and within one hundred and twenty (120) days after due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder that the Lender when so notified in writing by this Company of the failure of the Named Insured to pay such premium shall pay or cause to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefore. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said written notice by the Lender.

4. Whenever the Company shall pay to the Lender any sum for loss or damage under this policy and shall claim that as to the Named Insured no liability therefore exists, the Company, at its option, may pay to the Lender the whole principal sum and interest and other indebtedness due or to become due from the Named Insured, whether secured or unsecured, (with refund of all interest not accrued), and the Company, to the extent of such payment, shall thereupon receive a full assignment and transfer, without recourse, of the debt and all rights and securities held as collateral thereto.

5.  If there be any other insurance upon the within described property, the Company shall be liable under this policy as to the Lender for the proportion of such loss or damage that the sum hereby insured bears to the entire insurance of similar character on said property under policies held by, payable to and expressly consented to by the Lender. Any Contribution Clause included in any Fallen Building Clause Waiver or any Extended Coverage Endorsement attached to this contract of insurance is hereby nullified, and also any Contribution Clause in any other endorsement or rider attached to this contract of insurance is hereby nullified except Contribution Clauses for the compliance with which the Named Insured has received reduction in the rate charged or has received extension of the coverage to include hazards other than fire and compliance with such Contribution Clause is made a part of the consideration for insuring such other hazards. The Lender upon the payment to it of the full amount of its claim, will subrogate the Company (pro rata with all other insurers contributing to said payment) to all of the Lender's rights of contribution under said other insurance.

6.  The Company reserves the right to cancel this policy at any time, as provided by its terms, but in such case this policy shall continue in force for the benefit of the Lender for ten (10) days after written notice of such cancellation is received by the Lender and shall then cease.

7.  This policy shall remain in full force and effect as to the interest of the Lender for a period of ten (10) days after its expiration unless an acceptable policy in renewal thereof with loss there under payable to the Lender in accordance with the terms of this Lender's Loss Payable Endorsement, shall have been issued by some insurance company and accepted by the Lender.

8.  Should legal title to and beneficial ownership of any of the property covered under this policy become vested in the Lender or its agents, insurance under this policy shall continue for the term thereof for the benefit of the Lender but, in such event, any privileges granted by this Lender's Loss Payable Endorsement which are not also granted the Named Insured under the terms and conditions of this policy and/or under other riders or endorsements attached thereto shall not apply to the insurance hereunder as respects such property.

9.  All notices herein provided to be given by the Company to the Lender in connection with this policy and this Lender's Loss Payable Endorsement shall be mailed to or delivered to the Lender at its office or branch described on the first page of the policy.

Approved:
    Board of Fire Underwriters of the Pacific;
    California Bankers' Association – Committee on Insurance

## AA.   SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several, not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

## AB.   LOSS PAYABLE PROVISIONS

### A.  LOSS PAYABLE

For covered property in which both insured and a Loss Payee shown in the Schedule or in the Declaration Page have an insurable interest, the Company will:

    1.    Adjust losses with the Named Insured; and

    2.    Pay any claim for loss or damage jointly to the Named Insured and the Loss Payee, as interests may appear.

B.    LENDER'S LOSS PAYABLE

    1.    The Loss Payee shown in the Schedule or in the Declaration Page is a creditor, including a mortgage holder or trustee, whose interest in Covered Property is established by such written instruments as:

        a.    Warehouse receipts;
        b.    A contract for deed;
        c.    Bills of lading;
        d.    Financing statements; or
        e.    Mortgages, deeds of trust or security agreements.

    2.    For Covered Property in which both the Named Insured and a Loss Payee have an insurable interest:

        a.    We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.
        b.    The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.
        c.    If the Company deny the Named Insured claim because of the insured act or because the Named Insured have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

            (1)    Pays any premium due under this Coverage Part at our request if the Named Insured have failed to do so;
            (2)    Submits a signed, sworn proof of loss within 90 days after receiving notice from us of the Named Insured failure to do so; and
            (3)    Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

        d.    If the Company pays the Loss Payee for any loss or damage and deny payment to the Named Insured because of the Named Insured acts or because the Named Insured have failed to comply with the terms of this Coverage Part:

            (1)    The Loss Payee's rights will be transferred to us to the extent of the amount the Company pays; and
            (2)    The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, the Company may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, the Named Insured will pay the insured remaining debt to us.

3.    If the Company cancels this policy, the Company will give written notice to the Loss Payee at least:

a.    Ten (10) days before the effective date of cancellation if the Company cancels for the insured non-payment of premium; or

b.    Thirty (30) days before the effective date of cancellation if the Company cancels for any other reason.

4.    If the Company elects not to renew this policy, the Company will give written notice to the Loss Payee at least ten (10) days before the expiration date of this policy.

C.    CONTRACT OF SALE

1.    The Loss Payee shown in the Schedule or in the Declaration Page is a person or organization the Named Insured have entered a contract with for the sale of Covered Property.

2.    For Covered Property in which both the Named Insured and the Loss Payee have an insurable interest the Company will:

a.    Adjust losses with the Named Insured; and

b.    Pay any claim for loss or damage jointly to the Named Insured and the Loss Payee, as interests may appear:

3.    The following is added to the OTHER INSURANCE Condition:

For Covered Property that is the subject of a contract of sale, the word "the Named Insured" includes the Loss Payee.

## AC.    ELECTRONIC DATA

1.    Electronic Data Exclusion

Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:

a)    This Policy does not insure, loss, damage, destruction, distortion, erasure, corruption or alteration of ELECTRONIC DATA from any cause whatsoever (including but not limited to COMPUTER VIRUS) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

ELECTRONIC DATA means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes program, software, and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

COMPUTER VIRUS means a set of corrupting, harmful or otherwise unauthorized instructions or code including a set of maliciously introduced

unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. COMPUTER VIRUS includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

b) However, in the event that a peril listed below results from any of the matters described in paragraph a) above, this Policy, subject to all its terms, conditions and exclusions will cover physical damage occurring during the Policy period to property insured by this Policy directly caused by such listed peril.

**Listed Perils**
Fire
Explosion

2. Electronic Data Processing Media Valuation

Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:

Should electronic data processing media insured by this Policy suffer physical loss or damage insured by this Policy, then the basis of valuation shall be the cost to repair, replace or restore such media to the condition that existed immediately prior to such loss or damage, including the cost of reproducing any ELECTRONIC DATA contained thereon, providing such media is repaired, replaced or restored. Such cost of reproduction shall include all reasonable and necessary amounts, not to exceed USD10,000,000 any one loss, incurred by the Named Insured in recreating, gathering and assembling such ELECTRONIC DATA. If the media is not repaired, replaced or restored the basis of valuation shall be the cost of the blank media. However this Policy does not insure any amount pertaining to the value of such ELECTRONIC DATA to the Named Insured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered or assembled.

## AD.   LOSS ADJUSTMENT SERVICES

Crawford & Company, 3050 Saturn Street #200, Brea, California. 92821, is hereby authorized to represent the Company in the investigation and adjustment of any loss or damage under this Policy at the expense of the Company and without regard to the amount of loss or damage and/or applicable deductible if any.

