Jennie Lee Anderson (SBN 203586)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California  94104
Telephone:  415-986-1400
Facsimile: 415-986-1474
jennie@andrusanderson.com

Adam J. Levitt (*pro hac vice forthcoming*)
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone:  312-214-7900
Facsimile: 312-253-1443
alevitt@dicellolevitt.com

Mark Lanier (*pro hac vice forthcoming*)
**THE LANIER LAW FIRM PC**
10940 W. Sam Houston Parkway N., Suite 100
Houston, Texas 77064
Telephone:  713-659-5200
Facsimile: 713-659-2204
WML@lanierlawfirm.com

Timothy W. Burns (*pro hac vice forthcoming*)
**BURNS BOWEN BAIR LLP**
One S. Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
Facsimile: 608- 286-2037
tburns@bbblawllp.com

Douglas Daniels (*pro hac vice forthcoming*)
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas 77057
Telephone:  713-917-0024
Facsimile: 713-917-0026
douglas.daniels@dtlawyers.com

*Attorneys for Plaintiffs and the Class*
(Additional counsel listed on signature page)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **MENOMINEE INDIAN TRIBE OF WISCONSIN, MENOMINEE INDIAN GAMING AUTHORITY d/b/a MENOMINEE CASINO RESORT**, and **WOLF RIVER DEVELOPMENT COMPANY**, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>**(1)  LEXINGTON INSURANCE COMPANY;** | Case No.:   3:21-cv-00231-WHO<br><br>**AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>(1)  BREACH OF CONTRACT; and<br>(2) DECLARATORY JUDGMENT<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

(2)  **UNDERWRITERS AT LLOYD'S – SYNDICATES: ASC 1414, TAL 1183, MSP 318, ATL1861, KLN 510, AGR 3268;**
(3)  **UNDERWRITERS AT LLOYD'S - SYNDICATE: CNP 4444;**
(4)  **UNDERWRITERS AT LLOYD'S - ASPEN SPECIALTY INSURANCE COMPANY;**
(5)  **UNDERWRITERS AT LLOYD'S - SYNDICATES: KLN 0510, ATL 1861, ASC 1414, QBE 1886, MSP 0318, APL 1969, CHN 2015;**
(6)  **UNDERWRITERS AT LLOYD'S – SYNDICATE: BRT 2987;**
(7)  **UNDERWRITERS AT LLOYD'S - SYNDICATES: KLN 0510, TMK 1880, BRT 2987, BRT 2988, CNP 4444, ATL 1861, NEON WORLDWIDE PROPERTY CONSORTIUM, AUW 0609, TAL 1183, AUL 1274;**
(8)  **HOMELAND INSURANCE COMPANY OF NEW YORK;**
(9)  **HALLMARK SPECIALTY INSURANCE COMPANY;**
(10) **ENDURANCE WORLDWIDE INSURANCE LTD T/AS SOMPO INTERNATIONAL;**
(11) **ARCH SPECIALTY INSURANCE COMPANY;**
(12) **EVANSTON INSURANCE COMPANY;**
(13) **ALLIED WORLD NATIONAL ASSURANCE COMPANY;**
(14) **LIBERTY MUTUAL FIRE INSURANCE COMPANY;**
(15) **LANDMARK AMERICAN INSURANCE COMPANY;**
(16) **XL CATLIN INSURANCE COMPANY UK LTD;** and
(17) **SRU DOE INSURERS 1-20;**

Defendants.

3:21-cv-00231-WHO

AMENDED CLASS ACTION COMPLAINT

# CLASS ACTION COMPLAINT

Plaintiffs Menominee Indian Tribe of Wisconsin ("Menominee Tribe"), Menominee Indian Gaming Authority d/b/a Menominee Casino Resort ("Menominee Casino" or MCR") and Wolf River Development Company ("Wolf River")) ("Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide class of insureds under the Tribal First Tribal Property Insurance Program (collectively, the "Class"), bring this limited-fund class action against Defendants Lexington Insurance Company, *et al*.[1] (collectively, "Defendants" or the "Insurers") and in support thereof state the following:

## I.   NATURE OF THE ACTION

1.      Plaintiff Menominee Tribe is a federally recognized Indian Tribal Entity located in Keshena, Wisconsin, composed of more than 9,000 enrolled members.  The reservation consists of approximately 235,000 acres of land held in trust by the United States government for the benefit of the Tribe, along with other land held in fee by both Tribal members and non-Indians. Within certain restrictions imposed by the United States government, the Tribe has jurisdiction over activities occurring on the reservation and has rights to economic and other benefits resulting from use of the reservation property and resources.

2.      The mission of the Menominee Tribe is to promote, protect, and preserve the rights, resources, and culture of the Tribe through responsible leadership and the judicious exercise of its sovereign powers.  The Menominee Tribe value their children, elders, and each other, and value preserving their language, tradition, history, and culture.

---

[1] Defendants are: (1) Lexington Insurance Company; (2) Underwriters at Lloyd's – Syndicates: ASC1414, TAL 1183, MSP 318, ATL1861, KLN 510, AGR 3268; (3) Underwriters at Lloyd's - Syndicate: CNP 4444; (4) Underwriters at Lloyd's - Aspen Specialty Insurance Company; (5) Underwriters at Lloyd's - Syndicates: KLN 0510, ATL 1861, ASC 1414, QBE 1886, MSP 0318, APL 1969, CHN 2015; (6) Underwriters at Lloyd's – Syndicate: BRT 2987; (7) Underwriters at Lloyd's - Syndicates: KLN 0510, TMK 1880, BRT 2987, BRT 2988, CNP 4444, ATL 1861, Neon Worldwide Property Consortium, AUW 0609, TAL 1183, AUL 1274; (8) Homeland Insurance Company of New York; (9) Hallmark Specialty Insurance Company; (10) Endurance Worldwide Insurance Ltd t/as Sompo International; (11) Arch Specialty Insurance Company; (12) Evanston Insurance Company; (13) Allied World National Assurance Company; (14) Liberty Mutual Fire Insurance Company; (15) Landmark American Insurance Company; (16) XL Catlin Insurance Company UK Ltd; and (17) SRU Doe Insurers 1-20.

3.      Under the Indian Gaming Act of 1988, federally recognized tribes are permitted to conduct Class III casino gaming operations on tribal land, subject to negotiation of a gaming compact with the affected state.  These gaming operations provide invaluable revenue for the maintenance and operation of tribal institutions and activities. The Menominee Tribe and the State of Wisconsin entered into the Gaming Compact of 1992 and later amended that compact on April 25, 2003, and on subsequent occasions.  The Gaming Compact has been approved by the United States Department of the Interior and has permitted the Menominee Tribe to operate Class III gaming operations on tribal land for more than thirty years.

4.      According to the Bureau of Indian Affairs, the Menominee Tribe is one of 574 federally recognized Indian Tribal Entities in the United States.[2]  The National Indian Gaming Commission found that Indian gaming revenue totaled $33.7 billion in fiscal year 2018, generated from 501 gaming operations run by 241 federally recognized tribes across 29 states.[3]  Like many other recognized tribes, the Menominee Tribe relies upon revenue from its gaming operations and other commercial enterprises in order to fulfill its mission and to provide services to members of the tribe.

5.      Plaintiffs own, operate, and receive both business revenue and tax revenue from the Menominee Casino Resort in Keshena, Wisconsin.  MCR includes: a casino with table games, slots and bingo; restaurant; café; lounge; live entertainment space; gift shop; RV park; hotel with fitness center and indoor pool; and a convention and event center with banquet operations.  In addition, the Five Clans Ballroom can host weddings for up to 500 guests.  MCR has been welcoming guests for 33 years and is a popular destination for tourists and gaming enthusiasts throughout Wisconsin.  Those properties, however, have suffered direct physical loss or damage from COVID-19 (a.k.a. the "coronavirus" or "SARS-CoV-2").

6.      Plaintiffs also own, operate, and receive both business revenue and tax revenue from the Thunderbird Complex, located nine miles north of MCR.  Thunderbird is a modern

---

[2] https://www.govinfo.gov/content/pkg/FR-2020-01-30/pdf/2020-01707.pdf.

[3] https://www.nigc.gov/news/detail/2018-indian-gaming-revenues-of-33.7-billion-show-a-4.1-increase.

AMENDED CLASS ACTION COMPLAINT

facility including a mini casino with slot machines, the Thunderbird restaurant, and a full bar, as well as a venue for seasonal outdoor entertainment. The Thunderbird's properties also have suffered direct physical loss or damage from COVID-19.

7.      The Menominee Tribe also owns, operates, and receives business revenues from the Menominee Tribal Clinic (the "Clinic"), which provides healthcare to the Menominee community.  The skilled and dedicated professionals at the Clinic provide a broad range of healthcare services, including medical, dental, behavior health, optometry, pharmacy and laboratory services, as well as physical therapy, fitness, diabetes prevention and wellness programs.  Due to COVID-19, the Clinic also has suffered direct physical loss or damage and, as a result, the Clinic's ability to provide services has been severely hampered, causing a significant drop in business and tax revenue.

8.      Menominee Tribe also owns, operates, and receives business and tax revenues from other businesses located within the Menominee Indian Reservation, many operated by Wolf River. These businesses have suffered direct physical loss or damage due to COVID-19, causing a loss in business and tax revenue for Plaintiffs.

9.      For the policy period July 1, 2010, to July 1, 2020, Plaintiffs and the Class purchased insurance coverage in a Tribal Property Insurance Program ("TPIP," "Master Policy," or "Policy") prepared by Tribal First, which has its principal place of business in San Diego, California.  Tribal First is a specialized program of Alliant Underwriting Services, Inc, a California corporation with its principal place of business in Newport Beach, California.

10.     The TPIP is comprised of insurance policies from more than a dozen insurance carriers, led by Defendant Lexington Insurance Company.  The TPIP is comprised of various layers of coverage such that a particular insurer is responsible for losses that fall between specified amounts.  At least some of these layers of coverage have aggregate limits of coverage that may be exhausted by losses of any one or more of the Class members, such that if a loss of one Class member is paid, it reduces the insurance available in that layer to pay losses for other Class members. This situation creates a limited fund for which adjudication of one Class member's rights may, as a practical matter, be dispositive of the interests of other Class members or would

1    substantially impair or impede their ability to protect their interests.

