UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MENOMINEE INDIAN TRIBE OF
WISCONSIN, et al.,

             Plaintiffs,

      v.

LEXINGTON INSURANCE COMPANY,
et al.,

             Defendants.

Case No.  21-cv-00231-WHO


**ORDER GRANTING MOTIONS TO
DISMISS
RE: DKT. NOS. 62, 64, 67, 68, 69, 70, 73,
106**

      Plaintiffs Menominee Indian Tribe of Wisconsin, the Menominee Indian Gaming

Authority d/b/a Menominee Casino Resort ("MCR"), and the Wolf River Development

Company's (collectively, "Menominee") seek coverage from each defendant for the damages

Menominee sustained due to the COVID-19 pandemic and resulting government closure orders.

Defendant Lexington Insurance Company ("Lexington"), joined by the other insurance company

defendants (collectively "Defendants"), moves to dismiss Menominee's First Amended Complaint

("FAC") because Menominee cannot plausibly allege that it is entitled to coverage.  For the

reasons explained below, all of Defendants' motions related to Lexington's motion to dismiss

Menominee's FAC are GRANTED with prejudice.[1]

<b>BACKGROUND</b>

**I.     FACTUAL BACKGROUND**

      Menominee operates a variety of businesses located in Keshena, Wisconsin, including the

---

[1] Separate from Lexington's motion, defendants Arch Specialty Insurance Company ("Arch"),
Liberty Mutual Fire Insurance Company ("Liberty"), and Landmark American Insurance
Company ("Landmark") also moved to dismiss the FAC under various exclusionary provisions in
their own excess policies.  Menominee moved to strike their excess policies as extrinsic material
that were not referenced in or attached to the FAC.  Those motions are denied as moot.

United States District Court
Northern District of California

Thunderbird Complex—a mini casino, restaurant, bar, and outdoor entertainment venue—and the Menominee Tribal Clinic, a multi-service healthcare center.  Dkt. No. 58 ("FAC") ¶¶ 5–8.  These properties are among those insured under the Tribal Property Insurance Program ("TPIP"), a nationwide insurance program in which various insurers participate.  *Id.* ¶¶ 29, 46–50.  The TPIP involves separate layers of coverage that implicate different insurers.  *Id.*  ¶¶ 10–11.  For the policy period from July 1, 2019, through July 1, 2020, each of these policies incorporates a master policy form, referred to as the Tribal First Policy Wording, TPIP USA Form No. 15 (the "Policy"), which sets forth the terms, conditions, and exclusions of coverage applicable to Menominee.  *Id.* ¶ 46.  The Policy insures against "covered perils," which are defined as "all risk of direct physical loss or damage," subject to the Policy's "terms, conditions and exclusions."  Policy at 24.  The Policy was a part of the TPIP's "Property Solutions" and includes coverage under the Business Interruption, Extra Expense, Ingress/Egress, Civil Authority, Contingent Time Element, Tax Revenue Interruption, and Protection and Preservation of Property provisions.  FAC ¶¶ 11–12, 60–61.

In March 2020, the State of Wisconsin and the Menominee Tribe issued public health orders (the "Closure Orders") due to the "threat and presence of COVID-19."  *Id.* ¶¶ 101–34.  The orders required the "whole or partial suspension of business at a wide range of establishments" from March 2020 through March 2021.  *Id.*  The Wisconsin orders "exempted tribal members acting within their own reservation" but the Menominee Tribal Legislature adopted Wisconsin's guidelines, subject to "the sovereignty of the Tribe."  *Id.* ¶¶ 109, 120.

Menominee asserts that it suffered "direct physical loss or damage" to its property from "the presence of COVID-19."  *Id.* ¶¶ 13, 66, 138; *see also id.* ¶¶ 78–100.  According to Menominee, "it is statistically certain that the virus has been present for some period of time since the COVID-19 outbreak began and that the virus continues to pose an actual imminent threat to Plaintiffs."  *Id.* ¶ 148.  Menominee claimed that "[a]t least 42 employees [] tested positive in 2020" and "during the period of the Policy, individuals with COVID-19 or otherwise carrying the coronavirus entered Plaintiffs' properties, including MCR, Thunderbird, and the Tribal Clinic."  *Id.* ¶ 139.  It alleged that it incurred losses and was "forced to suspend business activities" due to

United States District Court
Northern District of California

2

United States District Court
Northern District of California

"the presence of COVID-19" and various "Closure Orders." *Id.* ¶¶ 13, 20, 151. The "presence of the coronavirus" and "the damage caused to Menominee's physical property" rendered its properties "uninhabitable." *Id.* ¶¶ 13, 15–16.

## II.     PROCEDURAL BACKGROUND

Menominee submitted an insurance claim for its alleged losses under the Policy, and the claim was denied. *Id.* ¶ 152. In November 2020, Menominee brought this class action in California state court against its insurers, seeking a declaration of coverage for the claimed damages Menominee sustained due to the COVID-19 pandemic and resulting Closure Orders. Dkt. No. 1-2. Lexington removed the action to federal court and on February 11, 2021, moved to dismiss the complaint, arguing, among other things, that Menominee had pleaded only the temporary loss of use of property. Dkt. No. 17. The other Defendants joined Lexington's motion. Dkt. Nos. 18, 20–23, 25–26, 28. On March 12, 2021, Menominee voluntarily amended its complaint and added various allegations regarding the presence of COVID-19 and the property damage the virus allegedly caused. Dkt. No. 58.

Menominee seeks relief under seven provisions of the Policy: Business Interruption, Extra Expense, Ingress/Egress, Interruption by Civil Authority, Contingent Time Element, Tax Revenue Interruption, and Protection and Preservation of Property. FAC ¶¶ 163–270. As to each identified provision, Menominee asserts causes of action for breach of contract and declaratory judgment. *Id.* On April 9, 2021, Lexington filed the present motion to dismiss Menominee's FAC. Dkt. No. 62 ("Mot."). Subsequently, the other Defendants joined Lexington's motion to dismiss.[2] Three

---

[2] The other defendants are the following: Underwriters at Lloyd's – Syndicates: ASC 1414, TAL 1183, MSP 318, ATL 1861, KLN 510, AGR 3268; Underwriter's at Lloyd's – Syndicate: CNP 4444; Underwriters at Lloyd's – Syndicates: KLN 0510, ATL 1861, ASC 1414, QBE 1886, MSP 0318, APL 1969, CHN 2015; Underwriters at Lloyd's – Syndicate: BRT 2987; Underwriters at Lloyd's – Syndicates: KLN 0510, TMK 1880, BRT 2987, BRT 2988, CNP 4444, ATL 1861, Neon Worldwide Property Consortium, AUW 0609, TAL 1183, AUL 1274; Homeland Insurance Company of New York; Endurance Worldwide Insurance Ltd T/AS Sompo International; and XL Catlin Insurance Company UK Ltd (Dkt. No. 63); Hallmark Specialty Insurance Company and Aspen Specialty Insurance Company i/s/h/a Underwriters at Lloyd's – Aspen Specialty Insurance Company (Dkt. No. 64); Evanston Insurance Company (Dkt. No. 65); Allied World National Assurance Company (Dkt. No. 67); Liberty Mutual Fire Insurance Company (Dkt. No. 68); Landmark American Insurance Company (Dkt. No. 69); and Arch Specialty Insurance Company (Dkt. No. 70).