However, the Company reserves the right to utilize other adjusting firms if and when they feel it necessary.

## AE.  SERVICE OF SUIT (U.S.A.)

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Named Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.  It is further agreed that service of process in such suit may be made upon:

FLWA Service Corp, c/o Foley and Lardner LLP, 555 California Street, Suite 1700, San Francisco, CA 94104-1520 (applicable to all markets except as noted below) and that in any

suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Named Insured (or Reinsured) to give a written undertaking to the Named Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## AF.   DEFINITIONS:

### 1.   OCCURRENCE

Each occurrence is defined as a loss, incident or series of losses or incidents not otherwise excluded by this Policy and arising out of a single event or originating cause and includes all resultant or concomitant insured losses. When the term applies to loss or losses from earthquake shock, flood and/or windstorm, the following provisions shall apply:

#### a.   Windstorm

Each loss by windstorm shall constitute a single claim hereunder; provided, if more than one windstorm shall occur within any period of seventy-two (72) hours during the term of this Policy, such windstorm shall be deemed to be a single windstorm within the meaning thereof. The Named Insured may elect the moment from which each of the aforesaid periods of seventy-two (72) hours shall be deemed to have commenced but no two such seventy-two (72) hour periods shall overlap. The Company shall not be liable for any loss occurring before the effective date and time of the Policy. The Company will be liable for any losses occurring for a period of up to seventy-two (72) hours after the expiration of this Policy provided that the first windstorm loss or damage within that seventy-two (72) hours occurs prior to the date and time of expiration of this Policy.

In the event of there being a difference of opinion between the Named Insured and the Company as to whether or not all windstorm losses sustained by the Named Insured during an elected period of seventy-two (72) hours arose out of, or was caused by a single atmospheric disturbance, the stated opinion of the United States Weather Bureau or comparable Authority in any other country or locality shall govern as to whether or not a single atmospheric disturbance continued throughout the period at the location(s) involved.

#### b.   Flood

Each loss by flood shall constitute a single loss hereunder.

1.   If any flood occurs within a period of the continued rising or overflow of any river(s) or stream(s) and the subsidence of same within the banks of such river(s) or stream(s); or

2.      If any flood results from any tidal wave or series of tidal waves caused by any one disturbance;

such flood shall be deemed to be a single occurrence within the meaning of this Policy.

Should any time period referred to above extend beyond the expiration date of this Policy and commence prior to expiration, the Company shall pay all such flood losses occurring during such period as if such period fell entirely within the term of this Policy.

The Company shall not be liable, however, for any loss caused by any flood occurring before the effective date and time of this Policy or commencing after the expiration date and time of this Policy.

Flood shall mean a general condition of partial or complete inundation of normally dry land area from:

1.      overflow of inland or tidal water;

2.      unusual and rapid accumulation or run off of surface waters from any natural source.

Flood shall also mean mudslide or mudflow, which is a river or flow of liquid mud caused by flooding as defined in 1. or 2. above.

The definition of flood does not include ensuing loss or damage by fire, explosion or sprinkler leakage.

c.      **Flood Zone A and V**

Flood zones A and V as referenced in this policy is defined by FEMA as being inclusive of all 100 year high risk flood areas. A one-hundred-year flood is a flood event that has a 1% probability of occurring in any given year..

d.      **Earthquake Shock**

With respect to the peril of earthquake shock, any and all losses from this cause within a one hundred sixty-eight (168) hour period shall be deemed to be one loss.  The Named Insured may elect the moment from which each of the aforesaid periods of one hundred sixty eight (168) hours shall be deemed to have commenced but no two such one hundred sixty eight (168) hour periods shall overlap.

The Company shall not be liable for any loss caused by an earthquake shock occurring before the effective date and time of this Policy.  The Company will be liable for any losses occurring for a period of up to one hundred sixty eight (168) hours after the expiration of this Policy provided that the first earthquake shock loss or damage within that one hundred sixty eight (168) hours occurs prior to the date and time of the expiration of this Policy.

In the event of there being a difference of opinion between the Named Insured and the Company as to whether or not all earthquake shock losses sustained by

the Named Insured during an elected period of one hundred sixty eight (168) hours arose out of, or were caused by a single earthquake shock, the stated opinion of the National Earthquake Shock Information Service of the United States Department of the Interior or comparable Authority in any other country or locality shall govern as to whether or not a single earthquake shock continued throughout the period at the locations involved.

The term earthquake shock is defined as: earth movement meaning natural faulting of land masses, but not including subsidence, landslide, rock slide, earth rising, earth sinking, earth shifting or settling unless as a direct result of such earth movement. The definition of earthquake shock does not include ensuing loss or damage by fire, explosion or sprinkler leakage. Further Earthquake Sprinkler Leakage is covered outside of the "Earthquake Shock" definition and subject to the basic peril deductible.

**2. PERSONAL PROPERTY OF OTHERS**

Means, any property (other than real property) belonging to others for which a Named Insured has assumed liability. This includes but is not limited to:

- Articles of Clothing
- Jewelry
- Sound Equipment
- Fine Arts (up to the sub-limit of unscheduled fine arts)
- EDP Media & Hardware
- Valuable Papers
- Portable Electronic Equipment
- Employee Tools

**3. IMPROVEMENTS AND BETTERMENTS**

Means, additions or changes made by a Named Insured / lessee at their own expense to a building they are occupying that enhance the building's value.

**4. VALUABLE PAPERS AND RECORDS**

Means, all inscribed, printed, or written; documents, manuscripts or records; including but not limited to abstracts, books, deeds, drawing, films, maps, or mortgages. Valuable Papers are not money, securities, stamps or converted data program or instructions used in the Named Insured's data processing operations including the materials on which data is recorded.

5.    **TIER I WINDSTORM COUNTIES**

| State | Tier I Counties, Parishes or Independent Cities |
|---|---|
| Alabama | Baldwin, Mobile |
| Florida | Entire State, All Counties |
| Georgia | Bryan, Camden, Chatham, Glynn, Liberty, McIntosh, |
| Hawaii | Entire State, All Counties |
| Louisiana | Assumption, Calcasieu, Cameron, Iberia, Jefferson, Lafourche, Livingston, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Mary, St. Tammany, Tangipahoa, Terrebonne, Vermilion |
| Mississippi | Hancock, Harrison, Jackson |
| North Carolina | Beaufort, Bertie, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrell, Washington |
| South Carolina | Beaufort, Berkley, Charleston, Colleton, Georgetown, Horry, Jasper |
| Texas | Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Harris (entire County), Jackson, Jefferson, Kenedy, Kleberg, Liberty, Matagorda, Newton, Nueces, Orange, Refugio, San Patricio, Victoria, Willacy |
| Virginia | Accomack, Charles City, Chesapeake City, Gloucester, Hampton City, Isle of Wight, James City, Lancaster, Mathews, Middlesex, New Kent, Newport News, Norfolk City, Northampton, Northumberland, Poquoson City, Portsmouth City, Prince George, Suffolk City, Sussex, Surry, Virginia Beach City, Westmoreland, Williamsburg City, York |

6.    **RESIDENTIAL/HABITATIONAL**

The term residential/habitational with respects to deductibles is defined as: single family dwellings, duplexes, four-plexes, apartment buildings, or any other structure that is currently being used as the aforementioned occupancies. However, single family dwellings, duplexes, four-plexes, and apartment buildings that are not currently being used primarily as a residence will not be considered residential/habitational. Additionally, nursing homes, battered family shelters, youth centers, dormitories, and other occupancies that are business related will not be considered residential/habitational.