2        11.    Tribal First made this insurance program available to tribes and tribal entities

3    throughout the United States. Tribal First maintains a list of insureds under the program, including

4    Plaintiffs, who are subject to the same overall aggregate policy limits for one or more particular

5    layers of coverage. "Notice of Loss" must be made in writing to Tribal First.  The Master Policy

6    that Tribal First brokered and that Defendants sold to Plaintiffs is memorialized in the Tribal First

7    "Property Solutions" book, pages 1-113, which are attached hereto as Exhibit 1.

8        12.    Among other provisions, the Master Policy provides coverage for "loss resulting

9    directly from interruption of business, services, or rental value caused by direct physical loss or

10   damage, as covered by this Policy to real and/or personal property insured by this Policy, occurring

11   during the term of this Policy."

12       13.    Due to COVID-19, Plaintiffs have suffered "direct physical loss or damage" to

13   MCR, Thunderbird, the Clinic, and other businesses.  COVID-19 damaged the property of MCR,

14   Thunderbird and the Clinic, making each of them unusable in the way that they had been used

15   before COVID-19 and effectively uninhabitable for patrons. Instead of being able to fill MCR and

16   Thunderbird with guests, gamblers, meeting attendees, and diners, MCR and Thunderbird were

17   required by the presence of the virus and by resulting civil authority orders to drastically

18   reduce operations, and even to close entirely.  To do anything else would have threatened further

19   damage to the property at MCR and Thunderbird as well as further losses for Plaintiffs. Until

20   COVID-19 was brought under control, these properties were damaged and faced the threat of

21   further damage. Use of the properties was not possible.

22       14.    The presence of the coronavirus also limited access, reduced usable space, and

23   required the installation of physical barriers and increased cleaning and sanitizing at MCR,

24   Thunderbird, and the Clinic.  Significant repair and remediation was required before use of the

25   properties could be permitted without risking further physical damage to property and potential

26   injury to visiting patrons.

27       15.    This loss is "direct" — Plaintiffs suffered loss of business income occasioned

28   directly by the presence of the coronavirus and COVID-19 and the damage caused to Plaintiffs'

physical property, rendering MCR, Thunderbird and the Clinic uninhabitable or facing an imminent threat of uninhabitability.

16.     This loss is physical. Due to physical damage caused by the presence of the coronavirus, the interior spaces of MCR, Thunderbird, and the Clinic were effectively uninhabitable, or would have become so imminently, and Plaintiffs were unable to permit their customers to access their interior spaces, severely impacting their business. The physical presence of the coronavirus, the resulting damage to property, and the probability of consequential illness for any patron rendered the space effectively uninhabitable in the same way that a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable.[4]

17.     This loss constitutes a loss under the Policy. Plaintiffs experienced damage to property caused by the presence of the coronavirus, which in turn caused loss of functionality and diminishment of the usable physical space in the hotel, casino, dining and other areas in MCR, Thunderbird, and the Clinic.  This in turn caused further loss to MCR, Thunderbird and the Clinic.

18.     The loss or damage is capable of eventual repair, though that process is challenging and difficult. Some repairs have already been made, such as those listed in paragraph 14.

19.     Plaintiffs purchased "all risk" property coverage to protect themselves in the event that their hotel, casino, restaurant, healthcare or other businesses suddenly had to suspend operations for reasons outside of their control, or if they had to act in order to prevent further property damage.  Plaintiffs obtained this coverage through TPIP, which includes coverage described below for Property Damage, including insurance for Protection and Preservation of Property, as well as several so-called "Time-Element" coverages applying to disruption of

---

[4] Note, however, that Plaintiffs are not seeking recovery for their loss of use. Plaintiffs are seeking coverage for their loss of business income, rental value and tax revenue. As an example to illustrate the difference, some law firms have been unable to use their office space because of COVID-19, but the firms' business income has nevertheless increased, and they thus have faced no loss of business income. A claim by such a law firm for not being able to use its office space would be a "loss of use" claim. The law firm would have no loss of business income claim. Here, Plaintiffs' business has decreased because of the impairment of the hotel, casinos, restaurants and other facilities at MCR and Thunderbird, and Plaintiffs are seeking the loss of business income, rental value and tax revenue under the business interruption and other Time Element coverages of the Policy.

business, including Business Interruption, Extra Expense, Ingress/Egress, Interruption by Civil Authority ("Civil Authority"), Contingent Time Element and Tax Revenue Interruption coverages.

20.     MCR, Thunderbird and the Clinic suffered a physical loss of property due to the damage caused by the presence of COVID-19 and the Closure Orders (defined below). They were forced to suspend business activities due to this physical damage from COVID-19 and the Closure Orders, and they incurred losses covered by Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption provisions due to COVID-19 and the Closure Orders.

21.     Upon information and belief, Lexington and the other Insurers have, on a uniform basis, refused to pay claims for losses and costs due to COVID-19 and the resultant Closure Orders covered by the insurance provisions identified in this Class Action Complaint to all Class members under the Policy. Indeed, Lexington, through its affiliate at AIG Claims, Inc, has repudiated coverage for Plaintiffs' claim under the Policy.

## II.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over the matters alleged herein.

23.     This Court has personal jurisdiction over each of the defendants named in this action. Each of the defendant insurance companies regularly issued policies in California, and did, in fact issue policies in California to Plaintiffs and the Class as part of the TPIP developed and coordinated by Tribal First. Tribal First organized the TPIP from its office in California, and communications concerning the establishment and purchase of the TTPIP program from Class members around the country, including Plaintiffs, were received in California. Premium payments under the TPIP program were and continue to be mailed to Tribal First in California.

24.     Although the TPIP program is centered in California, none of the individual defendants has its principal place of business in California. Instead, through the TPIP, each of the Defendants has agreed to accept service of process for any suit based upon the Policy in San Francisco, California, at the offices of Foley & Lardner.

25.     Venue is also proper in this Court pursuant to California Code of Civil Procedure section 395(a) ("If none of the defendants reside in the state …, the action may be tried in the

superior court in any county that the plaintiff may designate in his or her complaint …").

### III.   THE PARTIES

*Plaintiffs*

26.     Menominee Indian Tribe of Wisconsin is a federally recognized Indian Tribe located in Keshena, Wisconsin.

27.     The Menominee Indian Gaming Authority d/b/a Menominee Casino Resort holds a business Charter from the Tribal Government of the Menominee Tribe and was formed for the purpose of conducting the gaming and gaming related operations of the Menominee Tribe on the reservation.

28.     Wolf River holds a Charter from the Tribal Government of the Menominee Tribe as a tribal business and was formed for the purpose of conducting the nongaming commercial activity of the Menominee Tribe on the reservation.

*Defendants*

29.     Lexington Insurance Company ("Lexington") is an insurance company organized under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts.  Lexington is a wholly owned subsidiary of American International Group, Inc. ("AIG").  At all times material hereto, Lexington conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Lexington issued Policy Nos. 017471589/06, 38412453, 38412468 and 011660435/07 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

30.     Underwriters at Lloyd's – Syndicates ASC1414, TAL 1183, MSP 318, ATL1861, KLN 510, and AGR 3268 are underwriters composed of separate syndicates, in turn comprised of entities known as "Names," which underwrite insurance in a market known as Lloyd's of London. The "Names" and syndicates are organized under the laws of the United Kingdom and are located in and have their principal place of business in England.  At all times material hereto, these underwriters conducted and transacted business through the selling and issuing of insurance

AMENDED CLASS ACTION COMPLAINT

policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, the underwriters identified in this paragraph issued Policy No. PJ193647 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

31.     Underwriters at Lloyd's - Syndicate: CNP 4444 is an underwriting syndicate comprised of "Names," which underwrites insurance in the Lloyd's of London market.  The "Names" and syndicate are organized under the laws of the United Kingdom and are located in and have their principal place of business in England.  At all times material hereto, these underwriters conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, the underwriters identified in this paragraph issued Policy No. PJ1900131 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

32.     Underwriters at Lloyd's - Aspen Specialty Insurance Company ("Aspen") is an underwriting syndicate formed by Aspen Specialty Insurance Company, which underwrites insurance in the Lloyd's of London market.  The syndicate is organized under the laws of the United Kingdom and is located in and has its principal place of business in England.  At all times material hereto, Aspen conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Aspen issued Policy No. PX006CP19 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

33.     Underwriters at Lloyd's - Syndicates: KLN 0510, ATL 1861, ASC 1414, QBE 1886, MSP 0318, APL 1969, and CHN 2015 are underwriting syndicates comprised of "Names," which underwrite insurance in the Lloyd's of London market.  The "Names" and syndicates are organized under the laws of the United Kingdom and are located in and have their principal place of business in England.  At all times material hereto, these underwriters conducted and transacted business through the selling and issuing of insurance policies within California, including, but not

limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, the underwriters identified in this paragraph issued Policy No. PJ1933021 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

34.   Underwriters at Lloyd's – Syndicate: BRT 2987 is an underwriting syndicate comprised of "Names," which underwrites insurance in the Lloyd's of London market.  The "Names" and syndicate are organized under the laws of the United Kingdom and are located in and have their principal place of business in England.  At all times material hereto, these underwriters conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, the underwriters identified in this paragraph issued Policy No. PD-10363-05 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

35.   Underwriters at Lloyd's - Syndicates: KLN 0510, TMK 1880, BRT 2987, BRT 2988, CNP 4444, ATL 1861, Neon Worldwide Property Consortium, AUW 0609, TAL 1183, AUL 1274 are underwriting syndicates comprised of "Names," which underwrite insurance in the Lloyd's of London market.  The "Names" and syndicates are organized under the laws of the United Kingdom and are located in and have their principal place of business in England.  At all times material hereto, these underwriters conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, the underwriters identified in this paragraph issued Policy No. PJ1900067 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

36.   Homeland Insurance Company of New York ("Homeland") is an insurance company organized under the laws of the State of New York, with its principal place of business in Plymouth, Minnesota.  Homeland is an underwriting company of OneBeacon Insurance Group, Ltd., which is a subsidiary of Intact Financial Corporation.  At all times material hereto, Homeland conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a

component of the Tribal First Property Insurance Program sold to Plaintiffs, Homeland issued Policy No. 798000237 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

37.     Hallmark Specialty Insurance Company ("Hallmark") is an insurance company organized under the laws of the State of Oklahoma, with its principal place of business in Dallas, Texas.  At all times material hereto, Hallmark conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Hallmark issued Policy Nos. 73PRX19A1B7 and 73PRX19A1EF to Plaintiffs, effective July 1, 2019, to July 1, 2020.