1   defendants, Arch, Liberty, and Landmark joined Lexington's motion and filed their own motions

2   to dismiss Menominee's FAC under different theories. *See* Dkt. Nos. 68–70.

3   **III.     POLICY PROVISIONS**

4          Under the Policy's section for "Business Interruption, Extra Expense & Rental Income,"

5   the provision provides, in relevant part:

6              Subject to the terms, conditions and exclusions stated elsewhere
             herein, this Policy provides coverage for:
7              . . .

8              **BUSINESS INTERRUPTION**
             Against loss resulting directly from interruption of business, services
9              or rental value caused by direct physical loss or damage, as covered
             by this Policy to real and/or personal property insured by this Policy,
10             occurring during the term of this Policy. . . .

11   Dkt. No. 58-1 ("Policy") at 19.

12          The Policy extends coverage to "Extra Expense," which provides in relevant part:

13             **EXTRA EXPENSE**
             This Policy is extended to cover the necessary and reasonable extra
14             expenses occurring during the term of this Policy at any location as
             hereinafter defined, incurred by the Named Insured in order to
15             continue as nearly as practicable the normal operation of the Named
             Insured's business following damage to or destruction of covered
16             property by a covered peril which is on premises owned, leased or
             occupied by the Named Insured . . . .
17

18   *Id.* Both the Business Interruption and Extra Expense loss is paid "during the period of

19   restoration," *id.*, which is defined as follows:

20             **PERIOD OF RESTORATION**
             The period during which business interruption and or rental
21             interruption applies will begin on the date direct physical loss occurs
             and interrupts normal business operations and ends on the date that
22             the damaged property should have been repaired, rebuilt
             or replaced with due diligence and dispatch, but not limited by the
23             expiration of this policy.

24   *Id*. at 23.

25          The section for "Business Interruption, Extra Expense & Rental Income," also includes

26   coverage to "Ingress/Egress" and "Interruption by Civil Authority," which states in relevant part:

27             **INGRESS /EGRESS**
             This Policy is extended to insure the actual loss sustained during the
28             period of time not exceeding 30 days, when as a direct result of
             physical loss or damage caused by a covered peril(s) specified by this

United States District Court
Northern District of California

4

Policy and occurring at property located within a 10 mile radius of covered property, ingress to or egress from the covered property covered by this Policy is prevented. Coverage under this extension is subject to a 24-hour waiting period.

**INTERRUPTION BY CIVIL AUTHORITY**
This Policy is extended to include the actual loss sustained by the Named Insured, as covered hereunder during the length of time, not exceeding 30 days, when as a direct result of damage to or destruction of property by a covered peril(s) occurring at a property located within a 10 mile radius of the covered property, access to the covered property is specifically prohibited by order of a civil authority. Coverage under this extension is subject to a 24-hour waiting period.

*Id.* at 20.

Under the same section for "Business Interruption, Extra Expense & Rental Income," coverage to "Contingent Time Element" and "Tax Revenue Interruption" states in relevant part:

**CONTINGENT TIME ELEMENT COVERAGE**
Business interruption, rental income, and extra expense coverage provided by this Policy is extended to cover loss directly resulting from physical damage to property of the type not otherwise excluded by this Policy at direct supplier or direct customer
locations that prevents a supplier of goods and/or services to the Named Insured from supplying such goods and/or services, or that prevents a recipient of goods and/or services from the Named Insured from accepting such goods and/or services. . . .

*Id.* at 20.

**TAX REVENUE INTERRUPTION**
Except as hereinafter or heretofore excluded, this Policy insures against loss resulting directly from necessary interruption of sales, property or other tax revenue including, but not limited to Tribal Incremental Municipal Services Payments collected by or due
the Named Insured caused by damage, or destruction by a peril not excluded from this Policy to property which is not operated by the Named Insured and which wholly or partially prevents the generation of revenue for the account of the Named Insured. . . .

*Id.* at 21. Like Business Interruption and Extra Expense coverage, Tax Revenue Interruption coverage is further limited to "only the length of time as would be required with exercise of due diligence and dispatch to rebuild, replace or repair the contributing property." *Id.*

Under the Policy's section for "Property Damage," which is separate from the section for Business Interruption coverage and its extensions, the Policy provides coverage for "Protection and Preservation of Property." *Id.* at 13. The Policy states, in relevant part:

**PROTECTION AND PRESERVATION OF PROPERTY**
. . .
> In case of actual or imminent physical loss or damage of the type insured against by this Policy, the expenses incurred by the Named Insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage otherwise recoverable under the Policy . . . .

*Id.*

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  This standard is not akin to a probability requirement, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

## I.    CHOICE OF LAW

As a preliminary matter, the parties dispute whether California or Wisconsin law applies to the Policy.  The parties do not dispute the choice-of-law principle for determining the substantive law—both parties agree that as "a federal court exercising diversity jurisdiction," I apply "California's choice-of-law principles to determine the body of substantive law that applies to the interpretation" of the Policy.  *See Welles v. Turner Ent. Co.*, 503 F.3d 728, 738 (9th Cir. 2007).

Under California's choice-of-law principles, Cal. Civ. Code § 1646 governs only the interpretation of contractual terms and the governmental interest analysis governs all other issues in a contract dispute.  *See Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1111 (9th Cir. 2020).  Section 1646 states, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646.  "A contract 'indicate[s] a place of performance' within the meaning of section 1646 if the contract expressly specifies a place of performance or if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances." *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1459 (2007).

Menominee contends that California law governs because the class action "implicates dozens of places of performance across the nation" and so under Section 1646, the "only unifying contractual 'place of performance' common to the class members is California, where Tribal First brokered the policies." Dkt. No. 72 ("Opp.") at 8–9.  It also relies on the governmental interest analysis, but because this dispute only concerns contract interpretation, only Section 1646 is applicable.  *See Glob. Commodities Trading Grp.*, 972 F.3d at 1111.

Defendants assert that no class has yet been certified and therefore only the allegations that Menominee pleaded as to itself are relevant.  *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (holding that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").  I agree with Defendants and

United States District Court
Northern District of California

1  conclude that the Policy indicates that the place of performance is Wisconsin.  *See* CAL. CIV. CODE

2  § 1646.  Menominee and its insured properties are located in Wisconsin.  FAC ¶¶ 26–28; Dkt. No.