AG.   **ADDITIONAL INSURED'S / LOSS PAYEES**

It is hereby understood and agreed that the interest of Additional Insured's and/or Loss Payees is automatically included, as per schedule held on file with Tribal First.

SECTION V

# FINE ARTS FLOATER

**A.    COVERAGE**

This policy insures against all risks of physical loss of or damage except as hereafter excluded occurring during the policy period to fine arts, which are the property of the Named Insured or the property of others in the custody or control of the Named Insured while on exhibition or otherwise within the limits of the United States.

If any of the property covered by this Section is also covered under any other provisions of the Policy of which this Section is made a part, those provisions are hereby amended to exclude such property, the intent being that the coverage under this Section is the sole coverage on such property.

**1.    PROPERTY COVERED**

Objects of art of every kind and description, and property incidental thereto, which are the property of the Named Insured, or the property of others in the custody and control of the Named Insured, or in transit at the Named Insured's risk, and property in which the Named Insured shall have a fractional ownership interest which are owned by or have been leased, loaned, rented or otherwise made available to the Named Insured. "Property" shall mean paintings, drawings, etchings, prints, rare books, manuscripts, rugs, tapestries, furniture, pictures, bronzes, potteries, porcelains, marbles statuary and all other bonafide works of art and other objects of rarity, historic value, cultural interest or artistic merit, which are part of the collections of the Named Insured, or in the care, custody or control of the Named Insured, and their frames, glazing and shadow boxes.

**2.    "WALL TO WALL" ("NAIL TO NAIL") COVERAGE**

This Section covers the Named Insured's property on a "Wall to Wall" ("Nail to Nail") basis, or domicile to domicile basis, as applicable, from the time said property is removed from its normal repository incidental to shipment until returned thereto or other point designated by the owner or owner's agent prior to return shipment, including while in transit to or from points of consolidation or deconsolidation, packing, repacking or unpacking, while at such locations during such processes or awaiting shipment.

Coverage shall terminate upon arrival of the covered property at the final destination designated by the owner or owner's agent, or upon expiration of this Policy, whichever may occur first, except that expiration of this Policy shall not prejudice coverage of any risk then in transit.

**B.    EXCLUSIONS**

1.    Loss or damage occasioned by: wear and tear, gradual deterioration, insects, vermin, inherent vice or damage sustained due to and resulting from any repairing, restoration or retouching process;

2.    Loss or damage caused by or resulting from:

a.   War, hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack;

    i.   by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or

    ii.   by military, naval or air forces; or

    iii.   by an agent of any such government, power, authority or forces;

b.   Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

c.   Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

3.   Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or is contributed to or aggravated by a Covered Cause of Loss. However:

a.   If fire not otherwise excluded results, the Company shall be liable for the direct physical loss or damage by such resulting fire, but not including, any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination, and

b.   This Policy does insure against physical loss or damage caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the Insured premises, provided that, at the time of such loss or damage, there is neither a nuclear reactor nor any new or used nuclear fuel on the Named Insured premises.

4.   Any dishonest, fraudulent or criminal act by the Named Insured, a partner therein or an officer, director, employee or trustee thereof, whether acting alone or in collusion with others.

For the purpose of this exclusion an act of vandalism or malicious damage by an employee shall not constitute a dishonest, fraudulent or criminal act.

## C.   LOSS PAYMENT BASIS / VALUATION

The valuation of each article of property covered by this Section shall be determined as follows:

a.   Property of the Named Insured shall be covered for and valued at the current fair market value of each article indicated on the books and records of the Named Insured prior to loss, according to the Named Insured's valuation of each object covered.

b.   Property of others loaned to the Named Insured and for which the Named Insured may be legally liable, or which the Named Insured has been instructed to insure, shall be covered for and valued at the amount agreed upon for each article by the Named Insured and owner(s) as recorded on the books and records of the Named Insured prior to loss.

c.    Otherwise, in the absence of recorded current fair market values or agreed values for each article covered, the Company shall not be liable beyond the fair market value of the property at the time any loss or damage occurs. Said value shall be ascertained by the Named Insured and the Company or, if they differ, then the amount of value or loss shall be determined as provided in the following appraisal clause.

## D.    SPECIAL CONDITIONS

1.    Misrepresentation and Fraud: This entire Section shall be void if, whether before or after a loss, the Named Insured has concealed or misrepresented any material fact or circumstance concerning this Policy or the subject thereof, or the interest of the Named Insured therein, or in case of any fraud or false swearing by the Named Insured relating thereto.

2.    Notice of Loss: The Named Insured shall as soon as practicable report in writing to the Company or its agent every loss, damage or occurrence which may give rise to a claim under this Section and shall also file with the Company or its agent within ninety (90) days from the date of discovery of such loss, damage or occurrence, a detailed sworn proof of loss.

3.    Examination under Oath: The Named Insured, as often as may be reasonably required, shall exhibit to any person designated by the Company all that remains of any property herein described, and shall submit, and insofar as is within its power cause its employees, Named Insured and others to submit to examination under oath by any person named by the Company and subscribe the same; and, as often as may be reasonably required, shall produce for examination all writings, books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or its representative and shall permit extracts and copies thereof to be made. No such examination under oath or examination of books or documents, nor any act of the Named Insured or any of its employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver of any defense which the Named Insured might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have been made or done without prejudice to the Company's liability.

4.    Settlement of Loss: All adjusted claims shall be paid or made good to the Named Insured within sixty (60) days after presentation and acceptance of satisfactory proof of interest and loss at the office of the Company. No loss shall be paid or made good if the Named Insured has collected the same from others.

5.    No Benefit to Bailee: This Section shall in no way inure directly or indirectly to the benefit of any carrier or other bailee.

6.    Subrogation or Loan: If in the event of loss or damage the Named Insured shall acquire any right of action against any individual, firm or corporation for loss of, or damage to, property covered hereunder, the Named Insured will, if requested by the Company, assign and transfer such claim or right of action to the Company or, at the Company's option, execute and deliver to the Company the customary form of loan receipt upon receiving an advance of funds in respect of the loss or damage; and will subrogate the Company to, or will hold in trust for the Company, all such rights of action to the extent of the amount paid or advanced, and will permit suit to be brought in the Named Insured's name under the direction of and at the expense of the Company.