38.     Endurance Worldwide Insurance Ltd t/as Sompo International ("Endurance") is an insurance company incorporated in England, with its principal place of business in London, England.  At all times material hereto, Endurance conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Endurance issued Policy No. PJ1900134 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

39.     Arch Specialty Insurance Company ("Arch") is an insurance company organized under the laws of the State of Missouri, with its principal place of business in Jersey City, New Jersey.  At all times material hereto, Arch conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Arch issued Policy No. ESP7303914-02 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

40.     Evanston Insurance Company ("Evanston") is an insurance company organized under the laws of the State of Illinois, with its principal place of business in Rosemont, Illinois. At all times material hereto, Evanston conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program

sold to Plaintiffs, Evanston issued Policy No. MKLV14XP012536 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

41.     Allied World National Assurance Company ("Allied") is an insurance company organized under the laws of the State of New Hampshire, with its principal place of business in New York, New York.  At all times material hereto, Allied conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Allied issued Policy No. 0310-8171-1N to Plaintiffs, effective July 1, 2019, to July 1, 2020.

42.     Liberty Mutual Fire Insurance Company ("Liberty Mutual" or "LMFIC") is an insurance company organized under the laws of the state of Massachusetts, with its principal place of business in Boston, Massachusetts.  At all times material hereto, Liberty Mutual conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Liberty Mutual issued a Policy to Plaintiffs, effective July 1, 2019, to July 1, 2020.

43.     Landmark American Insurance Company ("Landmark") is an insurance company organized under the laws of the State of New Hampshire, with its principal place of business in Atlanta, Georgia.   At all times material hereto, Landmark conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, Landmark issued Policy No. LHQ424636 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

44.     XL Catlin Insurance Company UK Ltd ("XL Catlin") is an insurance company domiciled in the United Kingdom and a member of AXA XL, which is a part of the AXA SA group of companies.  At all times material hereto, XL Catlin conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property

Insurance Program sold to Plaintiffs, and together with the Underwriters identified in Paragraphs 30 and 33, XL Catlin issued Policies No. PJ193647 and PJ1933021 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

45.     SRU Doe Insurers 1-20 are insurance companies who insure through Specialty Risk Underwriters ("SRU").   At all times material hereto, SRU conducted and transacted business through the selling and issuing of insurance policies within California, including, but not limited to, selling and issuing property coverage to Plaintiffs.  As a component of the Tribal First Property Insurance Program sold to Plaintiffs, SRU issued Policy No. AQS-190984 to Plaintiffs, effective July 1, 2019, to July 1, 2020.

## IV.     **FACTUAL BACKGROUND**

### A.     *The Master Policy*

46.     In return for the payment of a substantial premium, the Insurers issued to Plaintiffs and other members of the Class the Master Policy contained in TPIP USA Form No. 15, including each of the policies identified therein and described in Paragraphs 29 to 43of this Class Action Complaint.  Plaintiffs have performed all of their obligations under the Master Policy, including the payment of premiums, and on information and belief other Class Members have as well.  With respect to Plaintiffs, covered property includes Menominee Tribal property, such as the casino, hotel, restaurant, healthcare and other property at MCR, Thunderbird and the Clinic.

47.     The Policy "insures Real and Personal Property within the United States of America" and covers damage to "all property of every description both real and personal."

48.     Coverage under the Policy extends to "Miscellaneous Unnamed Locations," including "property at locations (including buildings, or structures, owned, occupied or which the Named Insured is obligated to maintain insurance)" within the United States.

49.     Under the Policy, Named Insureds are shown on the Declarations Page provided to each Named Insured, and a schedule of all Named Insureds is maintained by Tribal First. Menominee Indian Tribe of Wisconsin and Menominee Indian Economic Development Authority are Named Insureds shown on the Declarations Page of the copy issued to them.

50.     Named Insureds or Insureds also include agencies, organizations, enterprises or

AMENDED CLASS ACTION COMPLAINT

individuals "for whom the Named Insured is required or has agreed to provide coverage, or as so named in the 'Named Insured Schedule' on file with Tribal First, … and which are owned, financially controlled or actively managed by the herein named interest."  Policy § 1.B.  MCR and the Clinic are each an agency, organization, or enterprise for whom Menominee Indian Tribe of Wisconsin is required or has agreed to provide coverage, and are owned, financially controlled, or actively managed by Menominee Tribe.

51.     Insureds also include lessors and other parties of interest "in all property of every description … for their respective rights and interests," and mortgages "to whom certificates of coverage have been issued."

52.     Under the Policy, "occurrence" is defined as "a loss, incident or series of losses or incidents not otherwise excluded by [the] Policy and arising out of a single event or originating cause and includes all resultant or concomitant insured losses."

53.     In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake, H1N1, etc.). Most property policies sold in the United States, however, including those sold by Defendants, are all-risk property damage policies. These types of policies cover all risks of loss except for risks that are expressly and specifically excluded.

54.     Under the heading, "Perils Covered," the Insurers promised that: "Subject to the terms, conditions and exclusions stated elsewhere herein, this Policy provides insurance against all risk of direct physical loss or damage occurring during the period of this Policy."  Subject to these terms and conditions, none of which relieve the Insurers of their obligations for the claims made herein, the covered cause of loss under the Policy is therefore "all risk of direct physical loss or damage."

55.     Unlike many policies that provide business interruption and related coverages, the Policy sold by the Insurers does not include, and is not subject to, any exclusion for losses caused by viruses or communicable diseases.

56.     The Insurers did not exclude or limit coverage for losses from the spread of virus in the Protection and Preservation of Property, Business Interruption, Extra Expense,

Ingress/Egress, Civil Authority, Contingent Time Element, or Tax Revenue Interruption coverages of the Policy, or any other coverages of the Policy.

57.     The policy expressly excludes "fungus, mold(s), mildew or yeast," as well as "spores or toxins" created or produced by such "fungus, mold(s), mildew or yeast," but the exclusion does not cover viruses, which are in a completely different biological category. Furthermore, the exclusion highlights that the Insurers can list excluded pathogens if they wish to exclude them.

58.     The policy also contains an exclusion for seepage, pollution, or contamination, but this exclusion likewise does not refer or apply to a virus or communicable disease, nor does the policy extend the undefined term "contamination" to viruses.

59.     Losses due to COVID-19 are therefore a covered cause of loss, and losses due to COVID-19 fall within the "Perils Covered" under the Policy.

60.     The Property Damage coverage in Section II of the Policy includes "Protection and Preservation of Property" coverage that pays the cost of actions taken by insureds due to "actual or imminent physical loss or damage" to covered property.  Policy § II.B.16.  The Insurers agreed to pay "the expenses incurred by the Named Insured in taking reasonable and necessary actions for the temporary protection and preservation" of covered property.  In this same "Protection and Preservation of Property" provision, the Insurers required that insureds "shall endeavor to protect covered property from further damage" "[i]n the event of loss likely to be covered" by the Policy.

61.     The Time Element coverages in Section III of the Policy include Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption coverages, each of which applies here.

62.     In the Policy, the Insurers agreed to pay for actual "Business Interruption" "loss resulting directly from interruption of business, services or rental value caused by direct physical loss or damage" to covered property during the "period of restoration."  Policy § III.A.1.

63.     Insured Business Interruption losses include loss of Gross Earnings, which are the sum of: (a) "total net sales," plus (b) "other earnings derived from the operation of the business," minus the cost of: (c) "merchandise sold including packaging," (d) "materials and supplies

consumed directly in supplying" services, and (e) services "purchased from outside (not employees of the Named Insured) for resale that does not continue under contract." "No other cost shall be deducted in determining gross earnings."

64.     Rental value is comprised of several categories of loss, including "total anticipated gross rental income from tenant occupancy." "In determining rental value, due consideration shall be given to the experience before the date of loss or damage and the probable experience thereafter had no loss occurred."

65.     The period of restoration during which Business Interruption losses accrue begins "on the date direct physical loss occurs and interrupts normal business operations and ends on the date that the damaged property should have been repaired, rebuilt or replaced with due diligence and dispatch, but not limited by the expiration of this policy." The coverage period is 12 months.

66.     As described below, Plaintiffs' and the other Class Members' hotels, casinos, restaurants, healthcare facilities and other business properties, as well as their tax generating properties, have suffered direct physical loss or damage. Due to the physical damage caused by the presence of COVID-19, these properties became effectively or imminently uninhabitable by patrons and unsafe for their intended purpose and thus suffered physical loss or damage. The business functions of their hotels, casinos, restaurants, healthcare facilities and other properties, as well as their tax generating properties, have been impaired due to this physical damage. If they were to conduct business as usual, the disease and virus would continue to appear, property would suffer further damage, and guests, gamblers, meeting attendees, diners, patients, and others would get sick. This is not a non-physical or remote loss such as one occasioned by a breach of contract, loss of market, or the imposition of a governmental penalty. It is a direct physical loss. In their current condition, Plaintiffs' and the other Class members' hotels, casinos, restaurants, healthcare facilities and other properties, as well as their tax generating properties, cannot be used for their business purposes, though Plaintiffs and the other Class members are engaging in remediation and repairs to make the properties usable once again

67.     Moreover, the presence of virus or disease constitutes physical damage to property, as the insurance industry has recognized since at least 2006. When preparing so-called "virus"

exclusions to be placed in some policies, but not others, the insurance industry drafting arm, The Insurance Services Office ("ISO"), circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance),or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

68.     The presence of virus or disease has resulted in physical damage to property in that manner in this case and in addition has infested the air or imminently threatens to infest the air in the properties.