3  58-1 ("FAC, Ex. 1") at 3.  Accordingly, Wisconsin law applies to this dispute.

4      In Wisconsin, the interpretation of an insurance policy is a question of law.  *Casey v.*

5  *Smith*, 353 Wis. 2d 354, 365 (2014).  Wisconsin courts have a "well-established methodology for

6  determining insurance coverage," where a court first looks to the policy's initial grant of coverage.

7  *Id.*  "Second, if there is an initial grant of coverage, the court will examine whether any exclusions

8  withdraw coverage from a claim.  Third, if an exclusion applies, the court will then consider

9  whether there are any exceptions to the exclusion that reinstate coverage."  *Id.* (citations omitted).

10  Under Wisconsin law, courts interpret insurance policy language according to its "plain and

11  ordinary meaning, as understood by a reasonable person in the position of the insured."  *Id.*

12  "Ambiguities are construed against the insurer" and "policies should be construed to avoid absurd

13  or unreasonable results."  *Id.*

14  **II.**     **THE MEANING OF "DIRECT PHYSICAL LOSS OR DAMAGE" UNDER WISCONSIN LAW**

15      The threshold question is what constitutes "direct physical loss or damage" under

16  Wisconsin law.  Because the terms are undefined in the Policy, I must look to their common and

17  ordinary meaning.  *See Casey*, 353 Wis. 2d at 365.  Defendants argue that the plain and ordinary

18  meaning of "direct physical loss or damage" requires tangible, not intangible change to the

19  physical characteristics of the property.  Mot. at 8–9.  But Defendants conflate the term "direct

20  physical loss" with "direct physical damage."

21      Under Wisconsin law, the Seventh Circuit concluded that the term "direct" is meant to

22  "exclude situations in which an intervening force plays some role in the damage" and the term

23  "physical damage" "generally refers to tangible as opposed to intangible damage."  *See Windridge*

24  *of Naperville Condo. Ass'n v. Phila. Indem. Ins. Co.*, 932 F.3d 1035, 1040 (7th Cir. 2019); *see*

25  *also Advance Cable Co., LLC v. Cincinnati Insurance Co.*, 788 F.3d 743, 746 (7th Cir. 2015)

26  (concluding that hail denting a roof constituted "direct physical loss" where "loss" was defined as

27  "accidental loss or damage" in the policy).  These Seventh Circuit cases do not explain the

28

distinction between "physical loss" and "physical damage" because in both *Windridge* and *Advance Cable*, the term "loss" in "direct physical loss" was defined in the policy as "accidental loss or damage."  *See Windridge*, 932 F.3d at 1039; *Advance Cable*, 788 F.3d at 747.  Although the Seventh Circuit has concluded that "physical damage" under Wisconsin law "generally refers to tangible as opposed to intangible damage" such as an "alteration in appearance," *Windridge*, 932 F.3d at 1040 n.4, it has not determined the meaning of "physical loss."

The Wisconsin Supreme Court and court of appeals have briefly addressed the plain and ordinary meaning of "direct physical loss" in insurance policies.  In *RTE Corp. v. Maryland Cas. Co.*, 74 Wis. 2d 614, 624 (1976), the Wisconsin Supreme Court found that the "dictionary definition of the word loss is 'the state or fact of being destroyed or placed beyond recovery."  A Wisconsin court of appeals relied on *RTE Corp.* to hold that, "The common and ordinary meaning of the word 'physical' is 'of or related to natural or material things as opposed to things mental, moral, spiritual, or imaginary,' while the common and ordinary meaning of the word 'loss' is 'the state or fact of being destroyed or placed beyond recovery.'"  *3303-05 Marina Rd., LLC v. W. Bend Mut. Ins. Co.*, 791 N.W.2d 404 at *4 (Wis. Ct. App. Sept. 8, 2010) (citations omitted) (holding that, "by including the word 'physical' before 'loss of … Covered Property' the parties intended that the Policies cover material or tangible destruction of the Property, not financial detriment resulting from a hasty investment.").

With that background, the question becomes how courts have interpreted "direct physical loss" in the context of COVID-19 insurance cases.  In the past year there have been a handful of COVID-19 insurance cases discussing the meaning of "direct physical loss" under Wisconsin law.  They are not consistent.  These cases range from holding that "direct physical loss" requires physical damage to it does not require physical damage and that even "loss of use" alone can constitute "direct physical loss."

On one end of the spectrum is the most recent opinion on this issue, a Wisconsin district court decision, which found that "direct physical loss" does not encompass "loss of use" due to pandemic-related closure orders.  *See Biltrite Furniture, Inc. v. Ohio Sec. Ins. Co.*, 2021 WL

3056191, at *4 (E.D. Wis. July 20, 2021).[3]   Instead, the court held that "direct physical loss" "unambiguously requires some form of actual, physical damage to the insured premises to trigger coverage," based on its "common and ordinary meaning."  *Id.*  To reach this conclusion, the court relied on cases that applied Illinois or New York law, not Wisconsin law.  *See id.*

The court referenced only one case that applied Wisconsin law, *Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 607 N.W.2d 276, 284 (Wis. 2000), to hold that the plaintiff's "argument that its loss of use and functionality are 'physical losses' . . . is unsupported by Wisconsin law." *Id.* at *5.  But the *Wisconsin Label* court did not discuss the meaning of "direct physical loss." Rather, the court discussed how there was no physical damage to items that were accidentally mislabeled.  *Wis. Label Corp.*, 607 N.W.2d at 331–32.  The *Biltrite* court relied on *Wisconsin Label* to find that there was no "physical damage to the store or items therein by virtue of the COVID-19 pandemic or the attendant closure orders."  *Biltrite*, 2021 WL 3056191, at *5.  It concluded that it would follow in the footsteps of "many courts" and hold that "a complaint which only alleges loss of use of the insured property fails to satisfy the requirement for physical damage or loss."  *Id.* According to the *Biltrite* court, "'direct physical loss' encompasses theft, misplacement, or total destruction of property, while 'damage' addresses specifically harmed components, or other 'lesser' injuries."[4]  *Id.* at *4.

At the center of the spectrum is a Wisconsin state court case, which concluded that "direct physical loss" does not require physical damage and although "loss of use" alone is not enough, loss of use due to a physical event can constitute "direct physical loss."  *See* Dkt. No. 62-1 (*Al Johnson's Swedish Rest. & Butik, Inc. v. Society Ins. Mut. Co.*, No. 20-CV-52, Hr'g Tr. (Wis. Cir. Ct. Dec. 4, 2020)).  In *Al Johnson's*, the plaintiffs had sought insurance coverage after government orders shut down its businesses.  *Id.*  Unlike Menominee, they did not allege that COVID-19 was present on the premises.  The *Al Johnson's* court turned to Wisconsin precedent to determine what

---

[3] On August 20, 2021, Defendants filed a motion to submit the *Biltrite* case as additional authority. Dkt. No. 108.  I was aware of and analyzed the case before the motion was filed.  The motion is GRANTED.