7.   Loss Clause: Any loss hereunder shall not reduce the amount of this Section, except in the event of payment of claim for total loss of an item specifically scheduled hereon.

8.   Protection and Preservation of Property: In case of actual or imminent physical loss or damage of the type insured against by this Policy, the expenses incurred by the Named Insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage otherwise recoverable under the Policy and be subject to the applicable deductible and without increase in the limit provisions contained in this Policy.

9.   Appraisal: If the Named Insured and the Company fail to agree as to the amount of loss, each shall on the written demand of other, made within sixty (60) days after receipt of proof of loss by the Company, select a competent and disinterested appraiser, and the appraisal shall be made at a reasonable time and place. The appraisers shall first select a competent and disinterested umpire, and failing for fifteen (15) days to agree upon such umpire, then on the request of the Named Insured or the Company, such umpire shall be selected by a judge of a court of record in the state in which such appraisal is pending. The appraisers shall then appraise the loss, stating separately the fair market value at the time of loss and the amount of loss, and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of loss. The Named Insured and the Company shall each pay their chosen appraiser and shall bear equally the other expenses of the appraisal and umpire. The Named Insured shall not be held to have waived any of its rights by any act relating to appraisal.

10.   Civil Authority: Property covered under this Section against the peril of fire is also covered against the risk of damage or destruction by Civil authority during a conflagration and for the purpose of retarding the same; provided that neither such conflagration nor such damage or destruction is caused or contributed to by a peril otherwise excluded herein.

11.   Changes: Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Section or stop the Named Insured from asserting any right under the terms of this Section, nor shall the terms of this Section be waived or changed except by endorsement issued to form a part of this Section.

12.   Additional Covered Party(ies):   Corporations, associations, firms, institutions, museums, persons and others who own or control collections, objects or articles who make them available to the Named Insured, and temporary borrowers or custodians (but not carriers, packers or shippers) of property covered, are additional Insured(s) hereunder, but only as respects coverage afforded to said Named Insured's property.

13.   Packing:  It is agreed by the Named Insured that the property covered hereunder be packed and unpacked by competent packers.

14.   Other Insurance: This fine arts floater Section is excess coverage over any other valid and collectible insurance which may apply to any objects of art for which coverage would apply under this Policy.

15.   Pair And Set: In the event of the total loss of any article or articles which are a part of a set, the Company agrees to pay the Named Insured the full amount of the value of such set and the Named Insured agrees to surrender the remaining article or articles of the set to the Company.

# SECTION VI

# MOBILE / CONTRACTORS EQUIPMENT

**A.** **COVERAGE**

This Policy insures only contractor's equipment, whether self propelled or not, including equipment thereof while attached thereto or located thereon, such as bulldozers, drag lines, power shovels, derricks, drills, concrete mixers and other machinery of a similar nature and not subject to motor vehicle registration.

If any of the property covered by this Section is also covered under any other provisions of the Policy of which this Section is made a part, those provisions are hereby amended to exclude such property, the intent being that the coverage under this Section is the sole coverage on such property.

**B.** **PERILS EXCLUDED**

This Section insures against all risks of direct physical loss or damage occurring during the policy period to the above described property from any external cause except as provided below.

1. Loss or damage due to wear, tear, rust, corrosion, latent defect, mechanical breakage or improper assemblage.

2. Loss or damage due to the weight of the load imposed on the machine exceeding the capacity for which such machine was designed.

3. Loss or damage to crane or derrick boom(s) and jib(s) of lattice construction while being operated unless directly caused by fire, lightning, hail, windstorm, earthquake shock, explosion, riot, riot attending a strike, civil commotion, actual physical contact with an aircraft or airborne missile including objects falling therefrom, collision with other vehicles or other contractors equipment whether or not such other equipment is covered hereunder, landslide, or upset of the unit of which it is a part (but only when and to the same extent that such other perils are covered by the Policy).

4. Loss or damage due to explosion arising from within steam boilers.

5. Loss or damage to dynamos, exciters, lamps, switches, motors or other electrical appliances or devices, including wiring, caused by lightning or other electrical currents (artificial or natural) unless fire ensues and then for the loss by fire only.

6. Loss or damage due to dishonesty of Named Insured's employees or persons to whom the Named Insured's property is entrusted.

7. Loss or damage caused by or contributed to failure of the Named Insured to keep and maintain the property in a thorough state of repair.

8.   Loss or damage caused by or resulting from:

a.   War, hostile or warlike action in time of peace or, including action in hindering, combating or defending against an actual, impending or expected attack,

  i.    by any government or sovereign power (de jure or de facto) or by any authority maintaining using military, naval or air forces; or
  ii.   any military, naval or air forces; or
  iii.  by an agent of any such government, power, authority or forces;

b.   any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

c.   insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade;

9.   Loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) covered against in this endorsement; however, subject to the foregoing and all provisions of this Policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is covered against by this Policy.

## C.   PROPERTY EXCLUDED

1.   Automobiles, motorcycles, motor trucks, or parts thereof.

2.   Buildings

3.   Machinery or equipment or building materials to be installed in any building for the purpose of becoming a part thereof, nor on any property which has become a permanent part of any structure.

4.   Property that is located underground.

5.   Property while waterborne except while being transported on any regular ferry.

6.   The storage risk of property not owned or required to be insured by the Named Insured at premises controlled or leased by the Named Insured, except where incidental to the regular or frequent use of the equipment or property.

7.   Plans, blue prints, designs or specifications.

**D.**   **LOSS PAYMENT BASIS / VALUATION**

On Contractors Equipment (whether self propelled or not), on or off premises, where Replacement   Cost (New) values are specified, loss or damage shall be based on 100% of the Replacement Cost      (New) at the time of loss.  Partial losses shall be based on the cost of repairing or replacing the damaged portion, up to the fair market value of the Contractors Equipment.  However, should these costs exceed the fair market value then recovery shall be based upon the Replacement Cost (New).

If the values, provided by the Named Insured, provides a valuation based on replacement cost, then recovery will be on the same basis, if replaced.  If not replaced, the basis of recovery shall be actual cash value.

**E.**   **SPECIAL CONDITIONS**

This section covers property only within the limits of the United States of America.

It is a condition of this Policy that all articles covered hereunder are in sound condition at the time of attachment of this Policy.

# SECTION VII

# ACCOUNTS RECEIVABLE

**A.** **COVERAGE**

This Policy covers the loss of or damage resulting from insured perils to the Named Insured's records of accounts receivable as defined below, occurring during the Policy period.

**B.** **EXCLUSIONS**

In addition to the exclusions in the General Conditions, this coverage does not apply:

1. To loss due to any fraudulent, dishonest or criminal act by the Named Insured, a partner therein, or an officer, director, employee or trustee thereof, while working or otherwise and whether acting alone or in collusion with others.

   For the purpose of this exclusion an act of vandalism or malicious damage by an employee shall not constitute a dishonest, fraudulent or criminal act.