69.     In the Policy, in addition to Business Interruption losses, the Insurers agreed to pay reasonable and necessary "Extra Expense" losses incurred to continue the normal operation of business "as nearly as practicable" following damage to covered property by a covered cause of loss during the "period of restoration."  Policy § III.A.2.

70.     In the Policy, the Insurers also agreed to provide Ingress/Egress coverage, which applies to loss sustained for up to 30 days when "direct physical loss or damage … occurring at property located within a 10 mile radius of covered property" prevents ingress to or egress from covered property.  Policy § III.B.1.

71.     The Insurers further agreed to provide "Civil Authority" coverage, which applies to loss sustained for up to 30 days when a civil authority issues an order that prohibits access to covered property due to property damage "at a property located within a 10-mile radius of covered property."  Policy § III.B.2.

72.     COVID-19 caused physical damage to property within a 10-mile radius of the covered property of Plaintiffs and the other Class members in a similar manner as it did with

Plaintiffs' covered property, as described in this Class Action Complaint.  As described below, damage caused by the presence of COVID-19 on the Menominee Reservation, including within 10 miles of Plaintiffs' properties, and the resulting threat of further damage to property and to health, prompted the issuance of several civil authority orders by the State of Wisconsin and the Menominee Legislature.  These Civil Orders in turn prohibited access to Plaintiffs' property by patrons and caused Plaintiffs to incur further loss.

73.     In the Policy, the Insurers also agreed to "Contingent Time Element" coverage, which applies to losses caused by property damage at the properties of the suppliers or customers of Plaintiffs or Class members.  Under these Contingent Time Element coverages, the Insurers agreed to pay losses for Business Interruption, rental income, or Extra Expenses due to property damage "at direct supplier or direct customer locations" that (a) prevents a supplier of goods or services to the Insureds from supplying such goods or services, or (b) prevents recipients of goods or services of the Insured from accepting those goods or services.  Policy § III.B.4.  COVID-19 caused physical damage to property of direct suppliers and direct customers, resulting in Business Interruption and rental income losses, and as well as Extra Expenses, and the Policy provides coverage for these losses under the Contingent Time Element Coverage.

74.     In the Policy, the Insurers further agreed to pay "Tax Revenue Interruption" losses "resulting directly from necessary interruption of sales, property or other tax revenue … collected by or due" insureds caused by damage to property which is not operated by insureds, "and which wholly or partially prevents the generation of revenue for the account of" insureds.  Tax revenue covered by this provision includes "Tribal Incremental Municipal Services Payments," as well as other property tax and other tax revenue.  Policy § III.B.5.

75.     The time period for "Tax Revenue Interruption" coverage begins "with the date of damage to the contributing property" and continues "for only the length of time as would be required with exercise of due diligence and dispatch to rebuild, replace or repair the contributing property," but is "not limited by the expiration date" of the Policy.

76.     COVID-19 caused physical damage to such "contributing property" in the same manner that it did with Plaintiffs' other covered property, resulting in the interruption of Tribal

Incremental Municipal Services Payments, property tax, and other tax revenue.

77.     Losses caused by COVID-19 and the related Closure Orders issued by local, state and Tribal authorities therefore triggered the Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element, and Tax Revenue Interruption coverage provisions of the Policy.

**B.      *The Covered Cause of Loss***

**1. *The COVID-19 Pandemic***

78.     The coronavirus and coronavirus-containing respiratory droplets and nuclei are physical substances that are active on physical surfaces and are also emitted into the air. Such substances are not theoretical, intangible, or incorporeal, but rather have a material existence and are physically dangerous.   Fomites, droplets, droplet nuclei, and aerosols containing the coronavirus are dangerous physical substances that have a tangible existence.

79.     Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) is a betacoronavirus that is genetically related to several other zoonotic coronaviruses, including SARS-CoV-1, the etiological agent of SARS. SARS-CoV-2 causes coronavirus disease 2019 (COVID-19) in humans. SARS-CoV-2 has glycoprotein "spikes" that are able to bind to human angiotensin converting enzyme 2 (ACE-2) receptors, which is present on human respiratory epithelial cells. After binding to ACE-2, the virus is able to enter the cells and make copies of itself, which are then released. These released infectious viral particles are then expelled in respiratory secretions as respiratory droplets into a multiphase, turbulent gas cloud during breathing, coughing, sneezing, talking, and singing. There are large and small respiratory droplets within the cloud. Large respiratory droplets can infect other people either directly, through direct contact with respiratory mucosal surfaces, or indirectly, by contaminating surfaces which are then touched by another person who subsequently touches her or his mouth, nose, or eyes. The small droplets remain in the air as an aerosol, which can remain suspended in the air for hours, travel prolonged distances indoors along air currents induced by the heating and ventilation ("HVAC") system, and travel from room to room, infecting people directly through contact with, and inhalation of, the aerosol.  Particles from the aerosol can also contaminate surfaces.

80.     According to the World Health Organization ("WHO"), the incubation period for COVID-19—*i.e.*, the time between exposure to the coronavirus and symptom onset—can be up to 14 days. Other studies suggest that the period may be up to 21 days. Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are most contagious, as their viral loads will likely be very high, and they may not know they have become carriers. In addition, studies from the CDC and others estimate that between 40% to 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers). Pre- and asymptomatic carriers are likely unaware that they are spreading the coronavirus by merely touching objects and surfaces, or by expelling droplets into the air. The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

81.     The virus cannot be observed by the human eye without enhancement. No one can see the virus in the air, on one's hands, or on a surface. This, of course, makes it difficult to eliminate the virus, or eradicate its transmission, from air or surfaces. The presence of the virus is only observed through the infection rate in a particular area.

82.     The presence of the virus in a community, evidenced by infection rates, makes it more probably true than not, that live virus has been transferred in the air and to objects and surfaces. SARS-Co-V-2 spread is logarithmic.

83.     Aerosol, droplet, and fomite transmission are the basis for social distancing, hand-washing, stay-at-home orders, home-shelter orders, distance learning, reduced capacity and/or occupancy limits, and other measures implemented in various executive orders, including the Closure Orders from the State of New York and New York City. The virus is physically present in the community, including in the air and on objects and surfaces.  Aerosol and fomite transmission are real, and due to constant recontamination of air and surface areas, it is simply impossible to entirely eradicate the virus from indoor spaces and such surfaces if there continue to be unmasked people in the area.

84.     COVID-19 causes physical loss and damage by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by

rendering property unusable, uninhabitable, unfit for intended function, dangerous and unsafe. COVID-19 has caused such physical loss and damage to Plaintiffs' properties, as described further below.

85.     **First**, respiratory droplets (*i.e.*, droplets larger than 5-10 μm) expelled from infected individuals land on, attach, and adhere to surfaces and objects. In doing so, they structurally change the property and its surface by becoming a part of that surface. This structural alteration makes physical contact with those previously safe, inert surfaces (*e.g.*, fixtures, handrails, furniture) unsafe.

86.     According to the WHO, people can become infected with the coronavirus by touching such objects and surfaces, then touching their eyes, nose, or mouth. This mode of transmission—indirect transmission via objects and surfaces—is known as "fomite transmission." As the WHO has noted, fomite transmission is "a likely mode of transmission for SARS-CoV-2" because studies have consistently confirmed the existence of virus-laden droplets on objects and surfaces "in the vicinity of infected cases," and because it is well known that other coronaviruses can be transmitted via fomite transmission.[5]

87.     A study of a COVID-19 outbreak published in the CDC's Emerging Infectious Diseases journal identified indirect transmission via objects such as elevator buttons and restroom taps as an important possible cause of a "rapid spread" of the coronavirus in a shopping mall in Wenzhou, China.[6]

88.     Research has indicated that the coronavirus can be detected on certain surfaces even weeks after infected persons are present at a given location.

89.     In a study by the U.S. National Institutes of Health, researchers found that the coronavirus was detectable for up to three hours in aerosols, four hours on copper, up to 24 hours

---

[5]   *See*   https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions.

[6] *See* https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article.

on cardboard, and up to three days on stainless steel and plastic surfaces.[7]

90.     Another study found that the coronavirus remains active and dangerous on plastics for at least three days, while another reported that the coronavirus remained stable and viable for seven days on a range of common surfaces, including stainless steel, plastic, glass, and wood.[8] Another study even detected viable coronavirus samples on stainless steel and glass for approximately one month if left at or around room temperature.  All of these materials are used at Plaintiffs' properties.

91.     When the coronavirus and COVID-19 attach to and adhere on surfaces and materials, they become a part of those surfaces and materials, converting the surfaces and materials to fomites.[9]  This represents a physical change in the affected surface or material, which constitutes physical loss and damage.

92.     Merely cleaning surfaces may reduce but does not altogether eliminate the risk of transmission amongst people. There may be surfaces with residual infectious virus, and aerosolized infectious particles. In other words, disinfection is temporary at best; however, a space may remain contaminated if an aerosol is present, and immediately become contaminated thereafter if another infected person is present in the area.  This contamination will provide a constant modality for infection to people.

93.     **Second**, when individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei (*i.e.*, those smaller than 5 μm) that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. This process alters the structural properties of air in buildings from safe and breathable to unsafe and dangerous.

---

[7] *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hourssurfaces.

[8] *See* https://www.nejm.org/doi/full/10.1056/nejmc2004973;
https://www.medrxiv.org/content/10.1101/2020.05.07.20094805v1.full.pdf;
https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7.

[9]  *See*  https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions.

94.     Aerosol transmission is believed to be a common mode of transmission in many settings.  Aerosols can be generated through simple breathing, as well as heavier breathing while, for example, exercising at a health club.  According to research published in The Journal of the American Medical Association, a person who sneezes can release a cloud of pathogen-bearing droplets that can span as far as 23 to 27 feet.[10]  If a person is infected with SARS-CoV-2, whether symptomatic or asymptomatic, infectious viral particles will be aerosolized into the air through their breathing. Infection clusters suggest that aerosol, droplet, and fomite transmission explain SARS-CoV-2 transmission amongst humans.