[4] This is consistent with the Wisconsin Supreme Court's discussion in *RTE Corp. v. Maryland Cas. Co.*, 74 Wis. 2d 614 (1976) although the *Biltrite* court does not reference the case.

"physical loss" meant in the context of COVID-19.  *Id.* at 4–5; *see e.g.*, *Manpower Inc. v. Ins. Co. of the State of Pennsylvania*, 2009 WL 3738099, at *1 (E.D. Wis. Nov. 3, 2009) (concluding that "direct physical loss" did not require that the property be physically damaged); *Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 233 Wis. 2d 314, 331–32 (2000) (equating "common and ordinary meaning" of "physical injury" with "physical damage" and finding "[n]o physical damage" where a product was only mislabeled); *3303-05 Marina Rd., LLC v. W. Bend Mut. Ins. Co.*, 2010 WL 3489391, at *4 (Wis. Ct. App. Sept. 8, 2010) ("the common and ordinary meaning of the word 'loss' is 'the state or fact of being destroyed or placed beyond recovery.'").

The court concluded that "physical loss" does not "require[] a structural alteration," it does not "have to be permanent," and it does not require "physical damage to property." *Id.* at 4–5. But "physical loss" does require some sort of physical event causing the loss. *Id.* at 5–7. To reach this conclusion, the court relied on *Manpower*, a Wisconsin district court case where a tenant had sought coverage for its property when portions of its building collapsed even though the tenant's office space had not been affected. *Manpower*, 2009 WL 3738099, at *1. The *Manpower* court reviewed the policy language, which covered all risk of "direct physical loss of or damage to" the insured property and found that "'direct physical loss' must mean something other than 'direct physical damage.'" *Id.* at *5. Otherwise, "if 'direct physical loss' required physical damage, the policy would not cover theft, since once can steal property without physically damaging it." *Id.* As a result, the court rejected the insurer's argument that "a peril must physically damage property in order to cause a covered loss" and found that because a physical event—the collapse—created a physical barrier between the insured and its property, the loss was "physical" even though the insured's own property remained unchanged. *Id.* at *5–*6.

Under this framework, the *Al Johnson's* court concluded that there was no "physical loss" because plaintiffs had only alleged dispossession from government orders; unlike in *Manpower*, there was no "physical event" that had caused the loss. *Al Johnson's*, Hr'g Tr. at 7–8. Although *Al Johnson's* acknowledged that dispossession was part of the loss, that did not mean it was a "physical loss, or a loss occasioned by a direct physical loss." *Id.* The court distinguished two Missouri cases that held the presence of COVID-19 constituted "physical loss" because the *Al*

11

*Johnson's* plaintiffs had not alleged that COVID-19 was actually present on its premises.  *Id.* at 9, 11–12 (distinguishing *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F.Supp.3d 867(W.D. Mo. Sept. 21, 2020) and *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794 (W.D. Mo. Aug. 12, 2020)).  The court commented that it would not make an advisory ruling on whether the plaintiffs could have alleged "physical loss" had the plaintiffs alleged that COVID-19 was present on the premises.  *Id.* at 10, 12.

In another Wisconsin state court case where the plaintiffs did allege that the presence of COVID-19 on their premises created the physical loss, the court did not directly address whether COVID-19 can constitute "physical loss."  Dkt. No. 72-3 (*Colectivo Coffee Roasters, Inc. v. Society Ins.*, No. 20-CV-002597 (Wis. Cir. Ct. Jan. 29, 2021)).  Instead, the court found that the term "direct physical loss" was ambiguous because it was not so "clear that direct physical loss actually requires damage to the covered property" and therefore construed the term against the insurer and denied the insurer's motions to dismiss.  *Id.* at 38 (commenting that "direct physical loss must be something other than damage or the use of the word damage in that policy language would be surplus language, and one does not construe contract language so as to allow any of the material language to be surplus language.").

Finally, on the other end of the spectrum is a multi-district litigation involving a case under Wisconsin law, where an Illinois district court denied a motion for summary judgment and held that plaintiffs could plead "loss of use" alone and "did not need to "show a change to the property's physical characteristics" to plead "direct physical loss."  *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 2021 WL 679109, at *8–*9 (N.D. Ill. Feb. 22, 2021), *motion to certify appeal denied*, 2021 WL 2433666 (N.D. Ill. June 15, 2021).  Plaintiffs from Wisconsin, Minnesota, and Tennessee had alleged that "the losses to their businesses occurred as a direct result of the actual presence of the coronavirus itself on the premises" as well as government shut down orders.  *Id.* at *1.  The court held that "the disjunctive 'or' in [direct physical loss or damage] means that 'physical loss' must cover something different from 'physical damage.'"  *Id.* at *8.  Without relying on any Wisconsin case addressing the definition of "direct physical loss," the court concluded that a reasonable jury could find that plaintiffs had suffered "physical loss" because "the

pandemic-caused shutdown orders do impose a physical limit:  the restaurants are limited from using much of their physical space." *Id.* at *9.  To mitigate the inability of using all of the space, the restaurant had to expand the physical space and therefore the loss was a tangible or "physical" loss as opposed to an intangible one (e.g., government orders imposing a financial limit by capping the number of sales each restaurant could make).  *Id.*

*In re Society* is an outlier because it contradicts the other Wisconsin cases, which all held that loss of use alone is not enough to constitute direct physical loss.  *See, e.g.*, *Biltrite*, 2021 WL 3056191, at *4–*5 ("direct physical loss" encompasses theft, misplacement, or total destruction of property); *RTE Corp.*, 74 Wis. 2d at 624 ("loss is 'the state or fact of being destroyed or placed beyond recovery.").  At the very least there needs to be a physical event that caused the loss of use. *See, e.g.*, *Manpower*, 2009 WL 3738099, at *5–*6 ("physical loss" can be loss of use caused by a physical event); *Al Johnson's*, Hr'g Tr. at 4–7 (same); *Colectivo*, No. 20-CV-002597 at 38 (relying on *Al Johnson's* to acknowledge that there was no physical event that created a physical barrier between the insured and its property).  It is not apparent that the *In re Society* court relied on any Wisconsin law in holding that loss of use alone can constitute direct physical loss.  Accordingly, I will not consider *In re Society*'s definition of "direct physical loss."