2. To loss due to bookkeeping, accounting or billing errors or omissions.

3. To loss, the proof of which as to factual existence, is dependent upon an audit of records or an inventory computation; but this shall not preclude the use of such procedures in support if claim for loss which the Named Insured can prove through evidence wholly apart therefrom, is due solely to a risk of loss to records of accounts receivable not otherwise excluded hereunder.

4. To loss due to alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

**C.** **LOSS PAYMENT BASIS / VALUATION**

When there is proof that a loss covered by this Policy has occurred but the Named Insured cannot accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be based on the Named Insured's monthly statements and shall be computed as follows:

a. Determine the amount of all outstanding accounts receivable at the end of the same fiscal month in the year immediately proceeding the year in which the loss occurs;

b. Calculate the percentage of increase or decrease in the average monthly total of accounts receivable for the twelve (12) months immediately preceding the month in which the loss occurs as compared with such average for the months of the preceding year;

c. The amount determined under (a) above, increased or decreased by the percentage calculated under (b) above, shall be the agreed total amount of accounts receivable as of the last day of the fiscal month in which said loss occurs;

    d.      The amount determined under (c) above shall be increased or decreased in conformity with the normal fluctuations in the amount of accounts receivable during the fiscal month involved, due consideration being given to the experience of the business since the last day of the last fiscal month for which statement has been rendered.

There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged or otherwise established or collected by the Named Insured, and an amount to allow for probable bad debts which would normally have been uncollectible by the Named Insured.  All unearned interest and service charges shall be deducted.

**D.**    **DEFINITIONS:**

**ACCOUNTS RECEIVABLE:**

    a.      All sums due the Named Insured from customers provided the Named Insured is unable to effect collection thereof as the direct result of loss or damage to records of accounts receivable.

    b.      Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage.

    c.      Collection expense in excess of normal collection cost and made necessary because of such loss or damage.

    d.      Other expenses, when reasonably incurred by the Named Insured, in re-establishing records of accounts receivable following such loss or damage.

# SECTION VIII

# UNMANNED AIRCRAFT

## A. COVERAGE

This Policy insures only **Unmanned Aircraft,** that are usual to your business that you own or are required to insure, to pay for any physical damage loss sustained while not **In Flight** or **In Motion** and which are not the result of fire or explosion following crash or collision while the **Unmanned Aircraft** was **In Flight** or **In Motion** that are:

(1) Listed on the schedule which is a part of this policy or which is on file with us;

(2) Unscheduled but for an amount not to exceed the limit shown on the Declarations

If any of the property covered by this Section is also covered under any other provisions of the Policy of which this Section is made a part, those provisions are hereby amended to exclude such property, the intent being that the coverage under this Section is the sole coverage on such property.

## B. PERILS EXCLUDED

This Section insures against all risks of direct physical loss or damage occurring during the policy period to **Unmanned Aircraft** from any external cause except as provided below.

1. Loss or damage due to the **Unmanned Aircraft** being **In Flight** or **In Motion** including during propulsion system startup or any time the propulsion system is operating.

2. Loss or damage due to wear, tear, rust, corrosion, latent defect, mechanical breakage, freezing or improper assemblage.

3. Loss or damage due to the weight of the load imposed on the **Unmanned Aircraft** exceeding the capacity for which such **Unmanned Aircraft** was designed.

4. Loss or damage to tires except where such loss or damage is caused by fire, theft, windstorm or vandalism or is the direct result of physical damage covered by this policy.

5. Loss or damage to **Unmanned Aircraft** while being worked upon except for direct loss or damage caused by resulting fire or explosion.

6. Loss or damage to dynamos, exciters, lamps, switches, motors or other electrical appliances or devices, including wiring, caused by lightning or other electrical currents (artificial or natural) unless fire ensues and then for the loss by fire only.

7. Loss or damage due to conversion, embezzlement or secretion by any person or organization with legal right to possession of such **Unmanned Aircraft** under bailment, lease, conditional sale, purchase agreement, mortgage or other legal agreement that governs the use, sale or lease of the **Unmanned Aircraft**, nor for any loss or damage during or resulting therefrom.

8. Loss or damage due to dishonesty of Named Insured's employees or persons to whom the Named Insured's property is entrusted.

9.    Loss or damage caused by or contributed to failure of the Named Insured to keep and maintain the property in a thorough state of repair.

10.    Loss or damage caused by or resulting from:

    a.    War, hostile or warlike action in time of peace or, including action in hindering, combating or defending against an actual, impending or expected attack,

        i.    by any government or sovereign power (de jure or de facto) or by any authority maintaining using military, naval or air forces; or

        ii.    any military, naval or air forces; or

        iii.    by an agent of any such government, power, authority or forces;

    b.    any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

    c.    insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade;

11.    Loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) covered against in this endorsement; however, subject to the foregoing and all provisions of this Policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is covered against by this Policy.

## C.    PROPERTY EXCLUDED

1.    **Unmanned Aircraft** that are located in underground mines, caverns or underground storage facilities.

2.    **Unmanned Aircraft** while waterborne except while being transported on any regular ferry.

3.    The storage risk of **Unmanned Aircraft** not owned or required to be insured by the Named Insured at premises controlled or leased by the Named Insured, except where incidental to the regular or frequent use of the equipment or property.

**D.**   **LOSS PAYMENT BASIS / VALUATION**

On **Unmanned Aircraft**, on or off premises, where Replacement  Cost  (New)  values  are specified, loss or damage shall be based on 100% of the Replacement Cost (New) at the time of loss.  Partial losses shall be based on the cost of repairing or replacing the damaged portion, up to the fair market value of the **Unmanned Aircraft**.  However, should these costs exceed the fair market value then recovery shall be based upon the Replacement Cost (New).

If the values, provided by the Named Insured, provides a valuation based on replacement cost, then recovery will be on the same basis, if replaced.  If not replaced, the basis of recovery shall be actual cash value.

**E.**   **SPECIAL CONDITIONS**

This section covers property only within the limits of the United States of America.

It is a condition of this Policy that all articles covered hereunder are in sound condition at the time of attachment of this Policy.

**F.**   **DEFINITIONS**

**1.  UNMANNED AIRCRAFT**

Means a powered aerial vehicle that does not carry a human operator, uses aerodynamic forces to provide vehicle lift, can fly autonomously or be piloted remotely, is recoverable and in some cases can carry a non-lethal payload including the propulsion system and equipment usually installed in the vehicle (1) while installed in the vehicle, (2) while temporarily removed from the vehicle and (3) while removed from the aircraft for replacement until such time as replacement by a similar item has commenced; also tools and equipment which are specially designed for the aircraft and which are ordinarily carried therein.

**2.  IN FLIGHT**

Means, with respect to fixed wing **Unmanned Aircraft**, the time commencing with the actual take-off run or launch and continuing thereafter until it has completed its landing run; or capture; and if the **Unmanned Aircraft** is a rotorcraft, from the time the rotors start to revolve under power for the purpose of flight until they subsequently cease to revolve after landing; and if the **Unmanned Aircraft** is a balloon, while it is inflated or being inflated or deflated.