95.     Airborne viral particles are known to have spread into a building's HVAC system, leading to transmission of the coronavirus from person to person.  One study found the presence of the coronavirus within the HVAC system servicing hospital ward rooms of COVID-19 patients. This study detected SARS-CoV-2 RNA in ceiling vent openings, vent exhaust filters, and central ducts that were located more than 50 meters from the patients' rooms.[11]

96.     The Environmental Protection Agency ("EPA") has compiled several studies reflecting "epidemiological evidence suggestive of [coronavirus] transmission through aerosol."[12] Based on these and other studies, the EPA has recommended that buildings make improvements to their HVAC systems by, for example, increasing ventilation with outdoor air and air filtration.[13]

97.     The presence of COVID-19 at a property causes physical loss and damage by necessitating remedial measures to reduce or eliminate the presence of cases of COVID-19 and the coronavirus on-site.

98.     The presence of the virus, whether circulating or stagnant, has changed the object, surface, or premises, in that it has become dangerous to handle and/or enter, and cannot be used without remedial measures. Its use can only be restored with remedial action and sufficient time

---

[10] See https://jamanetwork.com/journals/jama/fullarticle/2763852.

[11] See https://www.researchsquare.com/article/rs-34643/v1.

[12] See https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-andpublications.

[13] See https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19.

for the contaminated air to be evacuated, as suggested by infectious disease experts.

99.     The presence of cases of COVID-19 at a property causes physical loss and damage by rendering a property that is usable and safe for humans into a property that, absent remedial measures, is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

100.     In addition, the presence of COVID-19 on property creates the imminent threat of further damage to that property or to nearby property. Individuals who come into contact, for example, with respiratory droplets at one location in the building by touching a fixture, pressing an elevator button, or gripping a handrail, will carry those droplets on their hands and deposit them elsewhere in the building, causing additional damage and loss.

### 2. *Wisconsin Civil Authority Closure Orders*

101.     The threat and presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the whole or partial suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiffs' businesses (the "Closure Orders"). These Orders have directly impacted Plaintiff's business.

102.     The threat and presence of COVID-19 is direct physical loss or damage to property, rendering that property actually or imminently uninhabitable by patrons, and has caused civil authorities across the United States to issue orders requiring the suspension or restriction of business at a wide range of establishments.  Those authorities include Tribal authorities with direct jurisdiction over MCR, Thunderbird, and the Clinic.   Indeed, many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders.  See N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)  (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); N.Y.C. Emergency Exec. Order No. 103, at 1 (Mar. 25, 2020)  (actions taken to prevent spread of COVID-19 "have led to property loss and damage"); Broward Cty. Fla. Administrator's Emergency Order No. 20-01, at 2 (Mar. 22, 2020)  (noting that COVID-19 "constitutes a clear and present threat to the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)  (emphasizing

that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group settings"); Napa Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020) (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020) (COVID-19 is "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time");  City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020) (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)  (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Exec. Order of the Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)  (in addition to COVID-19's creation of a "dangerous physical condition," it also creates "property or business income loss and damage in certain circumstances"); Colorado Dep't of Pub. Health & Env't, Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020)  (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020) ("This order and the previous orders issued during this emergency have all been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); and City of Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020) (prohibiting entities that provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property").

103.    Authorities in Wisconsin have issued several Closure Orders with a variety of restrictions impacting business activities of Plaintiffs, including the following:

104.    On March 12, 2020, Wisconsin Governor Tony Evers issued Executive Order 72, "Declaring a Health Emergency in Response to the COVID-19 Coronavirus."

105.    At the direction of Governor Evers, Wisconsin then issued Emergency Order 4,

Effective March 17, 2020, ordering "a statewide moratorium on mass gatherings of 50 people or more to mitigate the spread of COVID-19." Restaurants and bars were limited to "50 percent of seating capacity or 50 total people, whichever is less," and were required to maintain "distancing of 6 feet between tables, booths, bar stools, and ordering counters."

106.    On March 17, 2020, Wisconsin issued Emergency Order 5, effective at 5:00 PM on March 17, 2020, prohibiting gatherings of "10 or more people in a single room or single confined space at the same time." Restaurants were allowed to "remain open for take-out or delivery service only," and were required to "preserve social distancing of six feet between customers during pick up."

107.    On March 20, 2020, Wisconsin issued Emergency Order 8, "Updated Mass Gathering Ban," further detailing the limit on bars and restaurants to take-out and delivery (with no delivery of alcoholic beverages to retail customers unless they paid in person).

108.    On March 24, 2020, Wisconsin issued Emergency Order 12, a "Safer At Home Order."  The Order stated: "Despite prior emergency orders banning mass gatherings, the rates of infection continue to drastically increase, necessitating additional measures to slow the rate of infection and save lives."  The Order closed all Non-Essential Businesses and Operations and required Essential Businesses and Operations to comply with Social Distancing Guidelines.  All individuals present within the state were ordered "to stay at home or their place of residence," with certain exceptions. Bars and restaurants remained limited to take-out and delivery (with no delivery of alcoholic beverages to retail customers).

109.    Many of the restrictions in Emergency Order 12 were renewed through May 26, 2020, in Emergency Order 28.  Although the new order exempted tribal members acting within their own reservation, it emphasized that tribal authorities could issue their own orders providing similar restrictions or otherwise affecting those tribal members.  Specifically, the order stated that "Activities by Tribal members within the boundaries of their Tribal reservations … are exempt from the restrictions in this Order but may be subject to restrictions by tribal authorities."  As described below, the Menominee Tribe had already issued restrictions that applied to tribal members and that remained in force.

110.    Furthermore, Emergency Order 28 continued to apply to non-tribal members who may have wished to travel to a reservation in order to visit a casino, to eat at a restaurant, to stay in a hotel, or participate in other recreational or business opportunities available on the reservation. Emergency Order 28 expressly stated: "Non-tribal members should be respectful of and avoid nonessential travel to Tribal territory."

111.    Emergency Orders 12 and 28 provided that violations were punishable by up to 30 days in jail and/or a fine not to exceed $250.00.

112.    On November 10, 2020, Wisconsin issued Executive Order 94, "Relating to the Actions Every Wisconsinite Should Take to Protect their Family, Friends, and Neighbors from COVID-19," encouraging businesses to limit staff and customers on their premises and adopt stringent measures on the use of physical space. The state noted that individuals and businesses should "[f]requently clean high touch surfaces and objects" and "comply with social distancing of 6 feet between all individuals on the premises."

113.    On November 20, 2020, Wisconsin issued Executive Order 95, "Relating to Declaring a State of Emergency and Public Health Emergency," declaring the COVID-19 crisis a disaster and public health emergency pursuant to Wisconsin statutes and directing state agencies to assist the ongoing response. Executive Order 95 was accompanied by Emergency Order 1, "Relating to Reducing Hospital Bed and Staff Shortages by Requiring Face Coverings," that was likewise promulgated on November 20, 2020. Emergency Order 1 limited in-person gatherings, required individuals to wear masks, and seriously restricted the ability of individuals to interact in enclosed spaces. Emergency Order 1 of November 20, 2020 imposed civil penalties for any failure to comply with its strictures, "enforceable by civil forfeiture of not more than $200."

114.    On January 19, 2021, Wisconsin issued Executive Order 104, "Relating to Declaring a State of Emergency and Public Health Emergency," again declaring the COVID-19 crisis a disaster and public health emergency pursuant to Wisconsin statutes and authorizing additional measures to combat the spread of COVID-19, directing state agencies to assist the ongoing response.

115.    Executive Order 104 was accompanied by Emergency Order 1, "Relating to

Stopping the Spread of a New Highly Contagious Variant of COVID-19 by Requiring Face Coverings," that was likewise promulgated on January 19, 2021. The state identified a "new highly contagious variant" of COVID-19 and, in response, issued restrictions on the use of enclosed spaces, mask mandates, and physical distancing that applied to all individuals.

116.   On February 4, 2021, Wisconsin issued Executive Order 105, "Relating to Declaring a State of Emergency and Public Health Emergency," declaring again that the COVID-19 crisis is a disaster and public health emergency pursuant to Wisconsin statutes and authorizing additional measures to combat the spread of COVID-19, with direction to state agencies to assist the ongoing response.

117.   Executive Order 105 was accompanied by Emergency Order 1, "Relating to Stopping the Spread of a New Highly Contagious Variant of COVID-19 by Requiring Face Coverings," that was likewise promulgated on February 4, 2021. The state detailed its response to the COVID-19 crisis and again imposed restrictions on the use of enclosed spaces, mask mandates, and physical distancing that applies to all individuals.

118.   Emergency Order 1 of February 4, 2021 imposes civil penalties for any failure to comply with its strictures, "enforceable by civil forfeiture of not more than $200."

### 3.   *Menominee Civil Authority Closure Orders*

**119.**   On March 12, 2020, the Menominee Tribal Legislature issued a Declaration of State of Emergency due to COVID-19.

**120.**   On March 19, 2020, the Menominee Tribal Legislature approved a motion to "automatically adopt state guidelines including all emergency orders by the State of Wisconsin relating to COVID-19 as they are released."   By amended motion, the Tribal Legislature established that the Wisconsin guidelines would be the minimal guidelines for the Tribe, though guidelines would need to respect the sovereignty of the Tribe.   Adoption of the guidelines set forth by Wisconsin began no later than Wisconsin Emergency Order 5 and continued through subsequent Orders.

**121.**   On June 3, 2020, the Tribal Legislature approved a "Moving Safer Forward Plan" for restarting businesses, which set forth criteria for reopening but also maintained significant

restrictions on commercial activity for businesses that chose to reopen.

122.   In response to the growing incidence of COVID-19 in the State of Wisconsin, confirmed cases in Menominee, and the presence of the coronavirus on properties in Menominee, the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 1, effective July 29, 2020, through August 31, 2020, imposing an overnight curfew from 10:00 PM until 6:00 AM.

123.   Shortly thereafter, the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 2, Effective July 31, 2020, closing "casino gaming operations, bars and restaurants, and farmers markets," including gaming operations at MCR and Thunderbird.  All bars were closed, and restaurants within the gaming establishments were closed except for takeout. In an August 6, 2020, Order of Extension, these closures were extended until 7:00 AM on August 17, 2020.

124.   Effective July 31, 2020, the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 3, which required six-feet social distancing in all businesses.