In sum, a majority of these Wisconsin cases concluded that "direct physical loss" does not require physical damage and that loss of use caused by a physical event can constitute "direct physical loss."[5]  *See, e.g.*, *Manpower*, 2009 WL 3738099, at *5–*6 ("physical loss" does not require physical damage); *Al Johnson's*, Hr'g Tr. at 4–7 ("physical loss" does not require a structural alteration, permanency, or physical damage to property); *Colectivo*, No. 20-CV-002597 at 38.  But the most recent Wisconsin case reached the opposite conclusion and held that "direct physical loss"

_____

[5] Contrary to Defendants' argument that Wisconsin law comports with California law, the definition of "direct physical loss" can be different.  Under California law, "direct physical loss" requires a "distinct, demonstrable, physical alteration of the property," a "physical change in the condition of the property," or "permanent dispossession of something."  *See MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 771, 779–80 (2010) (internal quotation marks and citations omitted); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 487 F. Supp. 3d 834, 839 (N.D. Cal. 2020).

requires physical damage. *See Biltrite*, 2021 WL 3056191, at *4–*5 ("physical loss" requires some form of physical damage and encompasses theft, misplacement, or total destruction of property). The *Biltrite* court did not, however, discuss whether "physical loss" can encompass loss of use caused by a physical event. To avoid any confusion, I will address whether coverage applies in this case under both frameworks.

## III.   WHETHER MENOMINEE CAN STATE A PLAUSIBLE CLAIM OF RELIEF UNDER THE POLICY'S COVERAGE PROVISIONS

### A.   Business Interruption and Extra Expense Coverage

The parties disagree whether Menominee can plausibly state a claim for relief under the Business Interruption and Extra Expense provisions, which require allegations of "loss resulting directly from interruption of business, services or rental value caused by direct physical loss or damage" to the insured property that can be "repaired, built or replaced." FAC, Ex. 1 at 19, 23. Menominee contends that it is entitled to coverage because the presence of COVID-19 on its properties interrupted its businesses. The parties dispute whether Menominee adequately pleaded the presence of COVID-19 on its premises and whether the presence of COVID-19 can constitute "direct physical loss or damage."

### 1.   Whether Menominee Plausibly Pleaded the Presence of COVID-19 on Insured Property

Defendants assert that Menominee does not plausibly assert coverage under a policy provision, in part because Menominee fails to plead that there was an actual exposure of COVID-19 on its properties during the policy period. To argue that the FAC is sufficient, Menominee relies on a Missouri decision, *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 797–98 (W.D. Mo. Aug. 12, 2020). The *Studio 417* court held that the plaintiffs plausibly alleged that they were entitled to coverage because the plaintiffs pleaded that "the presence of COVID-19 and the Closure Orders caused a direct physical loss or direct physical damage to their premises 'by denying use of and damaging the covered property, and by causing a necessary suspension of operations during a period of restoration.'" *Id.* at 798. The *Studio 417* plaintiffs alleged that COVID-19 was present on their insured properties because it "is a physical substance" that "lives on and is active on inert physical surfaces and is also emitted into the air." *Id.* at 800

14

(quotation marks omitted).

Menominee argues that the FAC is sufficient because it pleaded similar facts as those alleged in *Studio 417*.  Opp. at 13–14.  Specifically, Menominee alleged that the "prolonged prevalence of COVID-19 in the areas encompassing Plaintiff's property made it unavoidable that individuals with COVID-19 or otherwise carrying the coronavirus, including employees, visitors, patrons, and guests would be physically present at Plaintiff's property on various dates since the earliest days of the pandemic."  FAC ¶ 139.  Menominee pleaded that "during the period of the Policy, individuals with COVID-19 or otherwise carrying the coronavirus entered Plaintiffs' properties, including MCR, Thunderbird, and the Tribal Clinic."  *Id.*  And in 2020, "hundreds of cases of COVID-19 were reported on the Menominee reservation," the number of cases in September exceeded 120 cases, and "[a]t least 42 employees tested positive."  *Id.*

Defendants contend that Menominee's claims fail to sufficiently allege that "an actual exposure occurred at an insured property."  Dkt. No. 77 ("Reply") at 4; *see Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.*, No. 20-CV-03750-WHO, 2021 WL 775397, at *1 (N.D. Cal. Feb. 1, 2021) ("*Water Sports Kauai II*") (dismissing plaintiff's claims because plaintiff failed to allege that COVID-19 was present at a specific store that caused plaintiff some specific loss).  A likelihood that COVID-19 was present on the property is not enough to allege "presence of COVID-19."  *See, e.g.*, *Water Sports Kauai II*, 2021 WL 775397, at *1 (dismissing allegations because "plaintiff pleaded only additional facts showing that the coronavirus was 'likely' in the environment surrounding at least three specific [] stores.")

Here, Menominee pleaded that COVID-19 was actually present on Menominee's businesses.  Although the FAC does not plead that any of the 42 employees who allegedly tested positive entered insured property while contagious, the FAC does allege that "during the period of the Policy, individuals with COVID-19 or otherwise carrying the coronavirus entered Plaintiffs' properties, including MCR, Thunderbird, and the Tribal Clinic."  FAC ¶ 139.  Accordingly, Menominee plausibly alleged that there was an actual exposure of COVID-19 at its businesses.

2.       **Whether the Presence of COVID-19 on Insured Property Constitutes "Direct Physical Loss or Damage"**

The more important question is whether the presence of COVID-19 constitutes "direct physical loss or damage" under Wisconsin law.[6]  Defendants contend that the presence of COVID-19 cannot constitute "direct physical loss or damage" because COVID-19 harms people, not property.  Opp. at 15.  In support, Defendants point to the Period of Restoration limitation to the Business Interruption and Extra Expense coverage, which allows coverage only until the damaged property at issue is "repaired, rebuilt or replaced."  Mot. at 10; *see* Policy at 19, 23. Because COVID-19 "can be eliminated from property through simple cleaning and disinfecting" the "presence of COVID-19 on property does not necessitate physical repair of that property" and so "it strains reason to view a virus as injuring property."  Mot. at 14.

Menominee argues that COVID-19 cannot be eliminated by simple cleaning and disinfecting.  Opp. at 17.  It pleaded that "[m]erely cleaning surfaces may reduce but does not altogether eliminate the risk of transmission" because "a space may remain contaminated if an aerosol is present, and immediately become contaminated thereafter if another infected person is present in the area."  FAC ¶ 92.  But Defendants do not argue that cleaning eliminates the risk of transmission or prevents the premises from being affected by COVID-19 again.  Instead, they contend that cleaning shows there is no need for the property to be repaired, rebuilt, or replaced, as required under the Policy to trigger coverage.