**3.  IN MOTION**

Means while the **Unmanned Aircraft** is moving under its own power or the momentum generated therefrom or while it is **In Flight** and, if the **Unmanned Aircraft** is a rotorcraft, any time the rotors are rotating or while it is **In Flight** and, if the **Unmanned Aircraft** is a glider or balloon, any time it is being transported, towed or while it is **In Flight.**

## SECTION IX

## BOILER AND MACHINERY BREAKDOWN EXTENSION

1.  **PERILS INSURED**

    In consideration of the premium paid and subject to the terms, General Conditions and General Exclusions of the policy to which this Extension is attached, and to the following terms and conditions, this Insurance is extended to cover direct damage to Covered Property caused by a Covered Cause of Loss.

2.  **ADDITIONAL COVERAGE**

    (a)  Hazardous Substance:

    The additional expense incurred for cleanup, repair or replacement or disposal of damaged, contaminated or polluted property as a result of an Accident, which causes property to become damaged, contaminated or polluted by a substance declared hazardous to health by an authorized governmental agency. The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>. For the purpose of this coverage "Additional expense" means any expense that would not have incurred, if no substance hazardous to health had been involved in the accident

    (b)  Ammonia Contamination:

    The loss, including salvage expense, incurred with respect to damage by ammonia contacting or permeating property under refrigeration or in process requiring refrigeration, as a result of any one Accident to one or more Objects. The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>.

    (c)  Water Damage:

    The loss, including salvage expense, with respect to property damaged by water, resulting from any one Accident. The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>.

    (d)  Media Coverage:

    The loss to all forms of electronic, magnetic and optical tapes and discs used in any electronic computer or electronic data processing equipment directly damaged by an Accident to an Object. The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>. For the purpose of this coverage, the valuation basis for "Media" is as follows:

    i.   For "Media" that are mass-produced and commercially available, at the replacement cost.

    ii.  For all other "Media," at the cost of blank material for reproducing the records.

(e)     "Consequential Damage"

The "Consequential Damage" to refrigerated and frozen goods of the Named Insured or for which the Named Insured is legally liable or under the Named Insured's care, custody or control caused solely by an Accident to an Object.  For the purpose of this coverage, "Consequential Damage" is defined as loss due to spoilage from lack of power, light, heat, steam or refrigeration, resulting from Accident.  The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>.

(f)     Utility Interruption

The loss caused by an Accident to an Object that is owned, operated or controlled by a public or private entity that the Named Insured has contracted with to furnish them with electrical utility service including all direct electrical suppliers.  The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>.

(g)     CFC Refrigerants and Halon

The replacement of any CFC (chlorofluorocarbon) refrigerant used in refrigeration or air conditioning equipment or Halon used in a fire suppression system due to an "Accident" to an Object.

(h)     Ordinance or Law

If an Accident to an Object at the Named Insured's location damages a building that is "Covered Property," the Company will pay for

i.      Loss to the Undamaged Portion of the Building, meaning loss to the undamaged portion of the building caused by enforcement of any ordinance or law that:

a.      Requires the demolition of parts of the same building not damaged by the Accident to an Object; or

b.      Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the location of the building.

ii.     Demolition Cost meaning the cost to demolish and clear the site of undamaged parts of the building, caused by the enforcement of building, zoning, or land ordinance or use.

iii.    Increased Cost of Construction, meaning the increased cost to:

a.      Repair or reconstruct damaged portions of the building; and

b.      Reconstruct or remodel undamaged portions of the building whether or not demolition is required;

when the increased cost is a consequence of enforcement of building, zoning or land use ordinance or law. But the Company will only pay for this increased cost if the building is repaired, reconstructed or remodeled.  Also, if the building is repaired, reconstructed or remodeled, it must be intended for similar occupancy as the current building, unless such occupancy is not permitted by zoning or land use ordinance or law.

Insurance under this section only applies with respect to ordinance or law that is in force at the time of the Accident to an Object. Insurance under this section does not apply to:

a.  Costs associated with the enforcement of any ordinance or law which requires any Named Insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of substances declared to be hazardous to health by a governmental agency; or

b.  Loss due to any ordinance or law that:

i.  The Named Insured was required to comply with before the Accident to an Object even if the building was undamaged; and

ii.  The Named Insured failed to comply with.

The coverage provided by this clause is sub-limited to <u>USD as per Declaration Page</u>.

## 3.  DEFINITION OF ACCIDENT

Accident shall mean a sudden and accidental breakdown of the Object, or a part thereof, which manifests itself at the time of it occurrence by physical damage to the Object that necessitates repair or replacement of the Object or part thereof; but Accident shall not mean:

a.  depletion, deterioration, corrosion , or erosion of material;
b.  wear and tear;
c.  leakage at any valve, fitting, shaft seal, gland packing, joint or connection;
d.  the breakdown of any vacuum tube, gas tube or brush;
e.  the breakdown of any structure or foundation supporting the Object or any part thereof;
f.  the functioning of any safety device or protective device.

## 4.  DEFINITION OF OBJECT

Except as otherwise specifically designated herein, Object as described below shall mean any equipment or apparatus which is owned by, leased by or operated under the control of the Named Insured subject to the Exclusions and Special Provisions specified herein:

a.  Any boiler, any fired vessel, any unfired vessel subject to vacuum or internal pressure other than static pressure of contents, any refrigerating and air conditioning vessels, or any piping and its accessory equipment, but such Object shall not include:

1.  Any boiler setting, any insulating or refractory material,

2.  Any sewer piping, any underground gas piping, any piping forming a part of a sprinkler system or any water piping other than

(a)  Feed water piping between any boiler and its feed pumps or injectors
(b)  Boiler condensate returning piping

b.  Any mechanical or electrical machine or electrical apparatus used for the generation, transmission or utilization of mechanical or electrical power, but Object shall not include

1. Any structure or foundation other than a bedplate of a machine,

2. Any vehicle, elevator, crane, hoist, power shovel or drag line, but not excluding any electrical equipment used with said machine or apparatus,

3. Any refractory material, or

4. Any penstock or draft tube.

## 5. COVERED CAUSE OF LOSS

A Covered Cause of Loss is an Accident to an Object insured hereon. An Object must be in use or connected ready for use at the time of the Accident.