125.   Cases of COVID-19 began to rise rapidly in September 2020 both on the Menominee reservation and in the State of Wisconsin as a whole.  In response to this growing incidence of COVID-19 and the presence of the coronavirus on properties in Menominee, the Menominee the Menominee Indian Tribe's COVID-19 Incident Command issued Emergency Order 4, effective September 16, 2020, through September 28, 2020, which closed MCR and Thunderbird, except for restaurant takeout, the gift shop, convenience store and gas station.  The Order also closed all bars and imposed an overnight curfew from 10:00 PM until 6:00 AM.  The closure was subsequently extended to October 5, and then to October 12.

126.   On September 25, 2020, in response to the continued spread of COVID-19 in Wisconsin and the physical spread of the virus on the Menominee reservation, the Menominee Tribe announced Emergency Management Coordinator (Covid-19) (No. 5) Order, 2021 ("Emergency Order 5"), extending Emergency Order 4 for seven days. Emergency Order 5 mandated that all restaurants and bars close, with the sole exception for "curbside food service," in response to the spread of COVID-19. MCR was also included in Emergency Order 5: The casino

was shut down and the only operations that were permitted to carry on, with restrictions, were the gift shop, Thunderbird C-Store, and the Casino Restaurants to the extent that they could provide curbside food service. Emergency Order 5 also imposed a daily curfew from 10:00 PM to 6:00 AM.

127.     On October 1, 2020, again in response to the continuing physical spread of the virus and the incidence of the disease, the Menominee Tribe announced Emergency Management Coordinator (Covid-19) (No. 6) Order, 2021 ("Emergency Order 6"), set to expire on October 12, 2020. Emergency Order 6 again extended Emergency Order 4, including the closure of all restaurants and bars, except for "curbside food service." MCR again was subject to Executive Order 6, and the casino remained shut down except for the gift shop, Thunderbird C-Store, and the Casino Restaurants to the extent that they could provide curbside food service. Most non-essential tribal government functions remained closed, shifting to "telework" operations.

128.     On October 13, 2020, again in response to the continuing physical spread of the virus and the incidence of the disease, the Menominee Tribe announced Emergency Management Coordinator (Covid-19) (No. 7) Order, 2021 ("Emergency Order 7"), set to expire on October 19, 2020. Emergency Order 7 once again extended Emergency Order 4, including the closure of all restaurants and bars, with the sole exception for "curbside food service." MCR remained shut down, and the only operations that were permitted to carry on were the gift shop, Thunderbird C-Store, and the Casino Restaurants, to the extent that they could provide curbside food service. Most non-essential tribal government functions remained closed, and the curfew was maintained.

129.     On October 15, 2020, again in response to the continuing physical spread of the virus and the incidence of the disease, the Menominee Tribe announced Emergency Management Coordinator (Covid-19) (No. 8) Order, 2021 ("Emergency Order 8"), which again extended Emergency Order 4, including the closure of restaurants except for "curbside food service" and other restrictions.

130.     On October 22, 2020, the Emergency Management Coordinator of the Menominee Tribe issued Emergency Management Coordinator (Covid-19) (No. 9) Order, 2020 ("Emergency Order 9"), scheduled to take effect on October 24, 2020 and expire on November 21, 2020.

Emergency Order 9 required restaurants and bars, gaming operations, and a host of other businesses and entities to "not exceed 50% in-person capacity." Any individual violating Emergency Order 12 was subject to a civil forfeiture of $500.

131.    On November 19, 2020, the Emergency Management Coordinator issued Emergency Management Coordinator (Covid-19) (No. 10) Order, 2020 ("Emergency Order 10"), schedule to take effect on November 19, 2020 and expire on January 9, 2021. Emergency Order 10 emphasized that "In light of the continued number of cases in Menominee County, the health, safety, and welfare of the Menominee Indian Tribe is at great risk for further spread of COVID-19 throughout the community." Accordingly, restaurants and bars, in addition to a variety of other businesses and entities, were ordered not to "exceed 50% in-person capacity." Emergency Order 10 also discouraged people from meeting with "people outside of those who live in their immediate household," specifically identifying "celebrations, events, activities, and other social gatherings," including private parties, reunions, gatherings, and many other types of events. Any individual violating Emergency Order 10 was subject to a civil forfeiture of $500.

132.    On January 9, 2021, in response to the continuing physical spread of the virus and the incidence of the disease, Emergency Management Coordinator (Covid-19) (No. 11) Order, 2021 ("Emergency Order 11") took effect, set to expire on February 6, 2021. Emergency Order 11 extended the restrictions of Emergency Order 10, limiting restaurants and bars, along with a host of other businesses and entities, to "50% in-person capacity". Gatherings with people outside an individual's immediate family remained strongly discouraged. Any individual violating Emergency Order 11 was subject to a civil forfeiture of $500.

133.    On February 1, 2021, the Emergency Management Coordinator issued Emergency Management Coordinator (Covid-19) (No. 12) Order, 2021 ("Emergency Order 12"), scheduled to take effect on February 6, 2021, and expire on March 6, 2021. Under this Order, restaurants and bars were not to "exceed 75% in-person capacity," and people were "strongly encouraged" to avoid gatherings with "people outside of those who live in their immediate household." The order again specifically discouraged individuals from attending "celebrations, events, activities, and other social gatherings," including private parties, reunions, gatherings, and many other types of events.

1   Any individual violating Emergency Order 12 was subject to a civil forfeiture of $500.

2   **134.**   On March 1, 2021, the Emergency Management Coordinator issued Emergency

3   Management Coordinator (Covid-19) (No. 13) Order, 2021 ("Emergency Order 13"), scheduled

4   to take effect on March 6, 2021, and expire on April 3, 2021, which extended the strictures of

5   Emergency Order 12.

6   ### *4.  Closure Orders Throughout the United States*

7   **135.**   Closure Orders were also issued by local, state and Tribal governments throughout

8   the United States.   The list includes Alaska, Oklahoma, New Mexico, Montana, Washington,

9   Wisconsin and 37 other states, plus the District of Columbia.   In addition, six other states issued

10   Closure Orders with social distancing, limits on the size of gatherings, and closure of certain non-

11   essential businesses, even if they did not expressly order that residents must Stay Home.   This list

12   includes, for example, South Dakota.

13   **136.**   Many Indian Tribes, Nations or Bands also issued Closure Orders, including

14   Cherokee, Chippewa, Choctaw, Colorado River, Crow, Menominee, Mission, Muscogee (Creek),

15   Navajo, Northern Cheyenne, Seminole, Southern Ute, Suquamish, and Tulalip.

16   **137.**   All of the Closure Orders described in this Class Action Complaint were issued in

17   response to the rapid spread of COVID-19 and the spread of the virus to Tribal properties and

18   nearby properties.

19   ### *5.   The Impact of COVID-19 and the Closure Orders*

20   **138.**   The physical presence of COVID-19 and the immediate threat of further physical

21   spread of the virus caused direct physical loss or damage to covered property under the Policy, by

22   rendering that property effectively or imminently uninhabitable for patrons, by impairing the

23   function of the covered property, and by causing the "interruption of business, services or rental

24   value" during a "period of restoration."   Testing of individuals was not widely available in Spring

25   2020, but confirmed cases of COVID-19 on the Menominee reservation and in Wisconsin as a

26   whole throughout the year confirmed the overwhelmingly likelihood of the physical presence of

27   the virus on Plaintiffs' properties and on nearby properties.

28   **139.**   The prolonged prevalence of COVID-19 in the areas encompassing Plaintiff's

property made it unavoidable that individuals with COVID-19 or otherwise carrying the coronavirus, including employees, visitors, patrons, and guests would be physically present at Plaintiff's property on various dates since the earliest days of the pandemic. Specifically, during the period of the Policy, individuals with COVID-19 or otherwise carrying the coronavirus entered Plaintiffs' properties, including MCR, Thunderbird, and the Tribal Clinic.  Despite the limited testing available for much of the year, hundreds of cases of COVID-19 were reported on the Menominee reservation in 2020, including among employees of Plaintiffs' businesses, adding further impetus to the closure of Plaintiffs' properties. At least 42 employees of Plaintiffs tested positive in 2020.  During the spike in cases in September 2020, the number of cases in Menominee County exceeded 120, according to news reports.

140.    Coronavirus-containing fomites (*i.e.,* inanimate objects), respiratory droplets, and nuclei from those individuals came into contact with, adhered to, and attached to the surfaces of the property upon which they landed, including without limitation, the real property, furniture, fixtures, and personal property at the properties.

141.    Coronavirus or coronavirus-containing fomites, respiratory droplets, and nuclei physically altered the property to which they adhered, attached, or came into contact including without limitation by altering the surfaces of that property and/or by making physical contact with those previously safe, inert materials dangerous. In addition, the coronavirus physically altered the air. Air inside buildings that was previously safe to breathe but could no longer safely be breathed due to coronavirus and COVID-19, has undergone a physical alteration.

142.    Coronavirus droplets have been conveyed from infected persons (whether symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including but not limited to furniture, doors, floors, bathroom facilities, equipment, and supplies, and into the air and HVAC system at Plaintiffs' properties, causing damage and alteration to physical property and ambient air at the premises. Aerosolized coronavirus has entered the air in Plaintiffs' properties.

143.    The presence of the coronavirus and COVID-19, including but not limited to coronavirus droplets or nuclei on solid surfaces and in the air at insured property, has caused and will continue to cause direct physical damage to physical property and ambient air at the premises.

Coronavirus, a physical substance, has attached and adhered to Plaintiff's properties, and by doing so, altered that property. Such presence has also directly resulted in loss of functionality of that property.

144.   The Closure Orders, including the issuance of the Wisconsin and Menominee Closure Orders, also prohibited access to interior spaces of MCR and Thunderbird and to the covered property of other Class Members.  Those Closure Orders were issued in response to the physical presence of the coronavirus at properties in Menominee and Wisconsin, including property within a 10-mile radius of Plaintiff's properties, and the imminent threat of further physical spread of the virus and resulting danger to individuals.