Numerous courts in this district and across the nation have considered this question and held that COVID-19 cannot constitute "direct physical loss or damage" because COVID-19 cannot

---

[6] Menominee incorrectly argues that in *Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.*, 499 F. Supp. 3d 670 (N.D. Cal. 2020) ("*Water Sports Kauai I*"), I held that if there is sufficient evidence that COVID-19 was present at the property and there was an imminent threat from COVID-19's presence, there is "direct physical loss or damage" to the property.  *See* Opp. at 11.  I only held that if this broader test applied, the plaintiff's allegations did not trigger coverage because it did not plausibly allege that an actual exposure of COVID-19 caused them to close a particular store or set of stores.  *Id.* at 675.  I expressly left open the question of whether the presence of COVID-19 can constitute "direct physical loss or damage" because "coronavirus does not physically impact the stores, can be readily cleaned up, and affects people not properties." *Water Sports Kauai II*, 2021 WL 775397, at *2 n.3.

"damage" property when it can easily be cleaned from surfaces.[7]  Opp. at 15–16.  To be sure, all of the cases from this district on which Defendants rely apply California law.  But California law interprets "direct physical loss" similarly to the *Biltrite* court; it requires a "distinct, demonstrable, physical alteration of the property" or a "physical change in the condition of the property." *Barbizon Sch. of San Francisco, Inc. v. Sentinel Ins. Co. LTD.*, No. 20-CV-08578-TSH, 2021 WL 1222161, at *7 (N.D. Cal. Mar. 31, 2021).  Likewise, the other cases nationwide, which also conclude that COVID-19 cannot constitute "direct physical loss" in part because the coronavirus can be easily eliminated by cleaning, are decided under state laws that interpret "direct physical loss" to require some physical damage to the property.[8]  *See* Mot. at 15 n.5.  Menominee asserts

---

[7] *See, e.g.*, *Barbizon Sch. of San Francisco, Inc. v. Sentinel Ins. Co. LTD.*, No. 20-CV-08578-TSH, 2021 WL 1222161, at *9 (N.D. Cal. Mar. 31, 2021) (concluding that there was no plausible allegation of "direct physical loss or damage" in part because "the virus fails to cause physical alteration of property" and it "'can be disinfected and cleaned' from surfaces") (collecting cases); *Baker v. Oregon Mut. Ins. Co.*, No. 20-CV-05467-LB, 2021 WL 1145882, at *3 (N.D. Cal. Mar. 25, 2021) (holding that it was implausible that "'hazardous human respiratory droplets [ ] posed an immediate danger to any person(s) physically present on the premises' and that it was 'impracticable to operate [the] business without immediately exposing the insured premises to' the hazardous droplets") (collecting cases); *Out W. Rest. Grp. Inc. v. Affiliated FM Ins. Co.*, No. 20-CV-06786-TSH, 2021 WL 1056627, at *3 (N.D. Cal. Mar. 19, 2021) (rejecting argument that "[t]he presence of COVID-19 constitutes the requisite 'damage' to trigger coverage") (collecting cases); *Protege Rest. Partners LLC v. Sentinel Ins. Co., Ltd.*, No. 20-CV-03674-BLF, 2021 WL 428653, at *4 (N.D. Cal. Feb. 8, 2021) (concluding that "a high risk that COVID-19 particles were present on . . . property" does not constitute physical damage and that even a "specific instance of COVID-19 particles inside of [a] business" would still "not qualify as a 'physical change' to the property"); *Kevin Barry Fine Art Assocs. v. Sentinel Ins. Co., Ltd.*, No. 20-CV-04783-SK, 2021 WL 141180, at *6 (N.D. Cal. Jan. 13, 2021) (concluding that "[e]ven if [the insured] had included allegations regarding the virus being present on and damaging the property, they would not be plausible. . . . The virus COVID-19 harms people, not property.") (collecting cases).

[8] *See Am. Food Sys., Inc. v. Fireman's Fund Ins. Co.*, 2021 WL 1131640, at *4 (D. Mass. Mar. 24, 2021) (under Massachusetts law, "direct physical loss or damage" "could not 'be construed to cover physical loss in the absence of some physical damage to the insured's property'"); *Bachman's Inc. v. Florists' Mut. Ins. Co.*, 2021 WL 981246, at *4 (D. Minn. Mar. 16, 2021) (under Minnesota law, direct physical loss of property "requires a showing that the insured property is injured in some way"); *Skillets, LLC v. Colony Ins. Co.*, 2021 WL 926211, at *7 (E.D. Va. Mar. 10, 2021) (acknowledging that the Eleventh Circuit defined "direct physical loss" as actual damage and representing the "diminution of value of something" when applying Florida law); *B St. Grill & Bar LLC v. Cincinnati Ins. Co.*, 2021 WL 857361, at *5 (D. Ariz. Mar. 8, 2021) (under Arizona law, "direct physical loss" requires "actual physical damage" to the covered premises); *Food for Thought Caterers Corp. v. Sentinel Ins. Co., Ltd.*, 2021 WL 860345, at *5 (S.D.N.Y. Mar. 6, 2021) (under New York law, "direct physical loss of or physical damage to property" was "limited to losses involving physical damage to the insured's property" and did not

that COVID-19 physically alters and damages property because "[w]hen the coronavirus and COVID-19 attach to and adhere on surfaces and materials, they become part of those surfaces and materials, converting the surfaces and materials to fomites" and "[t]his represents a physical change in the affected surface or material."  FAC ¶ 91; Opp. at 16–17.  This is unpersuasive, especially in light of the numerous cases across the nation holding otherwise.  Under the *Biltrite* court's interpretation of "direct physical loss," which requires physical damage, the presence of COVID-19 would not trigger coverage.

Under the line of Wisconsin cases that do not require physical damage for "direct physical loss," Menominee's allegations also fail because it did not plead a "causal physical event" for the loss.[9]  *See Al Johnson's*, Hr'g Tr. at 15–16 (holding that the period of restoration requirement—that the property be "repaired, rebuilt or replaced"—meant that "loss of use without more does not constitute direct physical loss or damage.").  In *Manpower*, the court found that the loss was "physical" because "it was caused by a physical event—the collapse [of the building]—which created a physical barrier between the insured and its property.  It was not an 'intangible' or 'incorporeal' loss."  *Manpower*, 2009 WL 3738099, at *6.  In this case, the presence of a virus, which can be eliminated through cleaning and disinfecting, would not constitute a "physical event" that caused the loss.  *See Casey*, 353 Wis. 2d at 365 ("policies should be construed to avoid absurd or unreasonable results.").