## 6. COVERED PROPERTY

Covered Property, as used in this Extension, means any property that:

a. The Named Insured owns; or
b. Is in the Named Insured's' care, custody or control and for which they are legally liable

## 7. SPECIAL PROVISIONS

a. As respects any boiler, fired or unfired vessel, refrigerating system or piping, the Company shall not be liable for loss from an Accident while said Object is undergoing a hydrostatic, pneumatic or gas pressure test that exceeds manufacturers recommended limits.

b. As respects any boiler of fired vessel, the Company shall not be liable for loss from an explosion of gas or unconsumed fuel within the furnace of such Object or within the passages from the furnace to the atmosphere, whether or not such explosion (a) is contributed to or aggravated by an Accident to any part of said Object that contains steam or water, or (b) is caused in whole or in part, directly or indirectly, by any Accident to any Object, or part thereof, nor shall the Company be liable for any loss from an Accident caused directly or indirectly by such explosion.

c. As respects any unfired vessel which is used for the storage of gas or liquid and which is periodically filled, moved, emptied and refilled in the course of its normal service, such vessel shall be considered as "connected ready for use" within the terms of this Extension of the Policy.

d. As respects any Object or part of an Object that is being dismantled, reassembled or is in storage, will be considered as "connected ready for use" within the terms of this Extension of the Policy.

e. As respects any gas turbine of the internal combustion type, (a) the combustor or such Object shall not be considered to be a "furnace" as the word is used in the Definition of Accident or in Special Provision 2 above and (b) the Definition of Accident shall not mean the cracking of any part of the Turbine exposed to the production of combustion.

f. As respects new turbine generator units, coverage shall not apply until the unit has been contractually accepted by the Named Insured, that all tests required by the

contractor have been performed and satisfied and the unit has been placed in commercial operation.

**8.    VALUATION**

a.    The Company will pay the Named Insured the amount the Named Insured spends to repair or replace the property directly damaged by an Accident. The Company payment will be the smallest of:

  1)    The Limit of Insurance;

  2)    The cost at the time of the Accident to repair the damaged property with property of like kind, capacity, size and quality;

  3)    The cost at the time of the Accident to replace the damaged property on the same site with other property:

    a)    Of like kind, capacity, size and quality; and
    b)    Used for the same purpose

  4)    The amount the Named Insured actually spends that is necessary to repair or replace the damaged property.

b.    As respects any Object if the cost of repairing or replacing only a part of the Object is greater than:

  1)    the cost of repairing the Object; or
  2)    the cost of replacing the entire Object on the same site;

The Company will pay only the smaller of (1) or (2).  The repair parts or replacement Object must be:

  1)    of like kind, capacity, size and quality; and
  2)    used for the same purpose.

c.    The Company will not pay:

  1)    if the loss or damage is to property that is obsolete or useless to the Named Insured; or

  2)    for any extra cost if the Named Insured decides to repair or replace the damaged property with property of a better kind or quality or of larger capacity,

d.    If the Named Insured does not repair or replace the damaged property within 18 months after the date of the Accident then the Company will pay on the smaller of the:

  1)    cost it would have taken to repair; or
  2)    actual cash value;

at the time of the "accident."

Paragraph (d) does not apply to any time period beyond the 18 months that the Company agrees to in writing.

e.    As respects CFC (chlorofluorocarbon) refrigerant or Halon, the following valuation basis is applicable:

  1)    If the CFC refrigerant or Halon is replaceable, the Named Insured may, at their option, elect to:

a) Repair or replace the damaged refrigeration equipment, air conditioning equipment or fire suppression system and replace the lost CFC refrigerant or Halon subject to it being of like kind, capacity, size and quality and used for the same purpose; or

b) Change the refrigeration equipment, air conditioning equipment or fire suppression system, through modification or replacement, to:

   i. Refrigeration or air conditioning equipment that uses an approved non-CFC refrigerant; or
   ii. A fire suppression system that uses an approved non – Halon agent.

But this option is available only if the change to the equipment or system is made within 18 months after the date of the Accident or within any extended time period that the Company agrees to in writing.

If Option 1) b) above is elected, the Company will not pay more than the least of the following amounts:

a) The Limit of Insurance;

b) The cost at the time of the Accident to repair the damaged refrigeration equipment, air conditioning equipment or fire suppression system, retrofit the equipment or system to accept non – CFC refrigerant or non – Halon fire suppressant, and charge the equipment or system with that refrigerant or fire suppressant;

c) The cost at the time of the Accident to replace the damaged refrigeration equipment, air conditioning equipment or fire suppression system with equipment or a system that is functionally equivalent and uses an approved non – CFC refrigerant or non – Halon fire suppressant;

d) The amount that the Named Insured actually spend that is necessary to change the refrigeration equipment, air conditioning equipment or fire suppression system, through modification or replacement, to equipment or a system that uses an approved non – CFC refrigerant or non – Halon fire suppressant; or

e) One hundred twenty-five percent (125%) of the amount the Company otherwise would have paid for loss to the refrigeration equipment, air conditioning equipment or fire suppression system.

f. If the CFC refrigerant or Halon is not replaceable and:

(1) The Named Insured repairs or replaces the damaged equipment within 18 months after the date of the Accident or within any extended time that the Company agrees to in writing, the Company will pay the least of the following amounts:

   (a) The Limit of Insurance;

   (b) The cost at the time of the Accident to repair the damaged refrigeration equipment, air conditioning equipment or fire suppression system,

retrofit the equipment or system to accept non – CFC refrigerant or non – Halon fire suppressant, and charge the equipment or system with that refrigerant or fire suppressant;

(c) The cost at the time of the Accident to replace the damaged refrigeration equipment, air conditioning equipment or fire suppression system with equipment or a system that is functionally equivalent and uses an approved non – CFC refrigerant or non – Halon fire suppressant;

(d) The amount that the Named Insured actually spend that is necessary to change the refrigeration equipment, air conditioning equipment or fire suppression system, through modification or replacement, to equipment or a system that uses an approved non – CFC refrigerant or non – Halon fire suppressant.

(2) If the Named Insured does not replace the damaged equipment within 18 months after the date of the Accident or within the extended time period that the Company agrees to in writing, the Company will not pay more than the lesser of:

(a) The amount that the Company would have paid if repair or replacement of the damaged equipment had been made as determined in F 1 above; or

(b) The actual cash value of the damaged equipment at the time of the Accident.

g. As respects Insurance under Ordinance and Law, the most the Company will pay as a result of any one Accident for:

a) Loss to the Undamaged portion of the building is included in the Limit of Insurance that otherwise applies to the damaged building. But in no event will the amount the Company pay for loss to the building, including the loss in value of the undamaged portion of the building due to enforcement of an ordinance or law to which this coverage applies, exceed:

i. The amount that the Named Insured actually spend to repair, rebuild or replace the building, but not more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

ii. The actual cash value of the building at the time of loss if the building is not repaired or replaced.

b) Demolition and Increased Cost of Construction is <u>USD as per Declaration Page</u>, subject to the following:

i. With respect to the coverage provided for Demolition Cost, the Company will not pay more than the amount the Named Insured actually spend to demolish and clear the site of the undamaged parts of the building;

ii. With respect to the coverage provided for Increased Cost of Construction:

(a)    We will not pay for the Increased Cost of Construction:

Until the building is actually repaired or replaced at the same or another premises; and

Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed 18 months. We may extend this period in writing during the 18 months.

(b)    If the building is repaired or replaced at the same location, or if the Named Insured elect to rebuild at another location, the most the Company will pay for the increased cost of construction is the increased cost of construction at the same location.