145.   The Closure Orders and the property damage caused by the presence of the coronavirus, including the issuance of the Wisconsin and Menominee Closure Orders, restricted the use of the Clinic and the healthcare facilities of other Class Members by prohibiting access of potential patients for anything but essential health care services.  These restrictions and conditions effectively eliminated the ability of patients to access health care facilities in order obtain other services, significantly reducing patient flow and revenue.  The restrictions and conditions also required increased spending by Plaintiffs for physical barriers, cleaning, sanitizing, and other measures aimed at remediating the physical presence of the virus, repairing the damage to property, and preventing further damage to property and to patrons.

146.   As a direct consequence of COVID-19 and the Closure Orders, MCR closed completely on March 19, 2020, and only partially reopened with restricted capacity on May 27, 2020.  (The affiliated gift shop opened slighter earlier, on May 1, 2020, but access to other parts of the property was still prohibited for patrons).  In response to COVID-19 and further Closure Orders, as well as additional evidence of the physical spread of coronavirus at its properties and nearby properties, MCR closed again on July 31, 2020, and only partially reopened with restricted capacity on August 17, 2020.  A large portion of MCR properties, everything apart from the gift shop, closed again on September 16, 2020, and only partially reopened later that month.  These closures not only affected the casino and restaurant operations but also the hotel, conference services and other operations on the property. Similarly, the Thunderbird Restaurant closed for on-

site dining, with patrons unable to access the in-person dining portions of the property. Thunderbird provided carryout operations for dining patrons, but the actual and potential physical presence of the virus on the property prevented patrons from accessing the internal restaurant seating area, both directly and as a result of the Closure Orders. The Closure Orders and the physical presence of the virus also forced the mini casino to close, prohibiting access by patrons to the property, and later, open only at reduced capacity.  For similar reasons, the Clinic was also required to reduce its capacity to see patients.

147.     Plaintiffs have instituted measures to repair the physical loss or damage, including the installation of physical barriers and increased cleaning and sanitizing at MCR, Thunderbird, and the Clinic.  Thus, structural alterations, changes, and/or repairs have been made by Plaintiffs, and are continuing, so that Plaintiffs can continue their operations to the extent possible after experiencing direct property damage caused by COVID-19 and to avoid imminent threat of further property damage.

148.     Given the employees, visitors, and patrons entering Plaintiffs' properties since the start of the pandemic, and the number of cases confirmed in the State of Wisconsin and on the Menominee reservation, it is statistically certain that the virus has been present for some period of time since the COVID-19 outbreak began and that the virus continues to pose an actual imminent threat to Plaintiffs.

149.     The Closure Orders and the property damage caused by the presence of the coronavirus at Plaintiffs' properties and at the properties of companies supplying Plaintiffs with customers further harmed Plaintiffs' business.  For example, area hotels, restaurants, and other businesses that facilitated travel by customers to MCR and Thunderbird experienced exposure to physical damage from the coronavirus and were subject to the Closure Orders, leading to a lessened ability of customers to travel to Plaintiffs' establishments in order to enjoy the services offered. For example, area restaurants within ten miles of Plaintiffs' property, such as the War Bonnet Bar & Grill, released statements in September 2020 confirming that they were forced to close for everything but curbside carry-out orders. Similarly, tour operators and bus companies which normally brought patrons to Plaintiffs' business ceased to do so and later only resumed at a

significantly reduced rate.

150.    Property damage caused by the presence of the coronavirus at other businesses and households in the Menominee area, and the Closure Orders that resulted from that property damage, together with evidence of a significant infection rate near those properties, further harmed Plaintiffs' business by depriving Plaintiffs of tax revenue that would have been generated by economic activity conducted by those businesses and individuals. For example, tax revenue would have been collected from hotel occupancy on the reservation had potential patrons and businesses engaged in their normal level of economic activity – a level at which they would have engaged but for the physical damage to property caused by the coronavirus and the related Closure Orders.

151.    As a result of the presence of COVID-19, the damage to Plaintiffs' property, and the Closure Orders, Plaintiff and the other Class members suffered losses covered by Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption protections.

152.    Plaintiffs submitted a claim for loss to the Insurers under the Policy due to the presence of COVID-19 and the Closure Orders, and the Insurers denied that claim.

## V.    CLASS ACTION ALLEGATIONS

153.    **Class Definition**.  Plaintiffs bring this action pursuant to California Code of Civil Procedure section 382, individually and on behalf of all others similarly situated. There are questions of common or general interest, and it is impracticable to bring all of the numerous parties before the Court.

154.    Plaintiffs seek to represent a nationwide Class defined as all persons and entities insured under the Policy with claims due to COVID-19 and/or closure orders from the relevant authorities, including persons and entities that:

(a)    Incurred reasonable and necessary expense to temporarily protect or preserve covered property due to "actual or imminent physical loss or damage" to covered property; or

(b)    suffered an interruption of business and sustained loss of Gross Earnings; or

(c) suffered an interruption of business and sustained loss of rental value; or

(d) incurred reasonable and necessary Extra Expense to continue the normal operation of business "as nearly as practicable" following damage to covered property by a covered cause of loss, during a "period of restoration"; or

(e) suffered an actual loss due to "direct physical loss or damage … occurring at property located within a 10-mile radius of covered property," thereby preventing ingress to or egress from covered property; or

(f) suffered an actual loss when a civil authority issued an order that specifically prohibited access to covered property, due to property damage "at a location within a 10-mile radius of covered property; or

(g) suffered Business Interruption, rental income or Extra Expense losses due to property damage at direct supplier and direct customer locations, preventing supply of goods or services from suppliers to insureds or from insureds to customers; or

(h) incurred Tax Revenue Interruption losses due to damage to contributing property not operated by insureds.

155. Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

156. **Numerous and Ascertainable Class Members.** The members of the defined Class are so numerous that individual joinder of all Class Members is impracticable. While Plaintiffs are informed and believe that there are dozens of Class Members, the precise number of Class Members is unknown to Plaintiffs but may be ascertained from the books and records of Tribal First or the Defendants. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

///

157. **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

(a) The Insurers issued the all-risk Policy in exchange for payment of premiums by or for Plaintiffs and other Class Members;

(b) whether the Class suffered a covered loss based on the Policy;

(c) whether the Insurers wrongfully denied all claims based on COVID-19 and the Closure Orders;

(d) whether the Policy's Protection and Preservation of Property coverage applies to reasonable and necessary expenses caused by COVID-19 and the Closure Orders;

(e) whether the Policy's Business Interruption coverage applies to an interruption caused by COVID-19 and the Closure Orders;

(f) whether the Policy's Extra Expense coverage applies to a business loss caused by COVID-19 and the Closure Orders;

(g) whether the Policy's Ingress/Egress coverage applies to a business loss caused by COVID-19 and the Closure Orders;

(h) whether the Policy's Civil Authority coverage applies to an interruption due to the Closure Orders;

(i) whether the Policy's Contingent Time Element coverage applies to an interruption caused by COVID-19 and the Closure Orders;

(j) whether the Policy's Tax Revenue Interruption coverage applies to an interruption due to COVID-19 and the Closure Orders;

(k) whether the Insurers have breached their contract of insurance through a blanket denial of all claims based on business interruption, business losses, costs or closures related to COVID-19 and the Closure Orders; and

(l) whether Plaintiffs and the other Class Members are entitled to an award of reasonable attorney fees, interest and costs.

158.   **Typicality.**   Plaintiffs' claims are typical of the other Class Members' claims because Plaintiffs and the other Class Members are all similarly affected by Defendants' refusal to pay under its Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption coverages.  Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.  Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful practices in which Defendants engaged.

159.   **Adequacy of Representation.** Plaintiffs are adequate Class representative because their interests do not conflict with the interests of the other Class Members who they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiffs intend to prosecute this action vigorously.  The interests of the above-defined Classes will be fairly and adequately protected by Plaintiffs and their counsel.

160.   **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests.**  Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Defendants' Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element and Tax Revenue Interruption coverages.  The prosecution of separate actions by individual Class Members would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants.  Moreover, the adjudications sought by Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class Members, who are not parties to this action, to protect their interests.

161.   **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties,

and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

162.    **Declaratory and Injunctive Relief.**  Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT – PROPERTY DAMAGE, PROTECTION AND PRESERVATION OF PROPERTY COVERAGE

163.    Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

164.    Plaintiffs bring this Count individually and on behalf of the Class.

165.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

166.    In the Policy, the Insureds agreed to pay for Plaintiffs' and the other Class Members' expenses for "reasonable and necessary actions for the temporary protection and preservation" of covered property, including expenses for actions taken due to "actual or imminent physical loss or damage" to covered property, and for actions taken to "protect covered property from further damage."

167.    Plaintiffs and the other Class Members incurred reasonable and necessary expenses "for the temporary protection and preservation" of covered property as a result of "actual or imminent physical loss or damage" to covered property caused by COVID-19.

168.    Plaintiffs and the other Class Members incurred reasonable and necessary expenses to "protect covered property from further damage" caused by COVID-19.

169.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the

Policy's clear and unambiguous terms.

170.    By denying coverage for any Protection and Preservation of Property losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

171.    As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT II**
**BREACH OF CONTRACT -- BUSINESS INTERRUPTION COVERAGE**

172.    Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

173.    Plaintiffs bring this Count individually and on behalf of the Class.

174.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

175.    In the Policy, the Insurers agreed to pay for Plaintiffs' and the other Class Members' actual "loss resulting directly from interruption of business, services or rental value caused by direct physical loss or damage" to covered property during the "period of restoration."  These losses include lost Gross Earnings and lost rental value.

176.    The "period of restoration begins "on the date direct physical loss occurs and interrupts normal business operations and ends on the date that the damaged property should have been repaired, rebuilt or replaced with due diligence and dispatch."  The "period of restoration" is "not limited by the expiration" of the Policy, and the coverage period is 12 months.

177.    COVID-19 caused direct physical loss and damage to the covered property of Class Members, requiring interruption of business activities at their covered property.  Losses caused by COVID-19 thus triggered the Business Interruption provision of the Policy.

178.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

**179.**   By denying coverage for any Business Interruption losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

**180.**   As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT III**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**

**181.**   Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

**182.**   Plaintiffs bring this Count individually and on behalf of the Class.

**183.**   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

**184.**   In the Policy, the Insurers agreed to pay reasonable and necessary Extra Expense incurred by Plaintiffs and other Class Members to continue the normal operation of business "as nearly as practicable" following damage to covered property by a covered cause of loss, during the "period of restoration."