_____

include "loss of use" of the insured premises); *Circus LV, LP v. AIG Specialty Ins. Co.*, 2021 WL 769660, at *4 (D. Nev. Feb. 26, 2021) (noting that the Nevada Supreme Court has "generally cabined claims for coverage under similar policies to plaintiffs who allege some sort of structural or physical change to a property, which actually altered its functionality or use" when interpreting the term "direct physical loss or damage"); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 2021 WL 972878, at *8 (W.D. Tex. Jan. 21, 2021) (acknowledging that other courts under Texas law found that "physical loss" requires a "distinct, demonstrable, physical alteration of the property"); *KD Unlimited*, 2021 WL 81660, at *5 (N.D. Ga. Jan. 5, 2021) (acknowledging that the Eleventh Circuit has explained that "direct physical loss" requires "that the damage be actual").

[9] The only Wisconsin law case that addresses whether the presence of COVID-19 constitutes "direct physical loss or damage" is *In re Society*, 2021 WL 679109.  But as established above, the court's conclusion that loss of use can constitute "direct physical loss" contradicts the other Wisconsin cases that conclude that loss of use, even loss of use of a physical space, is not enough to assert "direct physical loss" under Wisconsin law.

Menominee asserts that the presence of COVID-19 not only required increased cleaning and sanitizing but also "required the installation of physical barriers" at "MCR, Thunderbird, and the Clinic" and that "[s]ignificant repair and remediation was required before use of the properties could be permitted without risking further physical damage to property."  Opp. at 17–18; FAC ¶¶ 14–16.  The *In re Society* court addressed a similar "period of restoration" limitation and found that "there is nothing inherent in the meanings of ['repaired' and 'replaced'] that would be inconsistent with characterizing the Plaintiffs' loss of their space due to the shutdown orders as a physical loss."  *In re Soc'y*, 2021 WL 679109, at *9.  The court explained that,

> "For example, the coronavirus risk could be minimized by the installation of partitions and a particular ventilation system, then the restaurants would be expected to 'repair' the space by installing those safety features. As another example, if a restaurant could mitigate the loss caused by a percentage-capacity limit by 'replacing' some of its dining-room space by opening its adjacent banquet-hall room to increase the number of guests it could serve, then the restaurant would be expected to 'replace' the loss of space by doing so."

*Id.*

I disagree.  Installing physical barriers and increasing cleaning and sanitizing do not "repair" the property, as fixing a roof dented by hail would, for example.  *See Advance Cable*, 788 F.3d at 746.  As a Pennsylvania district court noted, "[i]n ordinary parlance, we repair what is broken" and *In re Society* contorts the Period of Restoration provision "far beyond their ordinary meaning."  *Tria WS LLC v. Am. Auto. Ins. Co.*, 2021 WL 1193370, at *7 n.5 (E.D. Pa. Mar. 30, 2021).  Menominee has "not alleged any unsatisfactory condition on the insured properties" that would be fixed through repair, replacement, or rebuild.  *See id.*  Accordingly, the presence of COVID-19 cannot constitute "direct physical loss or damage" under the Policy.

### 3.     Loss Causation

The Business Interruption and Extra Expense coverage provisions also requires that any direct physical loss or damage must "cause" an interruption in Menominee's business.  *See* Policy at 19.  Menominee fails to plausibly plead causation because neither the Closure Orders nor the coronavirus constitutes "direct physical loss or damage" that caused the business interruption.

Defendants focus on Menominee's alleged failure to plausibly plead that the actual

1    presence of COVID-19 caused any interruption.  Mot. at 16.  According to the Defendants, the

2    FAC "alleges that some unspecified number of COVID-19 carrying individuals 'entered' insured

3    properties 'during the period of the Policy,' but the FAC does not show that these individuals

4    actually caused certain premises to close or change operations."  Reply at 5; *see* FAC ¶ 139.

5    Instead, Menominee pleaded that the MCR closed on March 19, July 31, and September 16, 2020,

6    which were the same dates as the effective dates of the Closure Orders.  *See* FAC ¶¶ 120, 123,

7    125.  Defendants argue that the Closure Orders alone caused Menominee's business interruptions,

8    not the actual presence of COVID-19 on any insured property.  Mot. at 17–18.  Business

9    interruption due to Closure Orders is not sufficient to show causation from "direct physical loss."

10   *See, e.g.*, *Al Johnson's*, Hr'g Tr. at 16–17, 19 (finding no causation because "the suspension must

11   be caused by the direct physical loss" and government shut down orders, which caused the loss,

12   was not a physical loss).

13            In response, Menominee argues that it has specifically pleaded facts establishing that

14   COVID-19 directly caused their business interruptions and that it has "satisfied causation

15   requirements to establish at a minimum that COVID-19 is a proximate cause of the Menominee's

16   business interruption losses."  Opp. at 18.  Under Wisconsin law, "[i]n the context of a property

17   insurance policy, the word 'direct' indicates that the policy covers only losses and damage [that

18   are immediately or] proximately caused by a covered period—that is, it means that the policy does

19   not cover remote losses."  *Manpower*, 2009 WL 3738099, at *6.

20            Menominee asserts that the Closure Orders would not exist but for the presence of

21   COVID-19 and therefore it has sufficiently pleaded causation.  *Id.*  But as established above,

22   COVID-19 alone cannot constitute a "direct physical loss."  The cases on which Menominee relies

23   are distinguishable because they concern a distinct policy provision or hold that the coronavirus

24   can trigger coverage under the business interruption provision.  *See, e.g.*, *Boxed Foods Co., LLC v.*

25   *California Cap. Ins. Co.*, 497 F. Supp. 3d 516, 522 (N.D. Cal. 2020), as amended (Oct. 27, 2020)

26   (holding that COVID-19 is an efficient proximate cause of the loss and so the virus exclusion

27   provision applies under California law); *In re Soc'y*, 2021 WL 679109, at *8 (holding that because

28   the presence of COVID-19 can constitute "direct physical loss," a reasonable jury could find that

United States District Court
Northern District of California

COVID-19 proximately caused the business interruptions even if the government shutdown orders played a causal role in the loss); *see also Manpower* 2009 WL 3738099, at *6 (holding that the collapse of a building was a "direct physical loss" because the collapse was the proximate cause of the plaintiff's loss of its interest in its property). Menominee has not alleged and cannot plausibly allege that "direct physical loss or damage" caused the interruption and therefore cannot receive coverage under the Business Interruption or Extra Expense provisions.

### B. Interruption by Civil Authority Coverage

Next, for the Interruption by Civil Authority coverage to apply, there must be an "actual loss" sustained by Menominee, "when as a direct result of damage to or destruction of property by a covered peril(s) occurring at a property located within a 10 mile radius of the covered property, access to the covered property is specifically prohibited by order of a civil authority." Policy at 20. Menominee contends that the Closure Orders satisfy this provision of coverage because the "Closure Orders were issued in response to the physical presence of the coronavirus at properties in Menominee and Wisconsin, including property within a 10 mile radius of Plaintiff's properties, and the imminent threat of further physical spread of the virus and resulting danger to individuals." FAC ¶ 144; Opp. at 19–21. Menominee also argues that COVID-19 caused damage to property located within a 10 mile radius of the insured property in the same manner that it caused direct physical loss or damage to the insured property and the Closure Orders "prohibited access within a ten-mile radius area that included covered property." FAC ¶ 201.