(c)    If the ordinance or law requires relocation to another location, the most the Company will pay for the increased cost of construction is the increased cost of construction at the new location.

h.    If a claim or "suit" is brought against the Named Insured alleging that the Named Insured is liable for damage to property of another that was caused by an Accident to an Object, the Company will either:

1.    Settle the claim or "suit", or
2.    Defend the Named Insured against the "suit" but reserve the right for themselves to settle at any point.

## 9.    EXCLUSIONS

a.    To loss:

1)    From explosion of an Object other than:

a)    Any steam boiler, steam piping, steam turbine, gas turbine, steam engine, or
b)    Any machine when such loss is caused by centrifugal force or mechanical breakdown,

b.    Nuclear reaction or radiation or radioactive contamination however caused, however this exclusion shall not apply to nuclear medicine at covered hospitals,

c.    From fire concomitant with or following an Accident.

d.    From an Accident caused directly or indirectly by fire

e.    From a combustion explosion outside the Object concomitant with or following an Accident,

f.    From an Accident caused directly or indirectly by a combustion explosion outside an Object,

## 10.    CONDITIONS

a.    Inspection

The Company shall be permitted but not obligated to inspect the Named Insured's property and operations at any reasonable time. Neither the right to make inspections nor the making thereof nor any advice or report resulting therefrom shall constitute an undertaking, on behalf of or for the benefit of the Named Insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

b.    Suspension

Upon the discovery of a dangerous condition with respect to any Object, Alliant Insurance Services, Inc., may immediately suspend the insurance, with respect to an Accident to said Object, by written notice mailed or delivered to the Named Insured at the address of the Named Insured stated in the <u>Declaration Page</u>, or at the location of the Object, as stated for it in a schedule or endorsement. The insurance so suspended may be reinstated by the Company but only by an endorsement issued to form a part of this Policy. The Named Insured shall be allowed the unearned portion of the premium paid for such suspended insurance, pro rata for the period of suspension.

c.    Notice of Accident and Adjustments

When an Accident occurs, written notice shall be given to the Company as soon as practicable. The Company shall be given like notice of any claim made on account of such Accident. The Company or their representative shall have reasonable time and opportunity to examine the property, and the Named Insured's Location of Risk, before repairs are undertaken or physical evidence of the Accident is removed, except for protection or salvage. Proof of loss shall be made in such form as the Company may require. If suit is brought against the Named Insured for loss to which this Section of the Policy is applicable, any summons or other process served upon the Named Insured shall be forwarded immediately to the Company.

d.    Deductible

In the event of an Accident to an Object as insured under this Extension that is concomitant with or followed by physical loss or damage incurred under the All Risks policy that this Extension attaches to, the deductible to be applied to the total loss shall be the applicable Boiler & Machinery deductible.

# SECTION X

# ENDORSEMENTS

## 1. VACANT OR UNOCCUPIED LOCATIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

### All Coverage Parts

Permission is given for a scheduled location to be vacant or unoccupied for a period of sixty (60) consecutive days from the date of its acquisition or the inception date of this policy, which ever date is later.  Thereafter, coverage will apply subject to the following conditions and limitations:

    A.    The Named Insured must provide written notification to the Company of any and all vacant or unoccupied location(s) and properly designate the vacant/unoccupied status of each on the Statement of Values on file with the Company, prior to any loss or damage; and

    B.    The Named Insured must maintain all utilities and the same degree of fire protection, and watch and alarm service; and

If conditions A and B above are met, the liability of the Company for covered loss, damage or expense shall be limited to the lesser of the actual replacement cost, the actual cash value if the property is not replaced, or the individually stated value for the scheduled location which sustained the loss as shown in Statement of Value on file with the Company prior to the loss, but in no event shall the liability of the Company exceed USD2,000,000 in any one occurrence.  Any exception to this USD2,000,000 limitation on recovery must be agreed to by the Company, in writing and by endorsement, prior to any loss or damage.

If conditions A and B above are not met, the Company will:

    1.  Not pay for loss, damage or expense caused by or resulting from:  vandalism, sprinkler leakage, breakage of building glass, freezing, water damage, theft, attempted theft, any loss covered under any extension of coverage, all regardless of the cause of loss, and

    2.  Value all loss, damage or expense caused by a covered peril, not otherwise excluded above, at actual cash value or the actual repair/replacement cost, not to exceed USD500,000 in any one occurrence.

Any loss, damage or expense which occurs at an unscheduled location that is vacant or unoccupied at the time of loss, whether unnamed or newly acquired, will be valued at the lesser of the actual cash value, the actual replacement cost or the purchase price of the location, but in no event shall the liability of the Company exceed USD500,000 in any one occurrence.  The purchase price value as discussed herein will only be considered in the case of newly acquired properties.  Any exception to this limitation on recovery must be agreed to by the company, in writing and by endorsement, prior to any loss or damage.

As used in this Vacancy or Unoccupied Location Endorsement, a building is "vacant" or "unoccupied" when:

    a.  70% or more of its total square footage is "vacant" or "unoccupied"; or

    b.  When it does not contain enough business personal property to conduct customary operations, or, it does not contain enough business personal property pertaining to activities customary to the occupancy of the building.

There is no coverage afforded under the Errors and Omissions provision of this policy for loss, damage or expense at "vacant" or "unoccupied" properties as defined above.

## ENDORSEMENT 2

## CANCELLATION CLAUSE AMENDMENT
## DUE TO FINANCIAL STRENGTH DOWNGRADE ENDORSEMENT

It is hereby understood and agreed that Section IV, General Conditions, Clause N, Cancellation of this policy is amended.

This endorsement modifies insurance provided by the policy:

The Cancellation Provision, Cancellation Condition, or Cancellation Clause, whichever is applicable, is amended by adding the following paragraph to the end thereof:

Notwithstanding any other terms or conditions of this policy to the contrary, in the event that the financial strength rating of the **Company** is downgraded to: (1) below A- by A.M. Best Co., or (2) below BBB by Standard & Poor's Ratings Services (hereinafter, the **Credit Rating Downgrade**), this policy may be canceled by the **FIRST NAMED INSURED** by mailing prior written notice to the Company or by surrender of this policy to the **Company**.

If this policy is canceled by the **First Named Insured** due to such **Credit Rating Downgrade**, then the **Company** shall return the unearned pro rata proportion of the premium as of the effective date of cancellation and shall waive any minimum earned premium requirement specified herein.

The following definitions apply to this endorsement:

1. **Company** means any Insurer participating on this Policy.

2. **First Named Insured** means the first Named Insured as shown on the Declarations page of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**ENDORSEMENT 3**

**ECONOMIC SANCTIONS ENDORSEMENT**

This endorsement modifies insurance provided by this Policy.

The Insurer shall not be deemed to provide cover and the Insurer shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Insurer, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union or the United States of America.

All other terms and conditions of the policy remain the same.

PR4225 (07/13)

**ENDORSEMENT 4**

## WAR AND TERRORISM EXCLUSION ENDORSEMENT
**(applies to locations outside the USA, its territories and possessions)**

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

(1)     war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

(2)     any act of terrorism.

> For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to (1) and/or (2) above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.
In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

NMA2918
08/10/2001