**185.**   Due to COVID-19 and the Closure Orders, Class Members incurred Extra Expense at covered property.

**186.**   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

**187.**   By denying coverage for any Extra Expense losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

**188.**   As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT IV**
**BREACH OF CONTRACT – INGRESS/EGRESS COVERAGE**

189.   Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

190.   Plaintiffs bring this Count individually and on behalf of the Class.

191.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

192.   In the Policy, the Insurers agreed to pay for the actual loss sustained by Plaintiffs and other Class Members for up to 30 days when "direct physical loss or damage … occurring at property located within a 10-mile radius of covered property" prevents ingress to or egress from covered property.

193.   COVID-19 triggered the Ingress/Egress provision of the Policy.  COVID-19 caused direct physical loss or damage to property within a ten-mile radius of covered property in the same manner that it caused direct physical loss or damage to covered property described herein.

194.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

195.   By denying coverage for any Ingress/Egress losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

196.   As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT V**
**BREACH OF CONTRACT – INTERRUPTON BY CIVIL AUTHORITY COVERAGE**

197.   Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

198.   Plaintiffs bring this Count individually and on behalf of the Class.

199.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the

Policy.

**200.**    In the Policy, the Insurers agreed to pay for the actual loss sustained by Plaintiffs and other Class Members for up to 30 days when a civil authority issues an order that specifically prohibits access to covered property, due to property damage "at a property located within a 10-mile radius of covered property."

**201.**    The Closure Orders triggered the Civil Authority provision of the Policy.  COVID-19 caused direct physical loss or damage to property within a ten-mile radius of covered property in the same manner that it caused direct physical loss or damage to covered property, as described herein.  The Closure Orders were actions taken in response to the dangerous physical conditions resulting from the direct physical loss or damage to such properties, and the Closure Orders prohibited access within a ten-mile radius area that included covered property.

**202.**    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

**203.**    By denying coverage for any Civil Authority losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

**204.**    As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT VI**
**BREACH OF CONTRACT – CONTINGENT TIME ELEMENT COVERAGE**

**205.**    Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

**206.**    Plaintiffs bring this Count individually and on behalf of the Class.

**207.**    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

///

208.   In the Policy, the Insurers agreed to pay Plaintiffs' and the other Class Members' "Contingent Time Element" Business Interruption, rental income, and Extra Expense losses due to property damage "at direct supplier or direct customer locations" that (a) prevents suppliers from supplying goods or services to insureds, or (b) prevents customers from accepting goods or services from insureds.

209.   COVID-19 triggered the Contingent Time Element provision of the Policy. COVID-19 caused direct physical loss or damage to direct supplier or direct customer property in the same manner that it caused direct physical loss or damage to covered property, as described herein.

210.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

211.   By denying coverage for any Contingent Time Element losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

212.   As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT VII**
**BREACH OF CONTRACT – TAX REVENUE INTERRUPTION COVERAGE**

213.   Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

214.   Plaintiffs bring this Count individually and on behalf of the Class.

215.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

216.   In the Policy, the Insurers agreed to pay Plaintiffs' and the other Class Members' actual Tax Revenue Interruption losses "resulting directly from necessary interruption of" Tribal

Incremental Municipal Services Payments, sales tax, property tax, and other tax revenue collected by or due Class Members, caused by damage to property which is not operated by Class Members, "and which wholly or partially prevents the generation of revenue for the account of" Class Members.

217.    The Insurers agreed to pay these Tax Revenue Interruption losses beginning "with the date of damage to the contributing property" and continuing "for only the length of time as would be required with exercise of due diligence and dispatch to rebuild, replace or repair the contributing property."

218.    COVID-19 caused damage to contributing property in the same manner that it did with Plaintiffs' covered property, as described herein, resulting in interruption of Tribal Incremental Municipal Services Payments, sales tax, property tax, and other tax revenue.

219.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

220.    By denying coverage for any Tax Revenue Interruption losses incurred by the Class in connection with the COVID-19 pandemic, the Insurers have breached their coverage obligations under the Policy.

221.    As a result of the Insurers' breach of the Policy, the Class has sustained substantial damages for which the Insurers are liable, in an amount to be established at trial.

**COUNT VIII**
**DECLARATORY JUDGMENT – PROPERTY DAMAGE, PROTECTION AND PRESERVATION OF PROPERTY COVERAGE**

222.    Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

223.    Plaintiffs bring this Count individually and on behalf of the Class.

224.    The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

225.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

226.     The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

227.     An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of reasonable and necessary costs incurred by the Class "for the temporary protection and preservation" of covered property: (a) as a result of "actual or imminent physical loss or damage" to covered property caused by COVID-19, and (b) "to protect covered property from further damage" caused by COVID-19.

228.     Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

i.      Class Members' Property Damage, Protection and Preservation of Property losses incurred in connection with the COVID-19 pandemic are insured losses under the Policy; and

ii.     The Insurers are obligated to pay the Class for the full amount of the Property Damage, Protection and Preservation of Property losses incurred by their businesses stemming from the COVID-19 pandemic.

### COUNT IX
### DECLARATORY JUDGMENT – BUSINESS INTERRUPTON COVERAGE

229.     Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

230.     Plaintiffs bring this Count individually and on behalf of the Class.

231.     The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

**232.** Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

**233.** The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

**234.** An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Business Interruption losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

**235.** Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Business Interruption losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Business Interruption losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT X
## DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE

**236.** Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

**237.** Plaintiffs bring this Count individually and on behalf of the Class.

**238.** The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

239.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

240.   The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

241.   An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Extra Expense losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

242.   Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Extra Expense losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Extra Expense losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XI**
**DECLARATORY JUDGMENT – INGRESS/EGRESS COVERAGE**

243.   Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

244.   Plaintiffs bring this Count individually and on behalf of the Class.

245.   The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

246.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

247.     The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

248.     An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Ingress/Egress losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

249.     Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Ingress/Egress losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Ingress/Egress losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XII**
**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**

250.     Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

251.     Plaintiffs bring this Count individually and on behalf of the Class.

252.     The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

253. Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

254. The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

255. An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Civil Authority losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

256. Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Civil Authority losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Civil Authority losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XIII
## DECLARATORY JUDGMENT – CONTINGENT TIME ELEMENT COVERAGE

257. Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

258. Plaintiffs bring this Count individually and on behalf of the Class.

259. The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

260.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

261.     The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

262.     An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Contingent Time Element losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

263.     Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

   i.   Class Members' Contingent Time Element losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

   ii.  The Insurers are obligated to pay the Class for the full amount of the Contingent Time Element losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XIV**
**DECLARATORY JUDGMENT – TAX REVENUE INTERRUPTON COVERAGE**

264.     Plaintiffs repeat and reallege Paragraphs 1-162 as if fully set forth herein.

265.     Plaintiffs bring this Count individually and on behalf of the Class.

266.     The Policy is a contract under which Plaintiffs and the other Class Members paid premiums, in exchange for the Insurers' promise to pay their losses for claims covered by the Policy.

267.  Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by the Insurers, or the Insurers are estopped from asserting them, and yet the Insurers have abrogated their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Class Members are entitled.

268.  The Insurers have denied coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

269.  An actual case or controversy exists regarding Class Members' rights and the Insurers' obligations under the Policy to reimburse the full amount of Tax Revenue Interruption losses incurred by the Class in connection with interruption of their businesses stemming from the COVID-19 pandemic.

270.  Pursuant to California Code of Civil Procedure section 1060 *et seq.*, Plaintiffs seek a declaratory judgment from this Court declaring the following:

    i.    Class Members' Tax Revenue Interruption losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    The Insurers are obligated to pay the Class for the full amount of the Tax Revenue Interruption losses incurred in connection with the Closure Orders during the period of restoration and the interruption of their businesses stemming from the COVID-19 pandemic.

## VII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class Members, respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

    a.    Entering an order certifying the proposed nationwide Class, as requested herein, designating Plaintiffs as Class representatives, and appointing Plaintiffs' undersigned attorneys as Counsel for the Class;

b.      Entering an interim order attaching any layer of coverage that is subject to an aggregate limit that is shared among the Class members under the TPIP, such that one or more of Defendants may not pay the loss of one Class member to the detriment of other Class members;

c.      Entering judgment on Counts I-VII in favor of the Class and awarding damages for breach of contract in an amount to be determined at trial;

d.      Entering declaratory judgments on Counts VIII-XIV in favor of the Class, as follows;

i.      Class Members' Protection and Preservation of Property, Business Interruption, Extra Expense, Ingress/Egress, Interruption by Civil Authority, Contingent Time Element and Tax Revenue Interruption losses incurred in connection with the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

ii.     Defendants are obligated to pay for the foregoing losses incurred and to be incurred by the Class related to COVID-19, the Closure Orders and the interruption of their businesses stemming from the COVID-19 pandemic;

e.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

f.      Ordering Defendants to pay attorneys' fees and costs of suit;

g.      Ordering Defendants to pay multiple damages where required under state law; and

h.      Ordering such other and further relief as may be just and proper.

## VIII.   JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated:  March 12, 2021                                    Respectfully submitted,

Jennie Lee Anderson (SBN 203586)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California
Telephone:  415-986-1400
jennie@andrusanderson.com

Adam J. Levitt (*pro hac vice forthcoming*)
Mark S. Hamill (*pro hac vice forthcoming*)
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
mhamill@dicellolevitt.com

Mark A. DiCello (*pro hac vice forthcoming*)
Kenneth P. Abbarno (*pro hac vice forthcoming*)
Mark Abramowitz (*pro hac vice forthcoming*)
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio 44060
Telephone:  440-953-8888
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Timothy W. Burns (*pro hac vice forthcoming*)
Jeff J. Bowen (SBN 237805)
Jesse J. Bair (*pro hac vice forthcoming*)
Freya K. Bowen (*pro hac vice forthcoming*)
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Mark Lanier (*pro hac vice forthcoming*)
Alex Brown (*pro hac vice forthcoming*)
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North, Suite 100
Houston, Texas 77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com

Douglas Daniels (*pro hac vice forthcoming*)
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas 77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

*Counsel for Plaintiffs and the Proposed Class*