Defendants argue that these allegations are generic and conclusory. Mot. at 21; *see* FAC ¶¶ 101–34. I agree. Menominee does not allege that (1) a property within 10 miles of its insured property was physically damaged or destroyed or (2) that property damage at an insured property resulted in the Closure Orders, as required by the provision. Mot. at 21–22. As established above, the presence of COVID-19 cannot constitute "damage to property" and so even if Menominee alleged that the Closure Orders were issued "in response to the physical presence of the coronavirus" its claims would fail. *See* FAC ¶ 144. Moreover, Menominee claims that the Closure Orders were issued "to mitigate the spread of COVID-19"; they were not issued due to damage to one of Menominee's insured properties. *See* FAC ¶¶ 105, 108, 131; *see Adelman*

*Laundry & Cleaners, Inc. v. Factory Ins. Ass'n*, 59 Wis. 2d 145, 146–48 (1973) (per curiam) (concluding under Wisconsin law that coverage under a similar provision did not apply where the insured premises were restricted by a curfew related to civil disturbances and not due to damage to or destruction of the business property).  It cannot plausibly allege the requisite facts to trigger coverage under the Interruption by Civil Authority provision on the basis that COVID-19 was present at the properties.

### C.    Ingress/Egress Coverage

Similar to the Civil Authority provision, coverage under the Ingress/Egress provision requires (1) "actual loss sustained" as a "direct result of physical loss or damage caused by a covered peril(s) specified by this Policy and occurring at property located within a 10 mile radius of covered property"; and (2) that "ingress and egress from the covered property . . . is prevented." Policy at 66.  Menominee reiterates its arguments in support of finding coverage under the Civil Authority provision and asserts that direct physical loss or damage to nearby property prevented access to the Menominee's property.  Opp. at 21.

The presence of COVID-19 cannot constitute physical loss or damage and Menominee's allegations that it did not have access to its insured property are implausible.  Menominee pleaded that "[d]ue to physical damage caused by the presence of the coronavirus, . . . Plaintiffs were unable to permit their customers to access their interior spaces," FAC ¶ 16, and "the actual and potential physical presence of the virus on the property prevented patrons from accessing the internal restaurant seating area."  FAC ¶ 146.  But Menominee's insured property was still accessible; in fact, Menominee admits that its gift shop, convenience store, gas station, clinic, and restaurant remained open.  FAC ¶¶ 123, 125–29, 146.  Therefore, employees had physical access to Menominee's businesses even if patrons were "prohibited" from entering.  *Id.*  Menominee cannot state a plausible claim for Ingress/Egress coverage.  *See, e.g.*, *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 2020 WL 7078735, at *10 (D. Kan. Dec. 3, 2020) ("[T]he Complaint admits that the premises [were] accessible despite the Stay at Home Orders.  Therefore, assuming as true the facts alleged in the Complaint, COVID-19 did not prevent ingress or egress from Plaintiff's property.").

### D. Contingent Time Element Coverage

The Contingent Time Element coverage requires "loss directly resulting from physical damage to property . . . at direct supplier or direct customer locations that prevents a supplier of goods and/or services to [Menominee] from supplying such goods and/or services, or that prevents a recipient of goods and/or services from [Menominee] from accepting such goods and/or services." Policy at 20. Menominee asserts that it has alleged that "area hotels, restaurants, and other businesses that facilitated travel by customers to MCR and Thunderbird experienced exposure to and physical damage from the coronavirus." FAC ¶ 149; Opp. at 21. In particular, Menominee points to one business, the "War Bonnet Bar & Grill," which was "forced to close for everything but curbside carry-out orders." FAC ¶ 149. But the presence of COVID-19 cannot cause physical damage and Menominee does not "allege that the restaurant was in fact exposed to COVID-19 or suffered physical damage that actually prevented it from 'supplying Plaintiffs with customers.'" Opp. at 24. Further, the fact that the War Bonnet Bar & Grill was open for curbside carry out orders undermines its argument that the business was inoperable. *Id.* Menominee has not alleged and cannot allege a plausible claim to trigger Contingent Time Element coverage.

### E. Tax Revenue Interruption Coverage

The Tax Revenue Interruption coverage requires "loss resulting directly from necessary interruption of sales, property or other tax revenue . . . caused by damage, or destruction . . . to property which is not operated by [Menominee] and which wholly or partially prevents the generation of revenue for [Menominee]." Policy at 21. Menominee asserts that it pleaded "property damage across its holdings and on its reservation that affected its tax revenues" but these allegations are once again conclusory. *See* FAC ¶¶ 66, 76, 218 (alleging for example, that "COVID-19 caused damage to contributing property in the same manner that it did with Plaintiffs' covered property, as described herein, resulting in interruption of Tribal Incremental Municipal Services Payments, sales tax, property tax, and other tax revenue."). Because COVID-19 cannot cause damage to contributing property as it cannot for insured property, Menominee's claim under the Tax Revenue Interruption provision is likewise implausible.

**F.     Protection and Preservation of Property Coverage**

Finally, coverage under the Protection and Preservation of Property provision applies to "expenses incurred by [Menominee] in taking reasonable and necessary actions for the temporary protection and preservation of property insured" when there is "actual or imminent physical loss or damage." Policy at 13. Menominee alleged that the "installation of physical barriers and increased cleaning and sanitizing" were done to remediate property and avoid imminent threat of future property damage or loss. FAC ¶ 147; Opp. at 22–23. As Defendants assert, such an allegation is implausible because these "actions protected *people* from COVID-19 transmission, not *property* from physical damage." Mot. at 25 (emphasis in original). Menominee also does not have a plausible claim for coverage under the Protection and Preservation of Property provision.

In sum, because the presence of COVID-19 cannot constitute "direct physical loss or damage" under Wisconsin law, any amendment to Menominee's claims would be futile. Accordingly, all of the Defendants' motions related to Lexington's motion to dismiss the FAC are GRANTED with prejudice. *See Lopez*, 203 F.3d at 1127 (holding that a court does not have to grant leave to amend when "it determines that the pleading could not possibly be cured by the allegation of other facts.").

## CONCLUSION

For the reasons above, Defendants' motions to dismiss Menominee's FAC are GRANTED with prejudice. Judgment shall be entered in accordance with this Order.

**IT IS SO ORDERED.**

Dated:  August 23, 2021

William H. Orrick
United States District Judge

United States District Court
Northern District of California